No. 15-1867

# United States Court of Appeals
# for the Federal Circuit

MOTION GAMES, LLC,
*Appellant,*

v.

NINTENDO OF AMERICA INC.,
*Appellee.*

*Appeal from the Patent Trial and Appeal Board, United States Patent and Trademark Office in Case IPR 2014-00164*

## BRIEF FOR APPELLANT
## MOTION GAMES, LLC

D. Michael Underhill
munderhill@bsfllp.com
Richard S. Meyer
rmeyer@bsfllp.com
Boies, Schiller & Flexner LLP
5301 Wisconsin Avenue, N.W.
Suite 800
Washington, DC  20015
Telephone:  (202) 237-2727
Facsimile:  (202) 237-6131

Joshua M. Kalb
jkalb@hunton.com
Hunton & Williams LLP
Bank of America Plaza, Suite 4100
600 Peachtree Street, NE
Atlanta, GA 30308
Telephone:  (404) 888-4000
Facsimile:  (404) 888-4190

*Attorneys for Appellant Motion Games, LLC*

# <u>CERTIFICATE OF INTEREST</u>

Counsel for *Appellant Motion Games, LLC* certifies the following:

1.      The full name of every party or amicus represented by me is:

Motion Games, LLC

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Law firm: Hunton & Williams LLP
Partners: Michael A. O'Shea
Counsel: Leonard C. Suchyta
Associates: Joshua Kalb, Jeff B. Vockrodt

Law firm:  Boies, Schiller & Flexner LLP
Partners:  D. Michael Underhill, Richard S. Meyer
Associate:  Patrick M. Lafferty

Law firm: Love Law Firm PC
Partner: Gregory P. Love

Dated:  October 16, 2015          */s/ D. Michael Underhill*
                                                    D. Michael Underhill

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ............................................................1

STATEMENT OF JURISDICTION..............................................................1

STATEMENT OF THE ISSUES..................................................................2

STATEMENT OF THE CASE.....................................................................2

I.   Introduction...................................................................................2

II.  The '607 Patent.............................................................................6

    A.   Prior Art "Correlated" Computer Vision Systems......................6

    B.   Dr. Pryor's "Uncorrelated" Computer Vision Systems............11

    C.   Creating an Uncorrelated Data Base that Stands for an Object ...................................................................................13

    D.   Prosecution History................................................................17

III. The *Inter Partes* Review Proceeding ...........................................20

SUMMARY OF ARGUMENT ..................................................................24

ARGUMENT .........................................................................................26

I.   The Relevant Law.........................................................................26

    A.   The Standard of Review..........................................................26

    B.   Prosecution History Disclaimer ..............................................27

    C.   Prosecution Disclaimer Binds the PTAB in *Inter Partes* Reviews ...................................................................................28

II.  Dr. Pryor Narrowed "Creating A Data Base Of Said Object" ......30

i

III.   The PTAB Erroneously Found No Disclaimer ...........................................36

      A.   The PTAB Ignored Compelling Evidence of Disclaimer.........37

      B.   The PTAB Failed to Consider the Prosecution History as a Whole ......................................................................................38

      C.   The PTAB Unreasonably Quibbles with the Precise Disclaimer Language ..................................................................................40

      D.   The PTAB Misinterprets Statements Regarding Data Base "Use"........................................................................................41

      E.   The '607 Patent Specification Discloses Uncorrelated Data Bases ......................................................................................42

IV.   Using Any Proper Claim Construction, Hay and Haas Do Not Disclose or Suggest Creating an Uncorrelated Data Base................................................43

      A.   Any Data Base in Hay is a Correlated Data Base Created with Reference to and Knowledge of the Object .............................44

      B.   Haas Also Fails To Disclose Creating A Data Base Of An Object ......................................................................................49

V.   The Unrebutted Objective Indicia of Non-Obviousness Supports Validity..53

CONCLUSION .................................................................................................56

# TABLE OF AUTHORITIES

**Cases**

*Advanced Fiber Techs. Trust v. J & L Fiber,*
   674 F.3d 1365 (Fed. Cir. 2012) ..........................................................32

*Alloc v. Int'l Trade Comm'n,*
   342 F.3d 1361 (Fed. Cir. 2003) ..........................................................34

*Alza Corp. v. Mylan Labs., Inc.,*
   391 F.3d 1365 (Fed. Cir. 2004) ..........................................................30

*Apple Inc. v. Virnetx Inc.,*
   IPR2014-00481, 2015 WL 5047986 (P.T.A.B. Aug. 24, 2015)..........................29

*Ballard Medical v. Allegiance Healthcare Corp.,*
   268 F. 3d 1352 (Fed. Cir. 2001) ..........................................................27

*Bayer AG v. Elan Pharm. Research Corp.,*
   212 F. 3d 1241 (Fed. Cir. 2000) .................................................... 35, 38

*Bell Atl. Network Servs. v. Covad Commc'ns Group, Inc.,*
   262 F.3d 1258 (Fed. Cir. 2001) ..........................................................34

*Biogen Idec, Inc. v. GlaxoSmithKline LLC,*
   713 F.3d 1090 (Fed. Cir. 2013) .................................................... 23, 28

*Broadcom Corp. v. Emulex Corp.,*
   732 F.3d 1325 (Fed. Cir. 2013) ..........................................................48

*Catalina Lighting, Inc. v. Lamps Plus, Inc.,*
   295 F.3d 1277 (Fed. Cir. 2002) ..........................................................55

*Chimie v. PPG Indus., Inc.,*
   402 F.3d 1371 (Fed. Cir. 2005) ..........................................................27

*Computer Docking Station Corp.v. Dell, Inc.,*
   519 F.3d 1366 (Fed. Cir. 2008) ..........................................................33

*Ecolab, Inc. v. FMC Corp.*,
   569 F.3d 1335 (Fed. Cir. 2009) ........................................................................27

*Enzo Biochem Inc. v. Applera Corp.,*
   780 F.3d 1149 (Fed. Cir. 2015) ........................................................................26

*Ford Motor Company v. Vehicle Operation Technologies*, LLC,
   IPR2014-00594 (P.T.A.B. Oct. 15, 2014) ...........................................................29

*Genentech, Inc. v. Sandoz Inc.*,
   No. C 11-01925 JSW, 2012 WL 4473303 (N.D. Cal. July 10, 2012)................28

*Gillespie v. Dywidag Systems Intern., USA,*
   501 F.3d 1285 (Fed. Cir. 2007) ........................................................................33

*Grober v. Mako Products, Inc.*,
   686 F.3d 1335 (Fed. Cir. 2012) ........................................................................28

*In re Cuozzo Speed Techs., LLC,*
   793 F.3d 1268 (Fed. Cir. 2015) ........................................................................26

*In re Gordon*,
   733 F.2d 900 (Fed. Cir. 1984)...........................................................................48

*In re Huai-Hung Kao*,
   639 F.3d 1057 (Fed. Cir. 2011) ........................................................................55

*In re Paulsen*,
   30 F.3d 1475 (Fed. Cir. 1994)...........................................................................29

*In re Ratti*,
   270 F.2d 810 (C.C.P.A. 1959) ..........................................................................48

*MBO Laboratories, Inc. v. Becton, Dickinson & Co.*,
   474 F. 3d 1323 (Fed. Cir. 2007) ........................................................................32

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
   357 F.3d 1340 (Fed. Cir.2004)...........................................................................33

*Microsoft Corp.v. Proxyconn, Inc.*,
   789 F.3d 1292 (Fed. Cir. 2015) ............................................................... 29, 30

iv

*North American Container, Inc. v. Plastipak Packaging, Inc.*,
    415 F.3d 1335 (Fed. Cir. 2005) .......................................................... 33

*Omega Engineering, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003) .......................................................... 28

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
    520 F.3d 1338 (Fed. Cir. 2008) .......................................................... 55

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) .......................................................... 27

*Rambus Inc. v. Hynix Semiconductor Inc.*,
    254 F.R.D. 597 (N.D.Cal.2008) .......................................................... 53

*Rambus Inc.v. Infineon Techs. AG*,
    318 F.3d 1081 (Fed. Cir. 2003) .......................................................... 35

*Regents of Univ. of Minnesota v. AGA Medical Corp.*,
    717 F.3d 929 (Fed. Cir. 2013) ............................................................ 31

*Rheox, Inc. v. Entact, Inc.*,
    276 F.3d 1319 (Fed. Cir. 2002) .......................................................... 31

*Saffran v. Johnson & Johnson*,
    712 F.3d 549 (Fed. Cir. 2013) ............................................................ 31

*Seachange Int'l, Inc. v. C-Cor Inc.*,
    413 F.3d 1361 (Fed. Cir. 2005) ................................................... 31, 33

*Shire Dev., LLC v. Watson Pharm., Inc.*,
    787 F.3d 1359 (Fed. Cir. 2015) .......................................................... 27

*Southwall Techs., Inc. v. Cardinal IG Co.*,
    54 F.3d 1570 (Fed. Cir. 1995) .................................................... 27, 29

*Teva Pharm. U.S.A., Inc. v. Sandoz, Inc.*,
    __ U.S. __ , 135 S. Ct. 831 (2015) .................................................... 26

*The Scotts Company LLC v. Encap, LLC*,
    IPR2013-00110 (P.T.A.B. June 24, 2014) ......................................... 29

*TomTom, Inc. v. Adolph*,
  790 F.3d 1315 (Fed. Cir. 2015) ........................................................26

*Uship Intellectual Properties, LLC v. United States*,
  714 F. 3d 1311 (Fed. Cir. 2013) .......................................................32

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
  503 F.3d 1295 (Fed. Cir. 2007) ........................................................34

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996)............................................... 27, 28, 30

*ZMI Corp. v. Cardiac Resuscitator Corp.*,
  844 F.2d 1576 (Fed. Cir. 1988) ........................................................27

## Statutes

28 U.S.C. § 1295(a)(4)(A) ....................................................................1

35 U.S.C. § 318(a) ................................................................................1

35 U.S.C. §103 ................................................................................5, 26

35 U.S.C. 103(a) ................................................................................17

## STATEMENT OF RELATED CASES

Motion Games sued multiple Nintendo companies and two retailers for patent infringement in the United States District Court for the Eastern District of Texas, on November 16, 2012. Motion Games' complaint in Case No. 12-cv-00878 asserted that the Nintendo Wii gaming system infringed U.S. Patent No. 6,167,607 and two other patents. The named inventor is Dr. Timothy Pryor, the founder and owner of Motion Games. A year after it was sued, Nintendo successfully petitioned for *inter partes* review ("IPR"). After the PTAB invalidated all challenged claims of the '607 patent, the district court stayed the lawsuit, just four months before trial was to begin.

## STATEMENT OF JURISDICTION

Pursuant to 35 U.S.C. § 318(a), the PTAB issued its final written decision ("FWD") on May 15, 2015. The FWD is a final judgment regarding the validity of all challenged claims: claims 1, 2, 15–17, 25, 26, 34, and 39–41 of the '607 patent. Motion Games timely filed a Notice of Appeal. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A).

1

## STATEMENT OF THE ISSUES

Whether the PTAB erred:

(1)    in finding that there was no prosecution history disclaimer that excludes "correlated data bases" from the scope of the term "creating a data base of said object";

(2)    in broadly construing the term "creating a data base of said object" as ". . . at a minimum, storing the sensed pattern of the first and second targets and does not preclude that the sensed pattern is stored with reference to or knowledge of the object, itself";

(3)    in finding the challenged claims to be obvious in view of the Hay and Haas prior art references; and

(4)    in disregarding the unrebutted evidence of objective indicia of non-obviousness.

## STATEMENT OF THE CASE

### I.    Introduction

Motion Games' appeal challenges the PTAB's construction of a single claim term, "creating a data base of said object," which the PTAB found was not narrowed by prosecution history disclaimer.  The determinative issue is whether Motion Games is correct that the applicant, Dr. Timothy Pryor, disclaimed creating

2

"correlated" data bases during the initial prosecution.  If this Court finds that he

did, the PTAB erred and the challenged patent claims are valid over the cited prior

art, which teaches the creation of only "correlated" data bases.

It is unlikely that this Court has reviewed a clearer prosecution history

disclaimer.  To obtain allowance of the patent, Dr. Pryor all but said "I disclaim

correlated data bases."  Specifically, he expressly distinguished the "Bales" prior

art reference on the grounds that the data base alleged to be obvious from Bales "is

not the data base which is being claimed and used in the present invention."  In the

next sentence, he explained that: "[t]he suggested data base that the Examiner

proposes would be obvious from the Bales paper is one which merely correlates

targets to the object, while in the present invention there is no such correlation

. . . ."  The applicant's statements—which characterize the "present invention" and

distinguish the claims over the prior art by what they do *not* cover—are textbook

examples of prosecution history disclaimer.  Although one can argue over the

precise language that best captures the meaning of "creating a data base," one thing

is certain:  *that construction must exclude any data base in which targets are*

*correlated to the object.*

Although Motion Games repeatedly argued in the PTAB that these

statements mandated a finding of disclaimer, Nintendo never discusses these

3

statements in any of its PTAB filings.  Even stranger, the PTAB never addresses

these statements in its FWD, let alone offers a theory for how they could be

anything other than a disclaimer.  In fact, the FWD appears to go out of its way *not*

to address the key language.  It quotes from the applicant's statements in the

prosecution history that are before and *immediately* after the key language.  But the

PTAB inexplicably excises Dr. Pryor's intervening statement that the correlated

data base in Bales "is not the data base which is being claimed and used in the

present invention."  As shown below, the PTAB alters the quote and substitutes

ellipses for Dr. Pryor's dispositive language:

> *The Bales paper does not disclose the use of discrete targets in a*
> *pattern as a data base. . . .* **[In the Action, as noted above, the**
> **Examiner has again stated that those of ordinary skill could**
> **create a data base using the sensed locations of the targets in the**
> **Bales paper.  But this is not the data base which is being claimed**
> **and used in the present invention.]**  The suggested data base that the
> Examiner proposes would be obvious from the Bales paper is one
> which merely correlates targets to the object, which in the present
> invention there is no such correlation (though it could be done for
> additional reasons, as noted in certain dependent claims, but this
> would be another, different, data base.) *Rather, it is the pattern itself*
> *which now stands for the object and which is used regardless of a*
> *correlation to the actual object, and which is neither disclosed nor*
> *made obvious by the Bales paper.*

A-0008 (italics and ellipses added by PTAB; bracketed and bolded material

removed by PTAB).

4

Although Nintendo and the PTAB ignore this language, its legal effects cannot be avoided.  Indeed, in the parallel district court proceeding, Nintendo actually argued that this language was a prosecution history disclaimer that required the court to construe "creating a data base" as storing the physical arrangement or configuration of the targets "such that there is *no correlation* of the targets to the object."  A-0933-35.  Motion Games agreed with the substance of Nintendo's proposal and offered similar language that would be more readily understood by a jury, which the court adopted.  A-2577-78.

While the PTAB purports to find other prosecution history statements that reference what "creating a data base" is, the proper construction must *also* include what "creating a data base" is not.  Indeed, if the Examiner had applied the PTAB's disclaimer-less construction during the initial prosecution, the '607 patent never would have issued over Bales.  Nevertheless, the PTAB relied on its disclaimer-less construction of "creating a database" to invalidate all challenged claims under 35 U.S.C. § 103.  Specifically, by ignoring Dr. Pryor's disclaimer, it applied a combination of the Hay and Haas prior art references that taught the creation of the same correlated data base that had been disclosed by Bales and successfully distinguished during the initial prosecution.

The PTAB committed legal error.  The PTAB's claim construction and resulting finding of obviousness should be reversed.

## II.    The '607 Patent

The claims of the '607 patent relate to computer vision systems and methods that use an electro-optical sensor to gather limited information about a pattern of targets on an object.  A computer then uses that information to create an "uncorrelated" data base to "stand" for the object, without using knowledge of or reference to the object itself.  Depending on how the particular computer vision system is configured, the uncorrelated data base can permit the system to perform simple functions, such as detecting whether or not the object is present or has been deformed.  One application is in manufacturing plants where there is a desire to monitor the presence or progress of an object on the assembly line.

### A.    Prior Art "Correlated" Computer Vision Systems

In contrast to the simplified system taught in the '607 patent, prior art computer vision systems typically performed more complicated functions, such as determining the position and/or orientation in space of an object or its physical features.  But they were inherently expensive and needed substantial processing power to perform the correspondingly complicated mathematical algorithms. Before the invention of the '607 patent, the machine vision industry continually

6

strove for better and faster ways to determine the location and orientation of objects and their physical features more accurately.  A-1372 at ¶ 27 (Declaration of Dr. Aaron F. Bobick ["Bobick Dec."]).  The industry believed that the road to improvement was better correlation (or matching) of targets or features of an object (such as one or more LEDs) captured in a camera image with already-known targets or features of the object.  A-1375-76 at ¶¶ 34-35 (Bobick Dec.).  The industry therefore sought to collect and process increasing amounts of data about the objects to be detected, thereby requiring ever more complicated mathematical algorithms and computing power.  A-1372-73 at ¶¶ 26-29 (Bobick Dec.).

An example of a correlated data base in a prior art system is depicted below.  The left side of the figure represents a known model of a real world object, a J-hook (depicted as a blueprint).  The J-hook model has three known targets: the first located two inches from the top, the second located eight inches from the top and six inches below the first target, and the third located six inches from the bottom and three inches to the right of the second target.  The target points captured in an image of the real-world J-hook, shown on the right side of the figure below, are matched to the blueprint model, so that the system knows which known target from the model corresponds to each target in the image, and therefore where each of the

7

observed targets is located on the object.  Storing this information creates a

correlated data base.



A-1372-76 at ¶¶ 27-35 (Bobick Dec.).

The accepted wisdom at the time of the invention was that machine vision

systems needed to store sufficient data about the object and its targets or features to

permit the system to use the data detected in the camera image to determine

information about the object.  A-1371-73 at ¶¶ 24, 26-28 (Bobick Dec.).  The

systems then processed this data using complex photo processing and

mathematical algorithms.  A-1371-75 at ¶¶ 28-34 (Bobick Dec.).  Among other

things, these systems could determine the location and orientation of the J-hook

captured in the camera image on the right.  They did so by matching the locations

of the targets in the camera image with the known targets on the model of the

object.  They then calculated the position or orientation of the object in the model

8

that would result in the known targets corresponding with their observed positions in the image.  This is how the prior art in the initial prosecution (Bales) operated and was distinguished by Dr. Pryor from the invention claimed in the '607 patent.

> The Bales paper does not disclose the use of discrete targets in a pattern as a data base. Rather, the Bales paper discloses, for example, the use of the visible portions of a spiral stripe located *at a known position* on a *known cylinder* in order to determine the rotational position of the cylinder or three spots in a line on a flat plane at a *known location* on a *known object*. Using such targets, the *location, orientation and identity of the object* can be determined.

A-0482.

For example, in the figure below, the J-hook in the camera image is oriented horizontally.  To correlate the model to the real world object, the prior art systems analyzed the image of the three targets and determined which target in the image corresponded to which target in the stored model.  Because the system knows the location of each target on the object, and has correlated the targets in the image of the real world object to the known target locations in the model, the system can determine that the J-hook is indeed oriented horizontally.

9



The prior art cited in the initial prosecution (Bales) and in the IPR (Hay and Haas) all describe systems that correlated specific individual targets observed by the camera to known targets on a known model of the object. A-1382-91 at ¶ 51-73 (Bobick Dec.). Like the exemplary systems discussed above, the Bales, Hay, and Haas systems use a camera image to capture the targets on a real-world object or its features, and then correlate them to the known models to create a correlated data base. By comparing observed points to known models, they could then determine the location or orientation of the object or its features in space. A-1375-76 at ¶¶ 34-35 (Bobick Dec.). The common mechanism at the core of these prior art systems was the matching of observed data to a detailed model of the object. A-1381 at ¶ 47 (Bobick Dec.).

**B. Dr. Pryor's "Uncorrelated" Computer Vision Systems**

Against this backdrop, Dr. Pryor invented a novel, non-obvious, and much simpler computer vision system.  Dr. Pryor realized that, for some applications, a computer vision system could make useful determinations without correlation.  A-1379-82 at ¶¶43-50 (Bobick Dec.).  For these less precise applications, the *pattern* of observed targets on the object is sufficient to "stand" for the object itself, *i.e.*, to serve as a proxy.  *See, e.g.,* A-0482 ("it is the pattern itself which now *stands* for the object") (emphasis added).  By greatly simplifying the data base that stands for the object and eliminating the need to associate a "known" target on a model to observed targets, Dr. Pryor's computer vision system significantly reduced computer processing requirements, as well as eliminated the need to calibrate the system.  A-0481-82; A-1381-82 at ¶¶ 47, 49-50; A-1400-01 at ¶¶ 96-97.

The figure below demonstrates the use of a pattern of targets to stand for the object, where the data base has no information about the relationship of the targets to the object (such as the location of the targets on the object).  On the far left is the "uncorrelated" pattern of targets that is electro-optically sensed and stored in the data base, without any knowledge of how the targets relate to the detected object.  As shown, in the three boxes, the pattern could stand in for a myriad of different

11

real world objects, such as a cylinder, a tetrahedron, and a cube. The data base does not know or care what the object itself looks like.



Unlike the J-hook example above, these targets are not correlated with a known model of the object; the pattern merely "stands" for (or is the proxy for) the object. The uncorrelated data base has no information about where the targets are located on the object. While the uncorrelated data base cannot be used to determine the shape or orientation of the objects—such as whether it has been rotated counter-clockwise like the J-hook discussed above—it can be used for simpler tasks, such as identifying the presence of the objects as they move down an assembly line, or detecting whether the objects have been deformed. A-1381 at ¶ 47 (Bobick Dec.). Dr. Pryor's uncorrelated data base is particularly well-suited for applications where precision is not needed and/or computing power is at a premium. A-1370 at ¶ 22; A-1381-82 at ¶ 48-50.

12

## C. Creating an Uncorrelated Data Base that Stands for an Object

The '607 patent has two similar independent claims, a method claim and an apparatus claim (claims 1 and 25). A-0074-75. Claim 25 is representative:

> 25. Apparatus for creating a data base for an object having at least first and second discrete targets thereon in a pattern, said apparatus comprising:
>
> electro-optical sensing means for sensing the pattern of said first target and said second target; and
>
> processing means for creating a data base of said object using said sensed pattern of said first target and said second target, said data base comprising said sensed pattern of said first and second targets.

The claimed apparatus thus has (1) an electro-optical sensing means (*e.g.* a camera) that senses the pattern of targets (*e.g.* LEDs) on an object, and (2) a processing means that creates a data base of the object using that sensed pattern.

The dispositive issue in the IPR was whether prosecution history disclaimer required that "creating a data base of said object" be construed to exclude the creation of correlated data bases. Contrary to what the PTAB found, the specification in the '607 patent unambiguously teaches the creation of both uncorrelated and correlated data bases. For example, Figure 5 (reproduced below, colored annotations added) depicts a process in which targets are applied to the surface of sheet metal 702. A-0035; A-0059 at Col. 9:62-Col. 10:43. The sheet metal then undergoes a deformation process 706, such as folding, which changes

13

its shape.  After deformation is supposed to have occurred, camera 710 captures

the "after" image, and the system determines, based solely on whether or not the

target pattern changed, whether deformation in fact occurred.



FIG. 5

The system potentially uses three cameras (708, 710, and 714).  It can be

used with or without camera 708.  When camera 708 is deployed, it is used to

create an *uncorrelated* data base.  Specifically, as shown in the red box, camera

708's purpose is to capture an *initial* image of the dot pattern (*i.e.* targets) on the

sheet 702, which is then stored to create the data base shown at the top of Figure 5.

That data base stands for the object and is available for subsequent comparison to

captured images of patterns in real world objects.  The specification states that

camera 708 is used *only* when the targets are not correlated to the object.  A-0059

14

at Col. 10:10-14 ("The targets 700 can be rather precisely applied, *or if not*, can be initially monitored by a camera means 708 to discern what the pattern is.") (emphasis added). Specifically, when the targets are applied imprecisely, the computer vision system cannot know the location of the targets relative to features of the object. A-1953 (Deposition of Dr. Aaron Bobick ["Bobick Dep."]) at 63:1-25; *see also* A-1957 at 67:17-20. Thus, in this embodiment, it is the pattern itself that stands for the object and is stored to create an *uncorrelated* data base. A-1379-81 at ¶¶ 43-47 (Bobick Dec.). The pattern itself is a proxy for the object. In contrast, to create a *correlated* data base, the observed targets do not serve as a proxy for the object but are instead compared to a pre-existing model or known relationship between the targets and the object.

Unable to reconcile the use of camera 708 in Figure 5 with their argument that the data base in the '607 patent must be correlated, Nintendo and the PTAB simply ignore it and point to *other* steps in Figure 5 that they contend depict a correlated data base. *See, e.g.*, A-0010 ("*after* a forming process, camera means 710 again monitors targets 700 . . . ."). But these other steps are irrelevant. Dr. Pryor explained during prosecution that correlated systems can be used as adjuncts to the uncorrelated systems that are claimed in the patent. A-0482 ("… in the present invention there is no such correlation (though it could be done for

15

additional reasons, as noted in certain dependent claims, *but this would be another, different, data base*).") (emphasis added). Examples of these dependent claims are claims 3, 4, 27, and 28. But these additional limitations do not eliminate the requirement, stated in the independent claims, that an uncorrelated data base be created that stands for the object.

In short, the latter steps shown in Figure 5 are agnostic as to whether the targets were *initially* monitored by camera 708 (*i.e.,* creating an uncorrelated data base) or the locations of the targets on the object were known in advance (*i.e.,* using a model of the object). For example, Figure 5 teaches that the second camera 710 captures an image of the part after a forming operation such as bending (shown in the blue box above). The camera might, for example, determine if the bending has in fact occurred by detecting whether the pattern of the targets on the object has changed. A-0059 at Col. 10:15-31. The system can detect the changed pattern without regard for whether the dot pattern was precisely applied at known locations on the object (corresponding to the use of a correlated data base), or whether the targets were imprecisely applied (corresponding to the use of an uncorrelated data base). A-1949-1957 (Bobick Dep.) at 59:7-67:5; *see also* A-1917-1919 at 27:5-29:9.

16

### D. **Prosecution History**

During prosecution, Dr. Pryor disclaimed creating correlated data bases, *i.e.*, those requiring knowledge of or reference to the object, to distinguish over the prior art. As a result, it is impossible for the "creating a data base of said object" limitation of the claims to encompass creating a *correlated* data base. *See* A-0074-75 (claims 1 and 25); A-0481-82. It can cover creating only an *uncorrelated* data base.

The Examiner initially rejected the claims that became independent claims 1 and 25 in the '607 patent under 35 U.S.C. § 103(a). The Examiner cited the Bales paper,[1] which teaches identifying and determining the position and orientation of an object by correlating captured images of known targets on the object to a model of the object. A-0482 (describing Bales as using "visible portions of a spiral stripe located at a *known* position on a *known* cylinder in order to determine the

---

[1] Although not necessary to the Court's consideration of this appeal, the Bales reference is included in the Appendix. *See* Bales et al., NASA Technical Paper 1819, Marking Parts to Aid Robot Vision (Apr. 1981). A-0593-628. Nintendo's refusal to include the Bales reference in the Appendix is baseless. First, because the PTAB expressly relied on this reference in reaching its opinion, (A-0008, n.2), inclusion is proper under FRAP 16(a). Second, because it is a publicly available article that is discussed and quoted throughout the prosecution history and the declarations filed in the IPR, it is the proper subject of judicial notice.

rotational position of the cylinder or three spots in a line on a flat plane at a *known* location on a *known* object.") (emphasis added).

In light of Bales, the Examiner stated that one of ordinary skill in the art would know to "use a computer to create a data base, i.e. determine the position of the object," and that "one would have found it obvious to compare the determined position (i.e. created data base) with the desired position (*i.e.* predetermined data base), in order to ensure that the object is in its desired position before processing the object in some manner." A-0328-29 (September 30, 1997 Office Action).

Initially, Dr. Pryor contested the Examiner's reading of Bales, and pressed for broad claims that would cover a data base that was either correlated or uncorrelated to a known model of the object. A-0346-47 (April 1, 1998 Amendment). The Examiner did not accept Dr. Pryor's argument and again rejected the amended claims in light of Bales. A-0452-53 (June 16, 1998 Office Action). But Dr. Pryor continued to advocate in the November 10, 1999 Examiner interview for claims covering the creation of a data base of the object that could either be based only on the targets *or* based on a known model of the targets on the object. Again, the Examiner "maintained his position that one skilled in the art would have found it obvious to sense the targets and then create a data base or create a data base and then sense the targets." A-0471 (November 10, 1999

18

Interview Summary).  The Examiner rejected the claims, finding it obvious to

"create a data base corresponding to the spacing between the targets based on the

sensed locations thereof."  A-0475 (November 22, 1999 Office Action).

At that point, Dr. Pryor finally acquiesced to the Examiner's position, and

agreed to limit his claims to creating uncorrelated data bases to avoid Bales.  Dr.

Pryor started by generally describing what his claimed invention is:

> *In the present invention*, an object is provided with at
> least first and second targets thereon which are in a
> pattern. This *pattern* may be known (targets dots on one
> inch centers) or unknown (for example applied to the
> object at *random locations*). Whatever the pattern, it is
> this pattern which is then sensed electro-optically, and
> *this sensed pattern then becomes a data base for the
> object.* This pattern data base can then be used in a
> number of ways, such as to handle the object or to track
> changes made to the object, *all without reference to or
> knowledge of the physical object itself.*

A-0481 (May 22, 2000 Amendment) (emphasis added).

Then Dr. Pryor specifically distinguished the data base the Examiner

suggested was obvious from Bales from the claimed data base by describing what

his invention was not.  Using words of manifest exclusion, Dr. Pryor offered the

restrictive words that forever surrendered correlated data bases from the scope of

"creating a data base of said object":

> [T]he Examiner has again stated that those of ordinary
> skill could create a data base using the sensed locations

19

of the targets in the Bales paper. *But this is not the data base which is being claimed and used in the present invention. The suggested data base that the Examiner proposes would be obvious from the Bales paper is one which merely correlates targets to the object, while in the present invention there is no such correlation* (though it could be done for additional reasons, as noted in certain dependent claims, *but this would be another, different, data base).* Rather, it is the pattern itself which now *stands for the object* and which is used regardless of a correlation to the actual object, and which is neither disclosed nor made obvious by the Bales paper.

A-0482 (emphasis added).

Dr. Pryor's unequivocal surrender of subject matter carried the day. In response to the clear and unmistakable disclaimer, the Examiner withdrew the rejection and allowed the claims over Bales. A-0495-96 (July 31, 2000 Notice of Allowance).

## III.     The *Inter Partes* Review Proceeding

Nintendo petitioned for IPR of claims 1, 2, 15-17, 25, 26, 34, and 39-41 of the '607 patent, on November 19, 2013. The petition asserted only a single obviousness combination of the Hay and Haas references. A-0084-85; A-0094-95. Nintendo's arguments relied on a construction for creating a "data base for an object" that improperly ignored Dr. Pryor's disclaimer of correlated data bases. A-0085 ("the sensed pattern of the targets on the object").

20

Nintendo knew better.  In the district court litigation, Nintendo had expressly argued that the construction of "creating a data base of an object" must account for Dr. Pryor's disclaimer in the prosecution history.  There, Nintendo quoted and asserted disclaimer based on the same prosecution history language on which Motion Games has always relied.  Nintendo's Markman Brief stated:

> [Nintendo's proposed] language – "such that there is no correlation of the targets to the object" – comes directly from what the Applicant stated during prosecution to distinguish his "present invention" from the prior art.  Specifically, the Applicant stated:
>
>> The suggested data base that the Examiner proposes would be obvious from the Bales paper is one which merely correlates targets to the object, while in the present invention there is no such correlation … [r]ather it is the pattern itself which now stands for the object and which is used regardless of a correlation to the actual object, and which is neither disclosed nor made obvious by the Bales paper.

A-0934 (quoting A-0482 (May 22, 2000 Amendment)) (underlining added by Nintendo).

In the district court, *both parties* argued that prosecution history disclaimer limited the scope of "creating a data base of an object."  The parties differed only over how best to convey the disclaimer:

| Claim Term | Plaintiff's Position | Defendants' Position |
|---|---|---|
| "Creating a data base of an object" or "Creating a data base for an object." | Storing as data a sensed pattern representative of a physical object without reference to or knowledge of the object itself. | Storing as data the physical arrangement or configuration in three dimensional space of said first and second targets on the physical object, such that there is no correlation of the targets to the object. |

A-0933 (highlighting added).  As shown above, unlike Nintendo's disclaimer language, Motion Games' disclaimer language faithfully captured Dr. Pryor's statement that the pattern must also "stand[] for the object": that the "sensed pattern [is] representative of a physical object."  The Court was persuaded that Motion Games' proposal was the better one because it appeared "more consistent with the context of the May 2000 Amendment" and "the use of 'correlate' in [Nintendo's] construction may require further construction and may ultimately be construed as something similar to Motion Games' proposed construction."  A-2578.  It therefore adopted Motion Games' language.

Despite having joined Motion Games in arguing in the district court that there was a disclaimer, Nintendo flip-flopped in the IPR.  Because the prior art disclosed only creating a correlated data base for an object, Nintendo reversed course and claimed that Dr. Pryor had not actually disclaimed correlated data bases after all.  Nintendo never attempted to explain why it asserted that there was a clear disclaimer in the district court but pretended that none existed in the IPR.  Nor did

22

Nintendo's filings in the IPR explain why the key prosecution history statement that it championed as dispositive of disclaimer in the district court did not apply equally in the IPR.  Instead, Nintendo's filings simply ignored that statement and emphasized the statement immediately following it.  A-0092-93 (IPR Petition); A-1853-54 (Nintendo Reply Brief).

But Dr. Pryor's statements in the prosecution history can mean only one thing:  he broadly disclaimed the creation of correlated data bases.  Indeed, when asked at the IPR hearing, Nintendo's counsel acknowledged that Dr. Pryor's comparison to Bales was "a general statement about the present invention" that was directed to the "claims at issue" at the time, which are the same ones that issued in the '607 patent.  A-2612 at 18:13-23.  Nintendo's counsel never explained *why* this language allegedly could mean anything other than Dr. Pryor had disclaimed creation of a correlated data base.

In its FWD, the PTAB recognized that it is bound by a "clear and unmistakable disavowal during prosecution."  But it somehow found no disclaimer of correlation related to "creating a data base of said object."  A-0007 (quoting *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013)).  The PTAB therefore broadly construed "creating a data base of said object" to mean "*at a minimum*, storing the sensed pattern of the first and second targets and

23

does not preclude that the sensed pattern is stored with reference to or knowledge of the object, itself." A-0010 (emphasis added).

The PTAB's finding that there was no disclaimer paved the way for its conclusion that Hay's disclosure of "computer 17 storing signals indicative of the positions of the target points on the focal plane of the camera array," which the parties' experts agreed were disclosures of *correlated* data bases, invalidates the claims. A-0016-17 (citing Col. 1, ll. 28–34 and Col. 4, ll. 13–33 of Hay). The PTAB also relied on a second reference, Haas, to support its finding that using discrete targets instead of Hay's target points on a target plane, would be a "simple substitution of known elements to achieve a predictable result." A-0016-17.

## SUMMARY OF ARGUMENT

The PTAB's finding of no disclaimer violates long-established case law; its resulting claim construction and obviousness determinations are reversible error.

The PTAB's construction of "creating a data base of said object" ignores a plain and unambiguous disclaimer. During prosecution, the Examiner rejected the claims in view of the Bales reference, which disclosed a system that correlated known targets to a known model of an object. To overcome the rejection, Dr. Pryor disclaimed correlated data bases. He stated that a correlated data base:

> is not the data base which is being claimed and used in the present invention. The suggested data base that the

24

> Examiner proposes would be obvious from the Bales paper is one which merely correlates targets to the object, while in the present invention there is no such correlation (though it could be done for additional reasons, as noted in certain dependent claims, but this would be another, different, data base).

A-0482 (May 22, 2000 Amendment).  Dr. Pryor's disclaimer narrowed the scope of his claims and thereby overcame the Bales rejection.  Although the broad disclosure in the specification of the '607 patent taught that data bases could be either correlated or uncorrelated, the disclaimer means that only uncorrelated data bases fall within the scope of the independent claims.

Any tribunal construing the term "creating a database"—whether a court or the PTAB—is bound to limit it to creating an *uncorrelated* data base, i.e., a data base representative of an object that is created without reference to or knowledge of the object itself.  But the PTAB excised the most important part of a purported block quote from the prosecution history:  Dr. Pryor's statement that "this is not the data base which is being claimed and used in the present invention."  A-0008.

The PTAB's finding of obviousness rested entirely on two references, Hay and Haas.  The record before this Court includes the references themselves, as well as the testimony of both sides' experts that the data bases taught in those references on which the PTAB relied correlate known targets to a known model.  Nothing in Hay or Haas, either alone or in combination, discloses an uncorrelated data base

that stands for the object.  This Court should therefore reverse the Final Written

Decision of the PTAB.

## ARGUMENT

### I.    The Relevant Law

#### A. <u>The Standard of Review</u>

Determinations of obviousness under 35 U.S.C. § 103 are questions of law.

*In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1280 (Fed. Cir. 2015).  Although

the Court reviews underlying factual determinations involving *extrinsic* evidence

for substantial evidence, "construction of a patent claim, like a district court's

interpretation of a written instrument, often requires the judge only to examine and

to construe the document's words without requiring the judge to resolve any

underlying factual disputes. . . . [W]hen the district court reviews only evidence

intrinsic to the patent (the patent claims and specifications, along with the patent's

prosecution history), the judge's determination will amount solely to a

determination of law, and the Court of Appeals will review that construction *de

novo*."  *Teva Pharm. U.S.A., Inc. v. Sandoz, Inc.,* __ U.S. __ , 135 S. Ct. 831, 840-

41 (2015); *see also Enzo Biochem Inc. v. Applera Corp.*, 780 F.3d 1149, 1153

(Fed. Cir. 2015) (same); *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1326 (Fed. Cir.

2015) (same).  "[T]he application of prosecution disclaimer" is also reviewed *de*

*novo*. *Shire Dev., LLC v. Watson Pharm., Inc*., 787 F.3d 1359, 1365 (Fed. Cir. 2015) (citing *Ecolab, Inc. v. FMC Corp*., 569 F.3d 1335, 1342 (Fed. Cir. 2009)).

### B. <u>Prosecution History Disclaimer</u>

In construing claim terms, the plain and ordinary meaning to one skilled in the art controls unless the inventor acted as his or her own lexicographer or disclaimed claim scope during prosecution. *See Phillips v. AWH Corp*., 415 F.3d 1303, 1319 (Fed. Cir. 2005) (*en banc*); *see also Vitronics Corp. v. Conceptornic, Inc.,* 90 F.3d 1576, 1582-83 (Fed. Cir. 1996); *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to 'exclude any interpretation that was disclaimed during prosecution.'") (quoting *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1580 (Fed. Cir. 1988)); *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution."); *Ballard Med. Products v. Allegiance Healthcare Corp*., 268 F.3d 1352, 1359 (Fed. Cir. 2001) ("An inventor may use the specification and prosecution history to define what his invention is and what it is not — particularly when distinguishing the invention over prior art.")

27

A disclaimer must be "clear and unmistakable." *See Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1341 (Fed. Cir. 2012). "[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003).

The prosecution history is particularly relevant to claim construction because it includes contemporaneous exchanges between the patent applicant and the Patent Office about what the claims mean. *Vitronics*, 90 F.3d at 1582; *see also Biogen Idec, Inc.*, 713 F.3d at 1095 ("Beyond the notice function and reliance-based aspects of a patent's prosecution history, it 'provides evidence of how the [PTO] and the inventor understood the patent.'")

## C. Prosecution Disclaimer Binds the PTAB in *Inter Partes* Reviews

A disclaimer of subject matter made during the initial prosecution necessarily narrows claim scope. *See Genentech, Inc. v. Sandoz Inc.*, No. C 11-01925 JSW, 2012 WL 4473303, at *6 (N.D. Cal. July 10, 2012) ("the Court is compelled to adopt the narrow construction of a claim term where, as here, the inventors, in order to overcome a prior art rejection, necessarily disclaimed an

examiner's interpretation of a limitation.") (citing *Southwall Techs.* 54 F.3d at 1576–77; *Omega Eng'g*, 334 F.3d at 1324.

A disclaimer indiscriminately binds both district courts when they hear infringement or validity claims and the Patent Office when it conducts post-grant review proceedings. *See Apple Inc. v. Virnetz Inc.*, IPR2014-00481, 2015 WL 5047986, at *3 (P.T.A.B. Aug. 24, 2015) ("[T]he Federal Circuit indicated that even for non-expired patents that return to the PTO, prosecution history may be an important component of intrinsic evidence in construing claims (notwithstanding that Patent Owner may amend the claims and a broadest reasonable construction standard applies)."); *see also Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015) ("The PTO should also consult the patent's prosecution history in proceedings in which the patent has been brought back to the agency for a second review."); *Ford Motor Co. v. Vehicle Operation Techs., LLC*, IPR2014-00594 (P.T.A.B. Oct. 15, 2014) (construing term in accordance with prosecution history disclaimer); *The Scotts Co. LLC v. Encap, LLC*, IPR2013-00110 (P.T.A.B. June 24, 2014) (citing *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994) (term may be defined more narrowly when "the patentee disavows the full scope of a claim term either in the specification or during prosecution"). The courts and the

PTAB use the same legal standard to determine prosecution disclaimer. *See Microsoft Corp.*, 789 F.3d at 1298.

A disclaimer controls regardless of whether it is asserted by the patent owner or accused infringer. *Vitronics,* 90 F.3d at 1583 ("Allowing the public record to be altered or changed by extrinsic evidence introduced at trial, such as expert testimony, would make this right meaningless . . . . *The same holds true whether it is the patentee or the alleged infringer who seeks to alter the scope of the claims*.") (emphasis added); *Alza Corp. v. Mylan Labs., Inc.*, 391 F.3d 1365, 1371 (Fed. Cir. 2004) (rejecting infringer's proposed claim construction that was contrary to court's finding of prosecution disclaimer).

## II.    Dr. Pryor Narrowed "Creating A Data Base Of Said Object"

Dr. Pryor unambiguously disclaimed claim scope.  In response to the Examiner's obviousness rejection over Bales, Dr. Pryor stated in the final office action response:

> [T]he Examiner has again stated that those of ordinary skill could create a data base using the sensed locations of the targets in the Bales paper. *But this is not the data base which is being claimed and used in the present invention.*  The suggested *data base* that the Examiner proposes would be obvious from the Bales paper is one which merely *correlates targets to the object, while in the present invention there is no such correlation* . . . .

30

A-0482 (emphasis added). It is beyond reasonable dispute that Dr. Pryor thereby manifestly excluded data bases that correlate targets to the object (*i.e.* correlated data bases) from the scope of "creating a data base" of an object.

First, Dr. Pryor's distinguishing arguments were specifically directed to the type of data bases that were created. He stated that the data base that "would be obvious from the Bales paper is one which merely *correlates targets to the object,*" which "is *not* the data base which is being claimed and used in *the present invention.*" A-0482 (emphasis added). A statement distinguishing the prior art because the limitation being construed is not "X" is about as clear as it gets. *Saffran v. Johnson & Johnson*, 712 F.3d 549, 559 (Fed. Cir. 2013) ("applicants rarely submit affirmative disclaimers along the lines of 'I hereby disclaim the following . . .' during prosecution and need not do so to meet the applicable standard."); *see also Regents of Univ. of Minnesota v. AGA Med. Corp.*, 717 F.3d 929, 942 (Fed. Cir. 2013) ("When an applicant tells the PTO that a prior art reference lies outside the scope of his claim, he is bound by that argument"); *Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1372-73 (Fed. Cir. 2005) ("Where an applicant argues that a claim possesses a feature that the prior art does not possess in order to overcome a prior art rejection, the argument may serve to narrow the scope of otherwise broad claim language."); *Rheox, Inc. v. Entact, Inc.*,

276 F.3d 1319, 1325 (Fed. Cir. 2002) ("Explicit arguments made during prosecution to overcome prior art can lead to narrow claim interpretations. . . ."); *MBO Labs., Inc. v. Becton, Dickinson & Co*., 474 F.3d 1323, 1330 (Fed. Cir. 2007) ("Prosecution arguments … which draw distinctions between the patented invention and the prior art are useful for determining whether the patentee intended to surrender territory, since they indicate in the inventor's own words what the invention is not."); *Uship Intellectual Props, LLC v. United States*, 714 F.3d 1311, 1315 (Fed. Cir. 2013) ("Our cases broadly state that an applicant's statements to the PTO characterizing its invention may give rise to a prosecution disclaimer.").

Indeed, Dr. Pryor's statements that the data base made obvious by Bales "is not the data base which is being claimed," and that "in the present invention there is no such correlation" are far clearer than statements this Court has found to be a disclaimer in other cases.  For example, in *Advanced Fiber Technologies Trust v. J & L Fiber*, the applicant distinguished the prior art from the pending claims based on slot size:  "the Gillespie screen slots are 0.030 inches, that is, 0.762 mm. *The slots of Gillespie are over three times the size of the slot width of the present invention*."  674 F.3d 1365, 1376 (Fed. Cir. 2012) (emphasis added).  The Court found a disclaimer because "[t]his statement, urged in support of patentability, is

'so clear as to show reasonable clarity and deliberateness' and 'so unmistakable as to be unambiguous evidence of disclaimer.'" *Id.*

Similarly, in *North American Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1345 (Fed. Cir. 2005), this Court construed the term "generally convex" in accordance with a prosecution disclaimer to exclude inner walls having any concavity.  The Court found a disclaimer based on a single statement in the prosecution history where the patentee distinguished the pending claims by arguing that the feature "as now defined in the claims *differs* from the [first prior art reference], wherein the corresponding wall portions 3 are *slightly concave* . . . . and the [second prior art reference], wherein the entire re-entrant portion is clearly *concave in its entirety*." *Id.* at 1340, 1344-45 (n.2) (emphasis added).[2]

_____

[2] *See also, Gillespie v. Dywidag Sys. Intern., USA*, 501 F.3d 1285, 1290–91 (Fed. Cir. 2007) (finding disclaimer of a smooth outer surface where applicant identified an angular outer surface as a feature of the invention to overcome a prior art reference disclosing a smooth outer surface.); *Computer Docking Station Corp.v. Dell, Inc.*, 519 F.3d 1366, 1375-76 (Fed. Cir. 2008) (finding disclaimer of a built-in keyboard or display where applicant stated in the prosecution history that its "portable computer" did not have a built-in keyboard or display, as with a laptop computer, but instead connected these devices as external peripheral devices.); *Seachange Intern., Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1372–73 (Fed. Cir. 2005) (finding disclaimer where applicant broadly claimed "a network for data communications," but in prosecution, argued around prior art by claiming a specific "point-to-point" network); *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir.2004) (limiting the term "transmitting" to require direct transmission over a telephone line because the patentee stated during prosecution

33

Second, Dr. Pryor further acknowledged that correlation "could be done for additional reasons, *as noted in certain dependent claims, but this data base would be another, different data base.*" A-0482. His statement underscores that the "creating a data base of said object" limitation that is present in both of the independent claims excludes creating a correlated data base, which is a "different" kind of data base. Examples of these dependent claims are claims 3, 4, 27, and 28.

Third, Dr. Pryor made clear that his statements were broadly applicable to "the present invention" claimed in the '607 patent. He stated that, "in *the present invention* there is no such correlation," and specifically identified the data base made obvious by Bales as "not the data base which is *being claimed and used in the present invention.*" A-0482 (emphasis added). This Court's precedents establish that an applicant's use of the phrase "the present invention" is embued with special significance. *See Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("describ[ing] the features of the 'present

that the invention transmits over a standard telephone line, thus disclaiming transmission over a packet-switched network); *Alloc v. Int'l Trade Com'n*, 342 F.3d 1361, 1372 (Fed. Cir. 2003) (finding the patentee expressly disavowed floor paneling systems without "play" because the applicant cited the feature during prosecution to overcome prior art); *Bell Atl. Network Servs. v. Covad Commc'ns Group, Inc*., 262 F.3d 1258, 1273 (Fed. Cir. 2001) (limiting operation of the "transceiver" to the three stated modes because of clearly limiting statements made by the patentee to try to overcome a prior art rejection).

34

invention' as a whole . . . limits the scope of the invention"); *Rambus Inc. v.*

*Infineon Techs. AG*, 318 F.3d 1081, 1094 (Fed. Cir. 2003) ("clear language

characterizing 'the present invention' may limit the ordinary meaning of claim

terms") (internal citations omitted).

Fourth, the finding of disclaimer is supported by the prosecution history

"examined as a whole." *See Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d

1241, 1252 (Fed. Cir. 2000). Before the key disclaimer statement discussed above,

Dr. Pryor explained the claimed invention as follows:

> *In the present invention,* an object is provided with at
> least first and second targets thereon which are in a
> pattern. This pattern may be known (targets dots on one
> inch centers) or unknown (for example applied to the
> object at random locations). Whatever the pattern, it is
> this pattern which is then sensed electro-optically, and
> this sensed pattern then becomes a data base for the
> object. This pattern data base can then be used in a
> number of ways, such as to handle the object or to track
> changes made to the object, *all without reference to or
> knowledge of the physical object itself.*

A-0481 (emphasis added).

And after the key disclaimer statement which explains what the invention *is*

*not*, Dr. Pryor again explained what the invention *is*:

> [T]he Examiner has again stated that those of ordinary
> skill could create a data base using the sensed locations
> of the targets in the Bales paper. But this is not the data
> base which is being claimed and used in the present

35

invention. The suggested data base that the Examiner proposes would be obvious from the Bales paper is one which merely correlates targets to the object, while in the present invention there is no such correlation (though it could be done for additional reasons, as noted in certain dependent claims, but this would be another, different, data base). *Rather, it is the pattern itself which now stands for the object and which is used regardless of a correlation to the actual object, and which is neither disclosed nor made obvious by the Bales paper.*

A-0482 (emphasis added). Thus, the statements that surround the disclaimer are fully consistent with Dr. Pryor's surrender of creating *correlated* data bases. Indeed, Dr. Pryor's statement that "it is the pattern itself which now *stands for the object*" further defines what it means to create an uncorrelated data base for an object.

## III.      The PTAB Erroneously Found No Disclaimer

By selectively reading snippets of the prosecution history, the PTAB misconstrued creating a data base to mean ". . . at a minimum, storing the sensed pattern of the first and second targets *and does not preclude that the sensed pattern is stored with reference to or knowledge of the object, itself.*" A-0010. But the PTAB's conclusion that there is no disclaimer cannot possibly be correct: it eliminates the very distinction that allowed the '607 patent to issue, thereby improperly reinstating Bales as potentially invalidating prior art.

The FWD employs faulty reasoning throughout:

36

## A. <u>The PTAB Ignored Compelling Evidence of Disclaimer</u>

The PTAB conspicuously fails to mention, let alone analyze, Dr. Pryor's key statement that "[t]he Examiner has again stated that those of ordinary skill could create a data base using the sensed locations of the targets in the Bales paper. *But this is not the data base which is being claimed and used in the present invention*." A-0482 (emphasis added).  The PTAB's omission of this dispositive prosecution history statement is baffling; Motion Games repeatedly referenced this statement in its papers and at oral argument.  A-0890 (Motion Games' Patent Owner Response); A-2635 at 41:19-25; A-2636 at 42:14-20; A-2485 (Patent Owner's Motion to Exclude); A-1368-69 (Bobick Dec.).

Even more troubling, although the FWD includes an extensive block quote of the relevant language in the May 22, 2000 office action response, it inexplicably *omits* Dr. Pryor's key statement that the data base in Bales "is not the data base which is being claimed and used in the present invention."  Instead, the block quote includes the language that is before and immediately after the key language, *but physically excises the disclaimer language—and substitutes ellipses instead. Compare* A-0008 *with* A-0481-82.

Similarly, the PTAB never attempted to reconcile its finding of no disclaimer with other statements by Dr. Pryor in the prosecution history.  For

37

example, Dr. Pryor also stated that "[t]he suggested data base that the Examiner proposes would be obvious from the Bales paper is one *which merely correlates targets to the object, while in the present invention there is no such correlation* (though it could be done for additional reasons, as noted in certain dependent claims, *but this would be another, different, data base*)." A-0482. What else can this possibly mean except that the *independent* claims of the '607 patent do not claim the creation of a correlated data base? The PTAB never even hints at an answer.

### B.  The PTAB Failed to Consider the Prosecution History as a Whole

The PTAB relies only on portions of the prosecution that it alleges support its views on claim construction, while failing to address the parts that refute them. This selective reading is improper. *See Bayer AG v. Elan Pharm. Research Corp*., 212 F. 3d 1241, 1252 (Fed. Cir. 2000) ("In determining whether there has been a clear and unmistakable surrender of subject matter, the prosecution history must be examined as a whole.").

The PTAB purports to base its erroneous construction for "creating a data base of said object" on a single out-of-context snippet in the prosecution history: "[w]hatever the pattern, it is the pattern which is then sensed electro-optically, and this sensed pattern then becomes a data base for the object." A-0008; *see also* A-

38

0850 (Institution Decision).  The PTAB apparently interprets this statement to mean that the only limitation applicable to the claimed data base is that it must comprise a sensed pattern of targets.

This interpretation makes no sense.  First, claim construction requires a careful examination of the *entire* prosecution history.  Statements about what the invention is not are particularly important, as they *circumscribe* the invention.  Second, the applicant's general recitation of the claim language on which the PTAB relies comes *before* the applicant distinguished the claims over Bales.  A-0481-82.  Third, the PTAB's "construction" adds nothing to the actual language of the claims; the claims already state that "said created data base comprising said sensed pattern of said first and second targets."  Fourth, disclaimer narrows what would otherwise be the claim scope.  Its *purpose* is to further restrict claim language.  Finally, in addition to ignoring Dr. Pryor's clear disavowal as to what the data base is not, the PTAB's construction also ignores his later statement that "it is the pattern itself which now *stands* for the object."  Any proper claim construction must include language that conveys the idea, like that expressed by Motion Games in its proposed constructions in the district court and in the IPR, that the sensed pattern is "representative of the physical object."

39

## C. **The PTAB Unreasonably Quibbles with the Precise Disclaimer Language**

The PTAB's disagreement with the precise claim construction formulation urged by Motion Games for "creating a data base" is irrelevant to the PTAB's finding that there is no disclaimer. Motion Games' proposed construction defined creating an uncorrelated data base as "storing as data a sensed pattern representative of a physical object without reference to or knowledge of the object itself." A-0889-91. Motion Games believes that this phraseology clearly and accurately explained the creation of an uncorrelated data base. Indeed, in the parallel district court litigation, the court accepted this same construction of "creating a data base," and stated that "Motion Games' construction appears to be more consistent with the *context* of the May 2000 Amendment" and that "the use of 'correlate' in [Nintendo's] construction may require further construction and may ultimately be construed as something similar to Motion Games' proposed construction." A-2578 (emphasis added).

At the same time, Motion Games recognizes that the English language is rich and varied and that there are multiple ways to express the same concept. If the PTAB preferred different language that also captured the disclaimer, it was free to have used that formulation. Among other things, the PTAB could have started with the no-correlation language in Nintendo's proposed construction in the

40

parallel district court litigation,[3] and added the equally necessary concept that the sensed pattern "stands for the object."   A-0933-35.

In short, whatever the precise language that one uses to construe "creating a data base of said object," it cannot include creating correlated data bases.

### D. <u>The PTAB Misinterprets Statements Regarding Data Base "Use"</u>

The PTAB characterizes the May 22, 2000, Amendment as "stat[ing] that the data base is created from the sensed pattern of the discrete targets and stat[ing] that it could be *used* without reference to or knowledge of the object itself or *used* regardless of a correlation to the actual object."   A-0008 (emphasis in original).   In a remarkable *non sequitur*, the PTAB then concludes that the prosecution history does not "clearly and unmistakably disclaim[] a data base that stores the sensed pattern with reference to or knowledge of the physical object itself."   *Id.*

The two prosecution history statements to which the PTAB alludes do not support its remarkable position.[4]   It should not come as a surprise to anyone that

-----

[3]In marked contrast to the disclaimer-less arguments that it made to the PTAB, Nintendo's proposed construction in the district court was "storing as data the physical arrangement or configuration in three dimensional space of said first and second targets on the physical object, *such that there is no correlation of the targets to the object*."   A-0933 (emphasis added).

[4]The actual statements in the file history are as follows:

41

the uncorrelated data base that is "created" without knowledge of or reference to an object can also be "used." The statements in the prosecution history that the created data base can be used "without reference to or knowledge of the object" and "regardless of a correlation to the actual object" confirm that the claims are indeed directed to an uncorrelated data base, just as Motion Games has said all along.

### E. The '607 Patent Specification Discloses Uncorrelated Data Bases

The PTAB suggests that its disclaimer-less construction is supported by the '607 patent specification, which the PTAB claims does not disclose "a non-correlated data base." A-0009-10. As discussed above at pages 13-16, the PTAB is demonstrably incorrect; the specification discloses *both* correlated *and*

---

> This pattern data base can then be *used in a number of ways*, such as to handle the object or to track changes made to the object, all without reference to or knowledge of the physical object itself. . . .

A-0481 (emphasis added).

> Rather, it is the pattern itself which now stands for the object and *which is used regardless of a correlation to the actual object*, and which is neither disclosed nor made obvious by the Bales paper.

A-0482 (emphasis added).

uncorrelated data bases.  *See also* A-1379-80 at ¶¶ 43-44 (Bobick Dec.); A-1949-

1957 (Bobick Dep.) at 59:7-67:20; *see also* A-1917-1919 at 27:5-29:9.

Indeed, at the IPR hearing, Nintendo's counsel a*cknowledged* that the

specification could reasonably be read to disclose an uncorrelated data base:

> JUDGE PETRAVICK: Does the specification say anything about
> maybe not *pro hac verba* — but anything about storing a data base
> without any sort of correlating data?
>
> MR. PRESTA: Absolutely, you won't find that anywhere in the actual
> words of the patent.  However, if you look, for example, at figure —
> of the patent, at figure 5 of the patent, which if you take a look at it,
> slide 45, you know, there is, there is some initial steps where you have
> a camera that looks at the targets. . . . So their position is that there
> would be an initial step where maybe you only see the targets and you
> only store the X/Ys in the targets.
>
> And, you know, whether that is properly supported in the
> specification, there is nothing in it that really says that, *but, you know,
> it is not necessarily an unrealistic reading of it, but maybe there is
> support for that.* Maybe there is not. It is hard to say. But that's their
> view.

A-2609-10 at 15:13-16:8 (emphasis added).

## IV.     Using Any Proper Claim Construction, Hay and Haas Do Not Disclose or Suggest Creating an Uncorrelated Data Base

Both parties' experts agreed that the disclosure relied on by the PTAB in

Hay and Haas teaches only correlated data bases that were created *with* reference

to or knowledge of the object.  Because creation of correlated data bases using

knowledge of the object was the dispositive difference between the Bales

43

disclosure and the challenged claims of the '607 patent, neither Hay nor Haas, alone or in combination, can render the challenged claims obvious.

### A.     Any Data Base in Hay is a Correlated Data Base Created with Reference to and Knowledge of the Object

Hay discloses the use of cameras to observe a target on a tunnel drilling machine. A-0154 (Claims 1-16). The data gathered by those cameras guides the tunnel driller. *Id.* It is undisputed that the data is merely a correlation of observed points to known targets on known objects. *See* A-1382-85 at ¶¶ 51-58, 1387-89 at ¶¶ 65-69 (Bobick Dec.). Specifically, Hay's claims recite that the "target is attached to [the device] in [a] predetermined positional relationship," the apparatus has an "identifying means for identifying therein at least four target points…," and the apparatus "calculat[es] from said received signals the orientation of the target points *corresponding* to said images in relation to a given reference frame." A-0154. (emphasis added). These limitations demonstrate knowledge of the object, and an effort to correlate the observed points to known target points on a known object.

Hay's specification confirms that there is correlation. First, in describing the creation of the target, Hay states "[t]he lengths of AB, BC, CA, BD, CD, and AD are *known* and the direction cosines may be calculated using the focal length $Z_f$ and the co-ordinates of the points A', B', C', D' in the focal plane." A-0153 at Col.

44

5:9-12 (emphasis added). Likewise, the specification explicitly describes Figure 8

of Hay as a "a flow chart illustrating a program to calculate the three dimensional

position of a *known* three dimensional target from two dimensional co-ordinate

positions in the camera; and to refer co-ordinates of points *known* relative to the

target to new reference axes of the camera and a tunnel in which the camera is

located." A-0151 at Col. 2:58-64 (emphasis added). The target need not always be

in the same place. But if it is moved, it must be in a place in which "the positional

relationship of the target to the cutting head [the position of which is to be

determined] can at all times be defined." A-0153-54 at Col. 6:65-7:3. Without

knowledge of the positional relationship and the correlation to observed points, the

Hay patent would not work. As shown in Figure 8, the penultimate step of the

flow chart is to "transform the PQR coordinates of *known* data points on the cutter

into coordinates on the tunnel axis system." A-0150 at Fig. 8 (emphasis added).



FIG. 8

45

Second, other inquiries and steps in the flow chart in Figure 6 include "have both triangles been found?," "have solutions been found for all the triangles?," and "fit triangles into tetrahedron relationship and reject erroneous triangles."  A-0148 at Fig. 6.  Because their purpose is to facilitate a correlation between the observed points and the known targets on a known object, they make sense only if there is a detailed knowledge and understanding of the target.  A-1384-85 at ¶¶ 55-57 (Bobick Dec.).

Further, a figure in Hay identifies observed points and correlates them to known targets or features on the object.  A-0149 at Fig. 7 ("point 1 is identified," "point 2 is identified", etc.).  Only then does the apparatus "[a]rrange point co-ordinates ie X1 Y1, X2 Y2 etc in matrix to hand on to 2D to 3D program."  *Id.*



FIG. 7

Dr. Welch, Nintendo's expert declarant, admitted in deposition that Hay teaches one of ordinary skill in the art merely to correlate observed points to known targets on a known object:

46

- Q. …*The point of this is to come up with a correlation between observed points and known points* that can be used geometrically then to guide the cutting machine, correct?

    A. *That is correct*…

A-1195 at 138:3-7 (emphasis added).

- A. … *I would absolutely concede that the overall goal of this is to establish a relationship between the points that are imaged and the three-dimensional points on the target in this case.*

A-1198 at 153:6-10 (emphasis added).

- Q. And in order to accomplish [the claimed function of Hay], Hay teaches you to correlate the observed point A prime [in figure 4], back to the actual point A. Correct?

- A. It attempts to *correlate* the 2D projection, the image of the 3D object that is represented by 5. This physical pattern of these targets in the camera's image plane. *It needs to identify those and correlate those.*

A-1191 at 125:6-14 (emphasis added); *see also* A-1194-95 at 137:9-138:1 ("You would still, when you were done, you would have the correlation. *And that would*

47

*be the whole point of it.*") (emphasis added); A-1192 at 126:17-25; A-1194 at 134:12-24; A-1201 at 164:13-21.

In short, nothing in Hay suggests storing as data a sensed pattern representative of a physical object as *an uncorrelated data base*. A-1385 at ¶ 58 (Bobick Dec.). Indeed, the whole point of Hay is to teach how to correlate observed targets to known targets to ensure the resulting data reflects which known, real-world target each observed target represents. Hay could not function without correlating known targets to a known object. A-1385 at ¶¶ 57-58 (Bobick Dec.). Indeed, such a modification, which could come only from improper hindsight, could not have been made without destroying the basic operation and/or functionality of Hay, and therefore, cannot render the claims of the '607 patent obvious. *See Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1334-35 (Fed. Cir. 2013) (claim nonobvious where addition of a missing claim element to the prior art reference resulted in an "unfunctional" device); *see also In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984) (finding no suggestion or motivation to combine prior art references where in doing so, the primary reference "would be rendered inoperable for its intended purpose"); *In re Ratti*, 270 F.2d 810, 813 (C.C.P.A. 1959) ("This suggested combination of references would require a substantial reconstruction and redesign of the elements shown in [the primary reference] as well as a change in

48

the basic principles under which [the primary reference] construction was designed to operate.").

Tellingly, the primary disclosure in Hay on which the PTAB relies is nearly identical to the data base in Bales that Dr. Pryor distinguished. Specifically, the position of a known strip (Bales) or known points (Hay) are used to determine the location and orientation of the object. As shown below, Hay is no closer than Bales in teaching the claimed invention.

| Dr. Pryor's Prosecution History Argument Distinguishing Bales | Disclosure in Hay cited by PTAB |
| --- | --- |
| Rather, the Bales paper discloses, for example, the use of the visible portions of a spiral stripe located at a known position on a known cylinder in order to determine the rotational position of the cylinder or three spots in a line on a *flat plane at* a *known location on a known object*. Using such targets, the *location*, *orientation* and identity of the object can be determined.<br><br>A-0482. | a computer arranged to receive signals indicative of the *position of the four points on the focal plane* of the camera and for calculating from said received signals the *orientation* of the said target points relative to a reference plane, and for calculating thereby the *position* of the said object as projected on to any selected reference plane.<br><br>A-0016-17 (citing Hay at col. 1, ll. 28–34). |

## B. <u>Haas Also Fails To Disclose Creating A Data Base Of An Object</u>

Although the PTAB did not find or rely on Haas to show creating a data base for the object, A-0016-17, Haas is also directed to correlating targets to an object. A-1385-1387 at ¶¶ 59-64; A-1389-1391 at ¶¶ 70-73. The abstract states that the

reference is directed to "[a] measurement system [that] obtains and stores digital

data on the positions of golf club and significant human body parts during a golf

club swing." A-0155 at Abstract. The system uses multiple cameras to observe

LEDs or other targets at known locations on a golfer. A-0159 at Col. 3:16-26. The

locations of those known targets are then used to digitally recreate the golfer's

swing. A-0158 at Col. 1:38-52. It is undisputed that the Haas measurement

system correlates observed targets to known points on the golf club and body.

Haas uses sequential illumination of the LED targets placed on a golfer and

his club to correlate observed targets to known targets. A-0160 at Col. 5:24-48.

Specifically, only a single target is illuminated in each image. *Id.* The system

controls the timing of the illumination, and thus the data set constructed out of a

series of images correlates each data point to a known LED target. Haas explains

that the LEDs are flashed sequentially, so that the apparatus can "associat[e] [a]

specific light source with [a] specific body joint or golf club location…" A-0158

at Col. 2:30-34. Some method of ". . . identifying each of several simultaneously

sensed light sources must be performed." A-0158 at Col. 2:37-40 (emphasis

added). For example, Haas suggests assigning each individual target a distinct

color, further emphasizing the required correlation of observed targets to known

targets. A-0158 at Col. 2:42-44.

50

Haas repeatedly and unequivocally discloses that the observed data "must" be correlated back to known information about the object:

- "Synchronizing information from the sequence generator *must* be available to the data collection device *in order that the measured data will be correctly identified.*"  A-0159 at Col. 3:34-37 (emphasis added).

-  "A two-sensor system can be made to work by calculating the positions of hidden joints from measurements of visible joints and *known body dimensions ….*"  A-0159 at Col. 3:19-24 (emphasis added).

- "A synchronizing signal 47 is connected to the data collector 44 from the sequence generator 38.  As each light source is pulsed on, the synchronizing signal 47 *allows the data collector to label and store the data in the correct location for that particular light source.*  For example, if the light source associated with the golfer's left knee 20a is triggered on by signals from the sequence generator [it] *enables recognition by the data collector 44 that any signal occurring at that time originated in the light source associated with the golfer's left knee 20a.*"  A-0160 at Col. 5:26-38 (emphasis added).

- "This is done by analyzing the golfer's body and golf club as a compound pendulum system whose elements have *known or determined lengths, masses and inertias.*"  A-0159 at Col. 4:5-8 (emphasis added).

As was the case with Hay, Nintendo's expert confirmed that Haas merely discloses correlating observed points to known targets on a known object:

- Q.  To conduct that analysis of the golf swing that you have just mentioned, is it important to correlate the observed points to the actual points on the person and golf club?

    THE WITNESS:  It is the, I believe it is the case *that to do this you would have to be able to associate things in the camera with physical things that you are observing in the, on the user and on the golf club,* the light emitting components.  A-1208 at 190:14-24 (objection omitted and emphasis added).

51

- A.  So, yes.  I think that is consistent with what I stated earlier that the system, when you were referring me back to Column 2, *the system has to associate the features that are seen in the two-dimensional imagery eventually with the 3D points,* as a part of the overall process that is done, I believe.  A-1209 at 195:7-13 (emphasis added).

- Q.  If you look at Column 2, starting on Line 37, it says, "If the light sources are illuminated continuously, the more difficult task of identifying each of several simultaneously sensed light sources *must be performed*."  Do you see that?

     A.  I do.

     Q.  Okay.  Does that tell a person of ordinary skill in the art anything about whether or not the observed targets have to be correlated to specific targets in the real world?

     A.  *I think, I mean yes, it tells them that.*  But I repeat what I said before, which is that *in order to accomplished this you have to know the association between those physical markers and the images of those physical markers*, in order to determine the skeletal structure of the human with the golf club.

A-1208 at 191:19-192:12 (emphasis added).

In short, Haas requires: (1) that the identity of the observed targets be known (*e.g.,* which target represents the shoulder and which represented the elbow); and (2) that the relationship of both the targets and the remainder of the object be known (*i.e.,* the relationship between the shoulder and elbow and the upper arm).  These teachings cannot be reconciled with the properly construed uncorrelated "data base" of the '607 patent.  Haas could not be modified to function as claimed in the '607 patent without destroying its basic operation and/or functionality.

52

### V.    The Unrebutted Objective Indicia of Non-Obviousness Supports Validity

The PTAB's FWD also erroneously ignored the overwhelming, unrefuted evidence of objective indicia of non-obviousness.  A-0911-20 (Motion Games' Response Brief).  The evidence included the declaration of Dr. Aaron Bobick, a computer vision expert, who established that 1) the Wii is a commercial embodiment of the '607 patent claims and 2) the technology in the '607 patent significantly benefited the Wii, including reducing costs, complexity, and processing power.  A-1395-1401 at ¶¶ 84-98.  Motion Games also submitted the declaration of a video game industry expert, Ms. Susan Cummings who, with over 18 years of experience in the video game industry, testified in detail regarding the nexus between commercial success (and other objective indicia) and the value provided by the Wii's use of the '607 patent invention.  A-1594-1614 at ¶¶ 12-46.  Motion Games' proffered declarations thus mirrored the recommended practice of having technical and industry experts address these issues.  *See Rambus Inc. v. Hynix Semiconductor Inc.*, 254 F.R.D. 597, 603-04 (N.D. Cal. 2008) (technical expert opines on "whether a product embodie[d] a claimed invention or possibly whether a product is coextensive with a claimed invention" and "understanding the performance value provided by a claimed invention," while industry expert opines "on why particular products [were] commercially successful.").

53

Nintendo did not even try to rebut Motion Games' evidence. It offered no evidence that the Wii allegedly did not practice the claims of the '607 patent or that it operated differently than Dr. Bobick described, or that the commercial success of the Wii was attributed to any factors other than those identified by Ms. Cummings.

Nevertheless, the PTAB disregarded all evidence of secondary considerations on two erroneous grounds. First it alleged that "Patent Owner's argument is based upon the claims of the '607 patent requiring a feature of storing the sensed pattern without reference to or knowledge of the object on which the target resides." A-0022. This explanation is illogical. The PTAB's disclaimer-less construction broadly covered both correlated *and* uncorrelated data bases. If the '607 patent covered the Wii using Motion Games' narrow construction, it certainly encompassed the Wii under the PTAB's much broader construction.

Second, PTAB states that the undisputed documents on which Dr. Bobick relied to establish the Wii as a commercial embodiment were insufficient to establish that the Wii include the claimed features because it was based on counsel's preliminary infringement contentions in the district court litigation. A-0022. This explanation also makes no sense. Dr. Bobick offered a detailed limitation-by-limitation analysis that explained how each limitation was present. A-1397-1401 at ¶¶ 88-98. Nintendo never offered any evidence to contradict or

54

refute any of Dr. Bobick's conclusions.  Thus, it was impossible for the PTAB to have properly made a fact determination that was contrary to Dr. Bobick's testimony.

Finally, *without even mentioning the testimony of Motion Games' industry expert, Ms. Cummings*, PTAB stated that Motion Games failed to "establish a nexus between the claims of the '607 patent and the success of the Nintendo Wii." A-0022.  But the Cummings declaration clearly established the nexus for commercial success of the Wii and other indicia due to the '607 patent.  A-1595-1614 at ¶¶ 14-46.  The PTAB is not free to disregard evidence without any explanation as to why it is doing so.

In sum, the PTAB clearly erred when it failed to credit Motion Games' evidence of secondary considerations.  *See In re Huai-Hung Kao*, 639 F.3d 1057, 1067 (Fed. Cir. 2011).  Such evidence "is not just a cumulative or confirmatory part of the obviousness calculus, but constitutes independent evidence of nonobviousness." *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008).  Indeed, "objective indicia may often be the most probative and cogent evidence of non-obviousness in the record." *Catalina Lighting, Inc. v. Lamps Plus, Inc.,* 295 F.3d 1277, 1288 (Fed. Cir. 2002) (citation omitted).

## CONCLUSION

The PTAB erred in construing "creating a data base of said object," and

invalidating the challenged claims of the '607 patent.  When this term is properly

construed in accordance with the prosecution history disclaimer, no cited reference

discloses an uncorrelated data base that stands for the object.  Motion Games

respectfully requests that this Court enter an order reversing the Final Written

Decision of the PTAB and remanding this case to the PTAB with instructions to

enter judgment of no unpatentability in favor of patent owner Motion Games.


DATED: October 16, 2015          Respectfully submitted,

                                 BOIES, SCHILLER & FLEXNER LLP

                                 By: */s/ D. Michael Underhill*
                                 D. Michael Underhill
                                 munderhill@bsfllp.com
                                 Richard S. Meyer
                                 rmeyer@bsfllp.com
                                 5301 Wisconsin Avenue, N.W.
                                 Suite 800
                                 Washington, DC 20015
                                 Telephone:  (202) 237-2727
                                 Facsimile:  (202) 237-6131

Joshua M. Kalb
jkalb@hunton.com
HUNTON & WILLIAMS LLP
Bank of America Plaza, Suite 4100
600 Peachtree Street, NE
Atlanta, GA 30308
Telephone:  (404) 888-4000
Facsimile:  (404) 888-4190

*Attorneys for Appellant*
*Motion Games, LLC.*

# ADDENDUM

Trials@uspto.gov                          Paper 51
571-272-7822                              Entered:  May 15, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

NINTENDO OF AMERICA INC.,
Petitioner,

v.

MOTION GAMES, LLC,
Patent Owner.
_____

Case IPR2014-00164
Patent No. 6,167,607 B1
_____

Before MEREDITH C. PETRAVICK, BRYAN F. MOORE, and
TRENTON A. WARD, *Administrative Patent Judges.*

PETRAVICK, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*Inter Partes* Review
*35 U.S.C §318(a) and 37 C.F.R. § 42.73*

IPR2014-00164
Patent 6,167,607 B1

## I. INTRODUCTION

Nintendo of America Inc. ("Petitioner") filed a Petition (Paper 1, "Pet.") to institute an *inter partes* review of claims 1, 2, 15–17, 25, 26, 34, and 39–41 ("the challenged claims") of U.S. Patent No. 6,167,607 B1 ("the '607 patent"). On May 19, 2014, pursuant to 35 U.S.C. § 314, we instituted this trial as to all of the challenged claims on the sole proposed ground under 35 U.S.C. § 103. Paper 12 ("Dec. to Inst."). Motion Games, LLC ("Patent Owner") filed a Patent Owner Response (Paper 23, "PO Resp."), and Petitioner filed a Reply (Paper 28, "Pet. Reply").

Patent Owner filed a Motion to Exclude on December 10, 2014. Paper 33 ("Mot."). Petitioner filed an Opposition to Patent Owner's Motion to Exclude (Paper 38, "Opp."), and Patent Owner filed a Reply to Petitioner's Opposition (Paper 42, "Reply to Opp.").

An oral hearing in this proceeding was held on January 16, 2015. A transcript of the hearing is included in the record. Paper 48 ("Tr.").

For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that claims 1, 2, 15–17, 25, 26, 34, and 39–41 of the '607 patent are unpatentable.

### A. The '607 Patent

The '607 patent, titled "Vision Target Based Assembly," issued on January 2, 2001, based on Application No. 08/487,211, which was filed on June 7, 1995. Application No. 08/487,211 claims priority through a chain of related applications to Application No. 06/262,492, filed on May 11, 1981. Ex. 1001, 1.

2

IPR2014-00164
Patent 6,167,607 B1

The '607 patent relates to methods and systems for fabricating objects using targets applied to the object. *Id.* at Abstract. The '607 patent's specification describes numerous embodiments of using targets to control machines and objects during fabrication processes. One embodiment, depicted in Figure 5, relates to using targets to determine the attitude, shape, or dimension of the object before and after a forming process, and using that information for further handling, assembly, inspecting, or working of the object. *See id.* at col. 2, ll. 42–47. Figure 5 is reproduced below.



Figure 5 depicts the use of target points 700 over part 702.

Figure 5 shows part 702, such as a metal body panel or aircraft panel, before and after forming process 706. *See id.* at col. 9, l. 62–col. 10, l. 31. Prior to forming process 706, part 702 is imprinted with a dot target pattern on one inch centers through the total width, and camera 708 is used to determine the

3

IPR2014-00164
Patent 6,167,607 B1

patten of targets. *Id*. at col. 10, ll. 7–11. After forming process 706, camera 710 views targets 700 to determine if their pattern has changed in order to determine any irregularities in the forming process and to establish a "new data base" for part 702. *Id*. at col. 10, ll. 15-20. The new data base and target dots on the part then are used in the handing of the part during further forming processes, such as handling by handler 718. *See id*. at col. 10, ll. 23–49.

## B. Illustrative Claims

Claims 1 and 25 of the '607 patent are illustrative of the claims at issue and read as follows:

> 1. A method of creating a data base for an object having at least first and second discrete targets thereon in a pattern, said method comprising:
>
> electro-optically sensing, with an electro-optical sensing means, the pattern of said first target and said second target; and
>
> using a processing means, creating a data base of said object using said sensed pattern of said first target and said second target, said created data base comprising said sensed pattern of said first and second targets.
>
> 25. Apparatus for creating a data base for an object having at least first and second discrete targets thereon in a pattern, said apparatus comprising:
>
> electro-optical sensing means for sensing the pattern of said first target and said second target; and
>
> processing means for creating a data base of said object using said sensed pattern of said first target and

4

IPR2014-00164
Patent 6,167,607 B1

> said second target, said data base comprising said
> sensed pattern of said target and second targets.

### C. Related Proceedings

The '607 patent is involved in *Motion Games, LLC v. Nintendo Co., LTD; Nintendo of America Inc., Retro Studios, Inc., Rent-A-Center, Inc., and Gamestop Corp.*, No. 6:12-cv-878, filed in the U.S. District Court for the Eastern District of Texas.

Petitioner also filed petitions for *inter partes* review of U.S. Patent No. 7,756,297 B2 (IPR2014-00165) and U.S. Patent No. 7,843,429 B2 (IPR2014-00166). The proceedings in IPR2014-00165 and IPR2014-00166 were terminated due to settlement between the parties.

## II. ANALYSIS

### A. Claim Construction

Consistent with the statute and legislative history of the America Invents Act (AIA)[1], the Board interprets claims using the broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b); *In re Cuozzo Speed Techs., LLC,* 778 F.3d 1271, 1279–81 (Fed. Cir. 2015). Under the broadest reasonable construction standard, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

---

[1] Pub. L. No. 112-29, 125 Stat. 284 (2011).

IPR2014-00164
Patent 6,167,607 B1

### i. *"creating a data base of said object"*

Claim 1 recites a step of "creating a data base of said object using said sensed pattern of said first target and said second target, said created data base comprising said sensed pattern of said first and second targets."  Claim 25 recites "creating a data base of said object using said sensed pattern of said first target and said second target, said data base comprising said sensed pattern of said first and second targets" as the function of a means-plus-function limitation.

Patent Owner argues that "creating a data base" should be construed to mean "storing as data a sensed pattern representative of a physical object without reference to or knowledge of the object itself" because, according to Patent Owner, during prosecution the plain and ordinary meaning of "creating a data base" was disclaimed explicitly and "creating a data base" was limited to its proposed construction.  PO Resp. 8–10.  To support its argument, Patent Owner cites to this statement made in an Amendment, filed on May 22, 2000 (Ex. 1005, 318–320, "May 22 Amendment"): "it is the pattern itself which now stands for the object and which is used regardless of a correlation to the actual object, and which is neither disclosed nor made obvious by the Bales paper."  *Id*. at 9.  Patent Owner argues that "a construction that disregards an explicit disclaimer is not reasonable, and therefore should not be considered the broadest reasonable construction."  *Id*. at 9–10.

Petitioner argues that the broadest reasonable interpretation of "creating a data base" requires, "at a minimum, storing the sensed data."  Pet. Reply 1–2 (citing Dec. to Inst. 7 (stating that "[c]reating a data base requires, at a minimum, storing the sensed data")).  Petitioner also argues

6

IPR2014-00164
Patent 6,167,607 B1

that the May 22 Amendment does not support Patent Owner's alleged disclaimer (Pet. Reply 5–6). According to Petitioner, the prosecution history and the May 22 Amendment "does not define or limit the 'database' to one which does not refer to or have knowledge of the physical object, but rather only states that the 'data base' can be used without reference to or knowledge of the physical object itself." *Id*. at 6 (emphasis original). Petitioner further argues that neither the claims nor the Specification support Patent Owner's construction, but instead supports a construction of "creating a data base" as requiring, "at a minimum, storing the sensed data." *Id*. at 1–5.

Regardless of whether "a construction that disregards an explicit disclaimer is not reasonable" (PO Resp. 9–10), under the broadest reasonable construction standard, we are not persuaded that the May 22 Amendment includes the alleged explicit disclaimer. Only "a clear and unmistakable disavowal during prosecution overcomes the heavy presumption that claims terms carry their full ordinary and customary meaning." *Biogen Idec, Inc. v. GlaxoSmithKline LLC,* 713 F.3d 1090, 1095 (Fed. Cir. 2013) (internal quotation marks omitted); *see Omega Eng'g, Inc., v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003) (requiring that "the alleged disavowing statements to be both so clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer" (internal citations omitted)).

In the May 22 Amendment, the claims of the '607 patent were amended to include requirements that the object had discrete targets in a pattern; that the pattern was sensed by the sensing means; and that the data base comprised the sensed pattern. *E.g, see* Ex. 1005, 323. The May 22

7

IPR2014-00164
Patent 6,167,607 B1

Amendment also included arguments that the amended claims overcame a rejection under 35 U.S.C. § 103 over the Bales paper.[2] The pertinent portion of the arguments of the May 22 Amendment is reproduced below.

> In the present invention, an object is provided with at least first and second targets thereon which are in a pattern. This pattern may be known (targets dots on one inch centers) or unknown (for example applied to the object at random locations). Whatever the pattern*, it is the pattern which is then sensed electro-optically, and this sensed pattern then becomes a data base for the object. This pattern data base can then be used in a number of ways, such as to handle the object or to track changes made to the object, all without reference to or knowledge of the physical object itself. . . .*
>
> *The Bales paper does not disclose the use of discrete targets in a pattern as a data base*. . . The suggested data base that the Examiner proposes would be obvious from the Bales paper is one which merely correlates targets to the object, which in the present invention there is no such correlation (though it could be done for additional reasons, as noted in certain dependent claims, but this would be another, different, data base.) *Rather, it is the pattern itself which now stands for the object and which is used regardless of a correlation to the actual object, and which is neither disclosed nor made obvious by the Bales paper.*

Ex. 1005, 319–320 (emphases added).

As can been seen from the above, the May 22 Amendment states that the data base is created from the sensed pattern of the discrete targets and states that it could be *used* without reference to or knowledge of the object itself or *used* regardless of a correlation to the actual object. Thus, we are not persuaded by Patent Owner that the May 22, 2000 Amendment clearly

---

[2] BALES ET AL., NASA TECHNICAL PAPER 1819, MARKING PARTS TO AID ROBOT VISION (Apr. 1981).

IPR2014-00164
Patent 6,167,607 B1

and unmistakably disclaims a data base that stores the sensed pattern with reference to or knowledge of the physical object itself.

We are persuaded by Petitioner that the broadest reasonable construction in light of the Specification of "creating a data base of said object" requires, at a minimum, storing the sensed pattern of the first and second targets. This construction is consistent with the language of the claims, themselves, and with the Specification.

Independent claims 1 and 25 recite that the data base is created using the sensed pattern of the first and second targets and that the data base "compris[es] said sensed pattern of said first and second targets." Thus, the language of the claims themselves requires storing the sensed pattern of said first and second targets in the data base. We see nothing in the language of claims 1 and 25 that additionally requires that the sensed pattern is stored without reference to or knowledge of the object, itself, or additionally requires that the sensed pattern is later used without reference to or knowledge of the object, itself. Claims 1 and 25 also contain no requirements as to how the data base is used in further processing the object or precludes using the data base in further processing that requires reference to or knowledge of the object, itself.

We also see nothing in the Specification that requires that the sensed pattern be stored in the data base without reference to or knowledge of the object, itself. Although Patent Owner argues that the '607 patent "teaches multiple data bases; some requiring correlation between observed points and known targets, and some do not" and extolls the benefits of a non-correlated data base, Patent Owner does not provide any specific citation as to where the '607 patent discloses a non-correlated data base or the extolled benefits.

9

IPR2014-00164
Patent 6,167,607 B1

PO Resp. 4–6. Patent Owner, however, does cite to column 10, lines 7–31, as disclosing, generally, storing data related to the arrangement or configuration of targets on an object. *See id.* at 4–5.

Contrary to Patent Owner's argument, column 10, lines 7–31, of the Specification of the '607 patent do not support Patent Owner's proposed construction, but instead support Petitioner's proposed construction. The cited passage states that, after a forming process, camera means 710 again monitors targets 700 to sense the new pattern and to "establish the new data base for the part." Ex. 1001, col. 10, ll. 15–20. The '607 patent then describes that the data base then can be used for further handling and assembling processes. *See id.* at col. 10, ll. 15–58. Contrary to Patent Owner's argument, the further handling and assembling processes may require reference to or knowledge of the object itself. *See* col. 2, ll. 42–50 ("The location of the targets after forming are then determined. From this determined location, the attitude, shape, or dimensions of the object or portions thereof are also determined. Depending upon the determined data, the handling, [assembling], inspecting, or working the object is then effected."); col. 1, ll. 52–54 ("To use targets one must know the part feature database relative to the target points on the part."). This is consistent with a construction of "creating a data base of the object" as requiring, at a minimum, storing the sensed pattern of the first and second targets.

Given the above, we determine that the broadest reasonable construction in light of the Specification of "creating a data base of said object" requires, at a minimum, storing the sensed pattern of the first and second targets and does not preclude that the sensed pattern is stored with reference to or knowledge of the object, itself.

10

IPR2014-00164
Patent 6,167,607 B1

*ii. "processing means" and "processing means for creating a data base of said object using said sensed pattern of said first target and said second target, said data base comprising said sensed pattern of said first and second targets"*

Claim 1 recites "a processing means" in a step of creating a data base of said object using said sensed pattern of said first target and said second target. Claim 25 recites "processing means for creating a data base of said object using said sensed pattern of said first target and said second target, said data base comprising said sensed pattern of said first and second targets."

Petitioner argues that the "processing means" should be interpreted as means-plus-function language under 35 U.S.C. § 112, sixth paragraph.[3] Pet. 4. Petitioner argues that the corresponding structure is a "computer." *Id*. Patent Owner, likewise, indicated during oral hearing that the claimed processing means are equivalent to a general purpose computer. *See* Tr. 35–36 (Patent Owner's counsel stated: "All you are doing is sticking data into a database.")

These limitations are in "means-plus-function" form. The sixth paragraph of § 112 governs the scope and meaning of means-plus-function claim limitations. This paragraph provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim *shall be construed to cover the corresponding*

---

[3] Section 4(c) of the AIA, re-designated 35 U.S.C. § 112, sixth paragraph, as 35 U.S.C. § 112 (f). Because the '607 patent has a filing date prior to September 16, 2012, the effective date of the AIA, we refer to the pre-AIA version of 35 U.S.C. § 112.

IPR2014-00164
Patent 6,167,607 B1

> *structure, material, or acts described in the*
> *specification and equivalents thereof.*

(emphasis added).

For a computer-implemented means-plus-function claim limitation under 35 U.S.C. § 112, sixth paragraph, the specification must disclose a specific algorithm used by the computer to perform the recited function. *Function Media, LLC v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013); *In re Katz*, 639 F.3d 1303, 1315 (Fed. Cir. 2011); *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Techs., Inc.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). A narrow exception to this rule applies if the function is a generic function, such as "processing," "receiving," and "storing," and can be performed by any general-purpose computer without special programming. *In re Katz*, 639 F.3d 1303, 1316 (Fed. Cir. 2011).

We determine that the "processing means" is a limitation in means-plus-function form and is construed to cover the corresponding structure described in the '607 patent and equivalents. The function of the "processing means" is "creating a data base for an object using said sensed pattern of said first target and said second target." As discussed above, we determined that creating a data base requires, at a minimum, storing the sensed pattern. Storing the pattern is a generic function that can be achieved by any general purpose computer without special programming. Therefore, it is not necessary for the '607 patent to disclose more than a general purpose computer, such as a specific algorithm for creating the object's data base. *See In re Katz*, 639 F.3d at 1316. The '607 patent describes a computer storing target pattern data. Ex. 1001, col. 12, ll. 24–26; s*ee id.* at Fig. 5.

12

IPR2014-00164
Patent 6,167,607 B1

Given the above, we construe the claimed "processing means" as requiring a general purpose computer, or equivalents thereof.

### B. Obviousness Ground

Petitioner argues that claims 1, 2, 15–17, 25, 26, 34, and 39–41 are unpatentable under 35 U.S.C. § 103(a) over Hay and Haas.  Pet. 17–59.

> Section 103 forbids issuance of a patent when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art, (2) any differences between the claimed subject matter and the prior art, and (3) the level of skill in the art.  *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *see also KSR*, 550 U.S. at 407 ("While the sequence of these questions might be reordered in any particular case, the [*Graham*] factors continue to define the inquiry that controls.")

### i. Overview of Prior Art

### a. Hay

Hay is a U.S. patent titled "Position Detecting Apparatus" and issued on December 9, 1980.  Ex. 1002, 1.  Figure 1 of Hay is illustrative and reproduced below.

13

IPR2014-00164
Patent 6,167,607 B1



Figure 1 depicts a tunneling machine incorporating a position detecting apparatus.

Figure 1 depicts a tunneling machine incorporating the position detecting apparatus.  Ex. 1002, col. 1, ll. 36–38.  The position detecting apparatus includes computer 17 remote from the machine, target plane 5 attached to boom 2, and camera 6 positioned to view target plane 5.  *Id.* at col. 2, l. 65–col. 3, l. 3, col. 3, ll. 13–15, col. 3, ll. 33–38, claim 1.  Target plane 5 includes lines of radiation emitting LEDs defining target points at their intersections or, alternatively, includes target point source LEDs.  *Id.* at col. 1, ll. 43–47, col. 2, ll. 7–9, col. 6, ll. 10–12, Fig. 2.  Camera 6 is "preferably a solid-state device" with a "two dimensional array of radiation sensitive elements."  *Id.* at col. 3, l. 67–col. 4, l. 8.  Camera 6 views target plane 5 and generates signals indicative of the position of the target points on the focal plane of the camera.  *See id.* at col. 3, l. 50–col. 4, l. 8. Computer 17 receives and stores the generated signals.  *Id.* at col. 1, ll. 28–30; col. 4, ll. 13–34.

14

IPR2014-00164
Patent 6,167,607 B1

### b. Haas

Haas is U.S. patent titled "Apparatus and Method for Analyzing a Golf Swing and Displaying Results" and issued on January 30, 1979. Ex. 1003, 1. Figure 1A of Haas is reproduced below.



Figure 1A depicts an embodiment of the system of Haas.

Figure 1A depicts an embodiment of the system for analyzing a golf swing and displaying results. *Id*. at col. 4, ll. 52–53. A plurality of light sources, such as light source 18, are affixed to golfer 10 and golf club 14. *Id.* at col. 5, ll. 1–6. Electro-optical sensors 16, 16a, 16b, 16c view golfer 10 and golf club 14 (*id*. at col. 4, ll. 55–61) and output data defining the position of the light sources (*id*. at col. 1, ll. 38-41, col. 4, ll. 55–61). Data collector 44 receives and stores the output data. *Id*. at col. 5, ll. 28–31. The stored data is used to generate a representation of the golfer on a display for analysis of the golfer's swing. *See id*. at col. 1, ll. 38–57.

IPR2014-00164
Patent 6,167,607 B1

### ii. Independent Claim 1

Petitioner alleges that claim 1 is unpatentable as obvious over the combination of Hay and Haas. Pet 17–20, 23–25, 27–32. Petitioner argues that Hay discloses most of the limitations of method claim 1 (*id*. at 17–20, 27–32) and that, in particular, Hay discloses the step of creating a data base of the object using the sensed pattern (*id.* at19 (citing Ex. 1002, col. 1, ll. 28–34, col. 4, ll. 13–33)). Petitioner admits that Hay's four target points, which are on the same target plane, may not be considered discrete and relies upon Haas to cure any deficiency. Pet. 17–18. Petitioner argues that using discrete targets, as disclosed in Haas, instead of Hay's target points on a target plane would be a simple substitution of known elements to obtain a predictable result. *See* Pet.18, 25; Ex. 1006 ¶ 66.

Patent Owner argues that Hay and Haas fail to render claim 1 obvious because neither Hay nor Haas discloses the step of creating a data base of the object when the step is construed, as proposed by Patent Owner, to require storing as data a sensed pattern representative of a physical object without reference to or knowledge of the object itself. PO Resp. 10–24.

Patent Owner's argument fails from the outset because it is not based upon the broadest reasonable construction. As discussed above in section II(A)(i–ii), the broadest reasonable construction of "creating a data base of said object" requires, at a minimum, storing the sensed pattern of the first and second targets and of "processing means" requires a general purpose computer or equivalent. Claim 1, thus, requires, at a minimum, storing the sensed pattern of the first and second targets using a general purpose computer, or equivalent. As Petitioner points out, Hay discloses computer 17 storing signals indicative of the positions of the target points on

16

IPR2014-00164
Patent 6,167,607 B1

the focal plane of the camera array. *See* Pet. 19 ((citing Ex. 1002, col. 1, ll. 28–34, col. 4, ll. 13–33), 34–36. Hay, thus, meets the claimed step of "creating a data base," when given its broadest reasonable construction.

Upon review of Petitioner's evidence and analysis, and taking into account Patent Owner's additional arguments, discussed below, we determine that Petitioner has shown by a preponderance of the evidence that claim 1 is unpatentable under 35 U.S.C. § 103 over Hay and Haas.

### iv. Independent Claim 25

Likewise, Petitioner alleges that claim 25 is unpatentable as being obvious over the combination of Hay and Haas. Pet. 17–20, 23–25, 42–53. Petitioner argues that Hay discloses most of the limitations of claim 25 (*id.* at 17–20, 42–53) and that, in particular, Hay discloses the processing means for creating the data base of the object (*id.* at 19 (citing Ex. 1002, col. 1, ll. 28–34, col. 4, ll. 13–33)). Petitioner admits that Hay's four target points, which are on the same target plane, may not be considered discrete and relies upon Haas to cure any deficiency. Pet. 17–18. Petitioner argues that using discrete targets, as disclosed in Haas, instead of Hay's target points on a target plane would be a simple substitution of known elements to obtain a predictable result. *See* Pet. 18, 25; Ex. 1006 ¶ 66.

Patent Owner again argues that Hay and Haas fail to render claim 25 obvious because neither Hay nor Haas discloses the processing means for creating a data base of the object when "creating a data base" is construed, as proposed by Patent Owner, to require storing as data a sensed pattern representative of a physical object without reference to or knowledge of the object itself. PO Resp. 10–24.

IPR2014-00164
Patent 6,167,607 B1

Patent Owner's argument again fails from the outset because it is not based upon the construction of "processing means for creating a data base of said object" that we adopted above. As discussed above in section II(A)(ii), we construed the "processing means for creating a data base" element of claim 25 as requiring a general purpose computer or equivalent, thereof. As Petitioner points out, Hay discloses computer 17, which stores signals indicative of the positions of the target points on the focal plane of the camera array. *See* Pet. 19 ((citing Ex. 1002, col. 1, ll. 28–34, col. 4, ll. 13–33), 34–36. Hay, thus, meets the claimed processing means for creating a data base of the object, when this claim element is given the construction we adopted above.

Upon review of Petitioner's evidence and analysis, and taking into account Patent Owner's additional arguments, discussed below, we determine that Petitioner has shown by a preponderance of the evidence that claim 25 is unpatentable under 35 U.S.C. § 103 over Hay and Haas.

*v. Dependent Claims 2, 15–17, 26, 34, 39, 40, and 41*

Patent Owner makes no arguments regarding the additional limitations recited in dependent claims 2, 15–17, 26, 34, 39, 40, and 41. Upon review of the Petitioner's evidence and analysis (Pet. 20–23, 38–42, 53–59), we determine that Petitioner has shown by a preponderance of the evidence that the dependent claims are unpatentable. *See* Dec. to Inst. 11–13(discussing the disclosures of Hay and Haas with regards to the dependent claims).

IPR2014-00164
Patent 6,167,607 B1

*C. Patent Owner's Additional Arguments*

*i. Motivation to Combine*

Patent Owner argues that Petitioner's declarant Dr. Welch applied impermissible hindsight analysis in testifying that one of ordinary skill in the art would have been motivated to combine Hay and Haas because Dr. Welch was not able to articulate any motivation to combine the references during cross-examination.  PO Resp. 25–26 (citing Ex. 2005).  To support its argument, Patent Owner quotes Dr. Welch's statement below:

> I think implicit in that is the assumption that a person of ordinary skill needed a reason to combine that.  So they would have been motivated to combine if they saw a deficiency that they needed to address . . . What I'm saying is I'm not aware of any specific deficiency that one would need to address.  But if one of ordinary skill, themselves, thought there was something they didn't understand or didn't see, they could have easily reached to Haas, or many other things.

*Id*. at 16 (citing Ex. 2005, 185–186) (emphasis omitted).

Petitioner replies that Patent Owner mischaracterizes Dr. Welch's statement (Pet. Reply 10–11 (citing Ex. 2005, 180–181)) and that Dr. Welch set forth a number of motivations to combine Hay and Haas in his original and reply declarations (Pet. Reply 11).  According to Petitioner, correctly characterized, Dr. Welch's statement indicates that a person of ordinary skill in the art "would not even have to look beyond Hay to achieve the inventions of the '607 Patent but that 'if there was something that they didn't see in Hay for some reason, then [Dr. Welch] think[s] Haas probably would have made that more attractive to them if they did.'"  Pet. Reply 10–11 (citing Ex. 2005, 180–181).

We are not persuaded by Patent Owner's argument because, as Petitioner argues, it mischaracterizes Dr. Welch's quoted testimony.  Upon

19

IPR2014-00164
Patent 6,167,607 B1

review of Dr. Welch's pertinent cross-examination testimony, we agree with Petitioner that Dr. Welch's statement indicates that he believes a person of ordinary skill in the art would not have to look beyond Hay to achieve the claimed invention, but that Haas provides further evidence as to the obviousness of the invention. *See* Ex. 2005, 179–87; Ex. 1012 ¶ 20. We, thus, are not persuaded by Patent Owner that Dr. Welch applied impermissible hindsight analysis in testifying that one of ordinary skill in the art would be motivated to combine Hay and Haas.

### ii. Field of Endeavor

Patent Owner argues that one of ordinary skill in the art would not have been motivated to combine Hay and Haas because they address different problems in different fields of endeavor. PO Resp. 26. Patent Owner states, "both involve using cameras to observe targets, but the similarities stop there" (*id*. at 27) and argues that "Hay and Haas use different apparatuses, different algorithms, and attempt to solve different problems in highly disparate fields of endeavor" (*id.* at 29).

Petitioner replies that both Hay and Haas are within the computer vision field and that somebody working within that field would have knowledge of both. Pet. Reply 11–12. Petitioner argues that even Patent Owner's declarant Dr. Bobick admitted that somebody working in the computer vision field would have knowledge of both types of apparatuses. *Id*. at 11 (citing Ex. 1013, 11).

We are persuaded by Petitioner that Hay and Haas are analogous art because both are within the computer vision field of endeavor. *See* Pet. 24; Pet. Reply 11–12. Although Hay and Haas have some differences, both Hay

IPR2014-00164
Patent 6,167,607 B1

and Haas are within the computer vision field and both electro-optically sense and store target patterns.  *See* Ex. 1006 ¶¶ 64, 67, 70; Ex. 2005, 11–12.

### iii. Secondary Considerations

Patent Owner argues that evidence of secondary considerations outweighs Petitioner's prior art evidence of obviousness.  PO Resp. 30–39. Patent Owner argues that Petitioner's own Nintendo Wii embodies the features of the claims of the '607 patent and, in particular, embodies the feature of storing the sensed pattern without reference to or knowledge of the object on which the target resides.  *Id.* at 31.  It is this feature, according to Patent Owner, that is the basis for the success of the Nintendo Wii.  *See id.* 35–39.

Petitioner replies that Patent Owner provides insufficient evidence to establish a nexus between the success of the Nintendo Wii and the claims of the '607 patent.  Pet. Reply 13–14.

Factual inquiries for an obviousness determination include secondary considerations based on evaluation and crediting of objective evidence of nonobviousness.  *Graham,* 383 U.S. at 17–18.  To be relevant, evidence of nonobviousness must be commensurate in scope with the claimed invention. *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011).  Thus, to be accorded substantial weight, there must be a nexus between the merits of the claimed invention and the evidence of secondary considerations.  *In re GPAC*, 57 F.3d 1573, 1580 (Fed. Cir. 1995).  "Nexus" is a legally and factually sufficient connection between the objective evidence and the claimed invention, such that the objective evidence should be considered in determining nonobviousness.  *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988).

21

IPR2014-00164
Patent 6,167,607 B1

We are not persuaded by Patent Owner's argument because it is not commensurate with the scope of the claims. Patent Owner's argument is based upon the claims of the '607 patent requiring a feature of storing the sensed pattern without reference to or knowledge of the object on which the target resides. As discussed above in section II(A)(i), the claims of the '607 patent require no such feature.

Further, even if the claims required such a feature, Patent Owner's evidence is insufficient to establish that the Nintendo Wii includes such a feature. Patent Owner relies upon the Declaration of Dr. Bobick to establish a nexus between the claims of the '607 patent and the success of the Nintendo Wii. In testifying the Nintendo Wii is a commercial embodiment of the '607 patent, Dr. Bobick, however, states that his opinion is based upon only limited amounts of information provided in the related district court proceeding and that he reserves the right to amend or change his opinions. Ex. 2007 ¶ 84. Dr. Bobick, further, states that his opinion is based upon Exhibit 2012, which is a chart detailing Patent Owner's preliminary infringement contentions in the related district court proceeding. *Id*. ¶ 86. Exhibit 2012 is nothing more than attorney argument that the Nintendo Wii infringes the claims of the '607 patent and an insufficient basis for establishing a nexus between the success of the Nintendo Wii and the claims of the '607 patent. In order to establish a proper nexus, Patent Owner must offer "proof that the sales were a direct result of the unique characteristics of the claimed invention-as opposed to other economic and commercial factors unrelated to the quality of the patented subject matter." *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996).

IPR2014-00164
Patent 6,167,607 B1

### C. Motion to Exclude

Patent Owner filed a Motion to Exclude portions of the Reply Declaration of Dr. Francis Welch and corresponding portions of Petitioner's Reply. Mot. 1. Specifically, Patent Owner argues for exclusion of paragraphs 10–21 of Dr. Welch's Declaration and corresponding sections II–IV of Petitioner's Reply. *Id.*

As the movant, Patent Owner has the burden of proof to establish that it is entitled to the requested relief. *See* 37 C.F.R. § 42.20(C). For the reasons discussed below, we deny Patent Owner's Motion to Exclude.

### i. Under Federal Rule of Evidence ("FRE") 403

First, Patent Owner essentially argues that paragraphs 10–21 and Appendix D of Dr. Welch's Reply Declaration are improper rebuttal evidence which should have been presented with the Petition. Mot. 2–4, 10–11; Reply to Opp. 3, 4–5; *see also* Paper 35 (Petitioner's Notice of Objection to Reply Brief Materials arguing the same sections of the Reply and paragraphs of Dr. Welch's Reply Declaration exceed the permissible scope of reply). Patent Owner further argues that these paragraphs and sections should be excluded under Federal Rule of Evidence 403 because Patent Owner and its declarant did not have an opportunity to address this testimony. Mot. 10. According to Patent Owner the probative value is outweighed by the alleged undue delay in filing. Petitioner counters that these paragraphs of Dr. Welch's Reply Declaration and sections of its Reply should not be excluded because they are responsive to arguments raised in Patent Owner Response and the supporting evidence in Dr. Bobick's Declaration. Reply to Opp. 2–5.

IPR2014-00164
Patent 6,167,607 B1

We are not persuaded that paragraphs 10–21 of Dr. Welch's Reply Declaration and sections II-IV of the Reply should be excluded as inadmissible under FRE 403.  At the outset, Patent Owner's argument is improper.  A motion to exclude is neither a substantive sur-reply, nor a proper vehicle for arguing whether a reply or supporting evidence is of appropriate scope.  *Zynga Inc. v. Personalized Media Commc'ns, LLC*, IPR2013-00162, slip op. at 3 (PTAB Aug. 28, 2013)(Paper 16), *Berk-Tek LLC v. Belden Tech., Inc.*, IPR2013-00057, slip op. at 3 (PTAB Oct. 31, 2014) (Paper 39).

In any event, the mere fact that Dr. Welch's Reply Declaration includes evidence that was not discussed specifically in the Petition is insufficient to establish the impropriety of such evidence, much less inadmissibility under the FRE.  The very nature of a reply is to respond to the opposition, which in this case is the Patent Owner Response.  *See* 37 C.F.R. § 42.23(B).  Patent Owner argues that Petitioner should have been aware that Patent Owner might propose a claim construction based upon an alleged prosecution history disclaimer when it filed its Petition, and therefore, should have included its corresponding arguments and evidence in its Petition. *See* Mot. 3.  Patent Owner's argument is unreasonable.  The need for relying on evidence not previously discussed in the Petition may not exist until a certain argument has been raised in the Patent Owner Response.  Patent Owner's proposed claim construction was raised for the first time in these proceedings in Patent Owner Response.  The Reply complies with 37 C.F.R. § 42.23 as it only responds to arguments raised in Patent Owner's Response.  *See* Paper 36.

24

IPR2014-00164
Patent 6,167,607 B1

*ii. Under FRE 402*

Patent Owner argues that paragraphs 10–14 and Appendix D of Dr. Welch's Reply Declaration amount to improper opinions that there is insufficient written description and/or enablement to support the claims of the '607 when construed as proposed by Patent Owner and should be excluded under FRE 402 as irrelevant. Mot. 4–6; Reply to Opp. 4. Petitioner counters that paragraphs 10–14 and Appendix D is relevant because they rebut Patent Owner's claim construction argument and "goes directly to how the claims should be interpreted based on the written description of the '607 patent." Opp. 4.

We are not persuaded that paragraphs 10–14 and Appendix D of Dr. Welch's Reply Declaration should be excluded as irrelevant under FRE 402. Paragraphs 10–21 of Dr. Welch's Reply Declaration and sections II-IV of the Reply were submitted appropriately to respond to Patent Owner's claim construction argument and evidence presented in its Response.

*iii. Under FRE 702 or 703*

Patent Owner argues that paragraphs 15–21 of the Dr. Welch's Reply Declaration contradict Dr. Welch's cross-examination testimony and, therefore, should be excluded under FRE 702 and 703. Mot. 7–9. Patent Owner also argues that Appendix D of Dr. Welch's Reply Declaration should be excluded because it is conclusory expert testimony unsupported by any documentation. *Id*. at 6. Petitioner counters that Patent Owner's argument goes to the weight of the evidence rather than to its admissibility (Reply to Opp. 5–6) and disputes that Dr. Welch's Reply Declaration is contradictory or conclusory (*id*. at 7–9).

IPR2014-00164
Patent 6,167,607 B1

We are not persuaded that paragraphs 15–21 and Appendix D of Dr. Welch's Reply Declaration should be excluded under FRE 702 and 703. Patent Owner's arguments go to the weight of the evidence in question rather than its admissibility. There is a strong public policy for making all information filed in a non-jury, quasi-judicial administrative proceeding available to the public, especially in an *inter partes* review, which determines the patentability of claims in an issued patent. It is within the Board's discretion to assign appropriate weight to evidence. *See e.g., In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d 13598, 1368 (Fed. Cir. 2004) ("[T]he Board is entitled to weigh the declarations and conclude that the lack of factual corroboration warrants discounting the options expressed in the declarations.")

### iv. Procedural Deficiency

Patent Owner's Motion to Exclude also is deficient procedurally. A party challenging the admissibility of evidence with a motion to exclude "must object timely to the evidence." Office Trial Practice Guide, 77 Fed. Reg. 48,756, 48,767 (Aug. 14, 2012). Section 42.64(b)(1) of our Rules requires that "[o]nce a trial has been instituted, any objection must be served within five business days of service of evidence to which the objection is directed." As Patent Owner, itself, points out, Patent Owner's Motion to Exclude is based upon objections, which were untimely served. *See id.* at 1; *see* Opp. 1–2. Patent Owner did not request that the Board waive or suspend the requirement of 37 C.F.R. § 42.64(b)(1) prior to filing the late objections. In as much as Patent Owner does so now in its Motion to Exclude, Patent Owner's request is denied. Patent Owner's Motion to Exclude proffers no showing of good cause as to why the late service of the objection should be

26

IPR2014-00164
Patent 6,167,607 B1

excused (37 C.F.R. § 42.5(c)(3)), other than to argue that Petitioner suffered
no prejudice.  *See* Mot. 1; Opp. 1–2; Reply to Opp. 1–2.

In addition, 37 C.F.R. § 42.64(c) requires that "[t]he motion must
identify the objections in the record in order and must explain the
objections."  Office Trial Practice Guide, 77 Fed. Reg. at 48,767.  In the
Motion to Exclude, Patent Owner states that "Motion Games served
corresponding objections on Nintendo on November 10, 2014," but does not
identify the corresponding objections in the record.

## III. CONCLUSION

We conclude that Petitioner has demonstrated by a preponderance of
the evidence that claims 1, 2, 15–17, 25, 26, 34, and 39–41 are unpatentable
under 35 U.S.C. § 103(a) over Hay and Haas.

We deny Patent Owner's Motion to Exclude.

This is a Final Written Decision of the Board under 35 U.S.C. §
328(a).  Parties to the proceeding seeking judicial review of this decision
must comply with the notice and service requirements of 37 C.F.R. § 90.2.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1, 2, 15–17, 25, 26, 34, and 39–41 of U.S.
Patent No. 6,167,607 B1 are *unpatentable*; and

FURTHER ORDERED that Patent Owner's Motion to Exclude is
*denied*.

IPR2014-00164
Patent 6,167,607 B1

PETITIONER:

Barry J. Coyne
REED SMITH LLP
bcoyne@reedsmith.com

Joseph S. Presta
NIXON & VANDERHYE, P.C.
jsp@nixonvan.com

PATENT OWNER:

Jeffrey B. Vockrodt
HUNTON & WILLIAMS LLP
jvockrodt@hunton.com

Richard S. Meyer
BOIES, SCHILLER & FLEXNER LLP
rmeyer@bsfllp.com

28



US006167607B1

(12) **United States Patent**

Pryor

(10) **Patent No.:** **US 6,167,607 B1**

(45) **Date of Patent:** **Jan. 2, 2001**

(54) **VISION TARGET BASED ASSEMBLY**

(75) Inventor: **Timothy R. Pryor**, Tecumseh (CA)

(73) Assignee: **Great Lakes Intellectual Property**, Windsor (CA)

(*) Notice: Under 35 U.S.C. 154(b), the term of this patent shall be extended for 0 days.

(21) Appl. No.: **08/487,211**

(22) Filed: **Jun. 7, 1995**

**Related U.S. Application Data**

(62) Division of application No. 07/875,282, filed on Apr. 29, 1992, which is a continuation of application No. 07/478,078, filed on Feb. 9, 1990, now Pat. No. 5,148,591, which is a continuation of application No. 07/110,541, filed on Oct. 20, 1987, now abandoned, which is a continuation of application No. 06/865,637, filed on May 14, 1986, now abandoned, which is a continuation of application No. 06/660,280, filed on Oct. 12, 1984, now abandoned, which is a continuation-in-part of application No. 06/348,803, filed on Feb. 16, 1982, now abandoned, and a continuation-in-part of application No. 06/453,910, filed on Dec. 28, 1982, now abandoned, and a continuation-in-part of application No. 06/323, 395, filed on Nov. 20, 1981, now Pat. No. 4,482,960, and a continuation-in-part of application No. 06/651,325, filed on Sep. 17, 1984, now Pat. No. 4,769,700, and a continuation-in-part of application No. 06/592,443, filed on Mar. 22, 1984, now Pat. No. 4,602,163, which is a continuation-in-part of application No. 06/262,492, filed on May 11, 1981, now Pat. No. 4,453,085.

(51) Int. Cl.[7] ............................................ **B23Q 17/00**

(52) U.S. Cl. ...................... **29/407.04**; 29/407.1; 29/720; 29/702

(58) **Field of Search** ............................ 29/407.04, 407.09, 29/407.1, 720, 721, 705, 702, 703

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,014,000 | 3/1977 | Uno et al. . |
| 4,044,377 * | 8/1977 | Bowerman ........................ 901/47 X |
| 4,146,924 | 3/1979 | Birk et al. . |
| 4,190,890 * | 2/1980 | Marx ............................... 29/710 X |

| | | |
|---|---|---|
| 4,219,847 * | 8/1980 | Pinkney et al. ................... 901/47 X |
| 4,314,402 * | 2/1982 | Lemmer ............................ 29/833 X |
| 4,380,696 * | 4/1983 | Masaki ................................ 901/9 X |
| 4,396,945 * | 8/1983 | DiMatteo et al. ................. 901/47 X |
| 4,402,053 * | 8/1983 | Kelley et al. ..................... 901/47 X |
| 4,412,121 * | 10/1983 | Kremers et al. ................... 901/47 X |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2430058 * | 1/1976 | (DE) ........................................ 901/47 |
| 114505 * | 8/1984 | (EP) ......................................... 901/9 |
| 0219537 * | 9/1986 | (JP) ........................................ 29/720 |
| 0229252 * | 9/1988 | (JP) ........................................ 29/720 |

OTHER PUBLICATIONS

IBM Technical Disclosure Bulletin, vol. 27 No. 6, Nov. 1984, pp. 3653–3655, M. S. Chester, M. A. Levin R.H. Taylor, "Chip–Placement Alignment Technique".*

(List continued on next page.)

* cited by examiner

*Primary Examiner*—David P. Bryant
(74) *Attorney, Agent, or Firm*—Larson & Taylor PLC

(57) **ABSTRACT**

Methods and apparatuses for assemblying, handling, and fabrication are disclosed in which targets are used on objects. The targets can be specifically applied to the object, or can be an otherwise normal feature of the object. Conveniently, the targets are removable from the object or covered by another object during an assemblying process. One or more robots and imaging devices for the targets are used. The robots can be used to handle or assemble a part, or a fixture may be used in conjunction with the robots. Conveniently, the CAD design system is used in designing the targets as well as for the assembly process using the targets. A plurality of targets can also be used to monitor and inspect a forming process such as on a sheet panel.

**47 Claims, 24 Drawing Sheets**



Nintendo Ex. 1001

## US 6,167,607 B1
Page 2

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,435,835 | 3/1984 | Sakow et al. . |
| 4,475,122 | 10/1984 | Green . |
| 4,613,942 * | 9/1986 | Chen ................................. 901/47 X |
| 4,631,676 | 12/1986 | Pugh . |
| 4,639,878 * | 1/1987 | Day et al. ......................... 901/47 X |
| 4,670,298 * | 6/1987 | Lucas et al. ....................... 29/840 X |

### OTHER PUBLICATIONS

Decade of Robots 1983, pp. 30–33, Yoon Yong, Maurice Bonner, "Simulation: Preventing Some Nasty Snarl–ups".*

Merritt, "Industries Robots: Getting Smarter All The Time", Instruments control systems, Jul. 1982, pp. 32–38.*

Hollinger, "Robots That See, Feel and Sense", The Engineer, Nov. 1980, p. 45, 48.*

Ruoff, "PACS—An Advanced Multitasking Robot System", The Industrial Robot, Jun. 1980, pp. 87–98.*

Bales et al., "Marking Parts to Aid Robot Vision", NASA Technical Paper 1819, Apr. 1981.

Nintendo Ex. 1001



*FIG. 1*

Nintendo Ex. 1001

DISPLAY

CAD SYSTEM — 100

— 102

DESIGN PART
(INC. SPECIAL PTS. IF ANY) — 104

DESIGNATE TARGET POINTS — 106

SPECIFY OPERATING PARAMETERS — 108

ASSEMBLE HANDLE ETC.

"TRY" OPERATION IN COMPUTER — 110

OBSERVE "RESULTS" — 112

VARY PARAMETERS — 114

RE RUN OPERATION UNTIL SUCCESSFUL — 116

INTEGRATE WITH OTHER OPERATIONS AND CONTINUE — 118

*FIG. 2*

Nintendo Ex. 1001



*FIG.3a*

*FIG.3b*

Nintendo Ex. 1001



*FIG. 4a*



*FIG. 4b*

Nintendo Ex. 1001



*FIG. 5*

Nintendo Ex. 1001



*FIG. 6*



*FIG. 7*

Nintendo Ex. 1001

U.S. Patent          Jan. 2, 2001          Sheet 7 of 24          US 6,167,607 B1



**FIG.8**

Nintendo Ex. 1001



*FIG. 9*

Nintendo Ex. 1001



*FIG. 10A*

Nintendo Ex. 1001

U.S. Patent    Jan. 2, 2001    Sheet 10 of 24    US 6,167,607 B1

A-0040

Nintendo Ex. 1001



**FIG.10B**

Case: 15-1867    Document: 24    Page: 107    Filed: 10/16/2015



*FIG. 11*

Nintendo Ex. 1001



FIG. 12A

Nintendo Ex. 1001



*FIG. 12B*



*FIG. 13*

Nintendo Ex. 1001



## FIG. 14A



## FIG. 14B

Nintendo Ex. 1001



# FIG. 15A



# FIG. 15B

Nintendo Ex. 1001

Case: 15-1867    Document: 24    Page: 112    Filed: 10/16/2015



# FIG. 15C



# FIG. 16

Nintendo Ex. 1001



*FIG. 17*

Nintendo Ex. 1001



*FIG. 18*

Nintendo Ex. 1001



*FIG. 19*

Nintendo Ex. 1001

*FIG. 20*



Nintendo Ex. 1001



FIG. 21

Nintendo Ex. 1001



**FIG. 22**

Nintendo Ex. 1001



# FIG. 23A



# FIG. 23B

Nintendo Ex. 1001



*FIG. 23C*



LINE FLOW

TO AUTOMATION

*FIG.24*

Nintendo Ex. 1001

US 6,167,607 B1

1

## VISION TARGET BASED ASSEMBLY

This application is a division of application Ser. No. 07/875,282, filed Apr. 29, 1992, which was a continuation of application Ser. No. 07/478,078, filed Feb. 9, 1990, now U.S. Pat. No. 5,148,591, which was a continuation of application Ser. No. 07/110,541, filed Oct. 20, 1987, now abandoned, which was a continuation of application Ser. No. 06/865,637, filed May 14, 1986, now abandoned, which was a continuation of application Ser. No. 06/660,280, filed Oct. 12, 1984, now abandoned, which was a continuation-in-part of application Ser. No. 06/348,803, filed Feb. 16, 1982, now abandoned, and a continuation-in-part of application Ser. No. 06/453,910, filed Dec. 28, 1982, now abandoned, and a continuation-in-part of application Ser. No. 06/323,395, filed Nov. 20, 1981, now U.S. Pat. No. 4,482,960, and a continuation-in-part of application Ser. No. 06/651,325, filed Sep. 17, 1984, now U.S. Pat. No. 4,769,700, and a continuation-in-part of application Ser. No. 06/592,443, filed Mar. 22, 1984, now U.S. Pat. No. 4,602,163, which was a continuation-in-part of application Ser. No. 06/262,492, filed May 11, 1981, now U.S. Pat. No. 4,453,085.

### BACKGROUND OF THE INVENTION

The following are co-pending applications in the same field which are herein incorporated by reference:

1. Robot Calibration, Ser No. 453,910

2. Electro-Optical Systems for Control of Robots, Manipulator Arms and Coordinate Measuring Machines, or "Robots and Manipulator Arms", Ser. No. 592,443.

3. Robot Tractors Ser. No. 323,395, now U.S. Pat. No. 4,482,960.

4. Robot Tractors, Vehicles and Machinery, Ser. No. 651,325.

Flexible robot assembly is often very difficult in the absence of machine vision sensors to guide the operation. Even with such sensors, operation must be both accurate, ultra reliable, and fast enough to be justifiable relative to human labor. These criteria are seldom met by present day vision systems employing arbitrary gray level images and the like.

The target based invention described in reference 1 above has wide application to the assembly process. Described therein are several embodiments illustrating target based techniques which can overcome the limitations of present systems. The key to the use of the disclosed systems is that the target points on the part are easily discernable and unambiguous, after processing using rapid devices and other high speed analysis software.

The target system functions well because it is based on high contrast images and mathematical equations. To use targets one must know the part feature data base relative to the target points on the part. Targets on tooling, pallets and fixed members may also be of use. Special retro reflective targets give best contrast, but targets can be holes, corners or other easily determined natural part features.

Finally, where special targets are used which would not normally be present, techniques are disclosed to make these unobstrusive.

### SUMMARY OF THE INVENTION

In accordance with the present invention, a method for controlling an assembly process is provided in which at least one first robot holds a first part in relation to a second part. Targets are provided on at least one of the robots or the first

2

or second part. A TV camera then determines the position of the targets. From this determination, the assembly process is controlled.

In a preferred embodiment, the part held by the robot has a face on which the targets are located such that the TV camera can view these targets. In this manner, the robot is guided to handle or assemble the part.

A method for fabrication or assembly in which a fixture is provided is also disclosed. The location of a part having targets is determined with a TV camera and a robot then places the part on the fixture depending upon this determined location. A further object may be located on the fixture.

During a dynamic fabrication, it is also possible with the present invention to target the part so that corrections can be made during processing.

Preferably, the targets are located in a finished assembly in such a manner as to be out of view. These targets can be covered up by a second object assembled with respect to the first object if applicable.

The present invention also includes a method for guiding objects into openings or onto protrusions. A plurality of target features are initially provided adjacent an opening or protrusion. These target features are imaged with a TV camera in order to determine the location of the target features. From this determined target location, an object is guided onto the opening or protrusion.

The present invention also makes use of a CAD system in a method of fabrication. Initially, the design of a finished assembly of parts is provided in a CAD system. The CAD system is also provided with individual part designs which are used to make up the assembly. These designs include special targets or natural features which serve as targets. The entire system is then provided with a logical progression of functions feeding program/functions to one or more robotic automation devices for assembly. Assembly is assisted by the use of TV cameras which are provided with the design data. The parts are then suitably assembled using images of the targets determined by the camera. Initially, the CAD system can be used to simulate the fabrication process.

In another preferred embodiment of the present invention, targets are provided on an object before a forming operation is performed. The location of the targets after forming are then determined. From this determined location, the attitude, shape, or dimension of the object or portions thereof are also determined. Depending upon the determined data, the handling, assembling, inspecting, or working the object is then effected.

This invention further relates to methods and apparatus for determining the position of an object and guiding robots or other automation to handle or work on said object.

There are many instances in which it is desired to know the position of an object. In the manufacturing field, such instances include the position of objects along mass production lines, particularly those which are highly automated. For example, in a mass production line, it is frequently necessary to know with considerable precision the position of an object suspended from a conveyor system. This is particularly true in automated systems involving the use of robots for it is fundamentally necessary that the object be in a known position, relative to the robot, before the robot can execute a desired manipulation of the object.

In some instances, mechanical means are used to position the object and/or to orient the object in proper position for automated manipulation. For many applications, however, it

Nintendo Ex. 1001

US 6,167,607 B1

3

is necessary to provide "vision" in order to determine the position of an object. This is particularly true in the case of robots which can perform a myriad of physical manipulations, all automatically. It is well recognized in the field of robots that robotic "vision" is one of the major obstacles to much wider use of robots which are presently quite sophisticated in terms of the manipulations of which they are capable.

Specifically the problem in plants of operationally using robots to handle or work on random parts on continuous conveyors is an enormous one. Since such conveyors are omni present in plants of all types, this problem must be effectively dealt with, if large scale robot usage is to become a reality.

In doing so, there are many types of electro-optically based "machine vision" systems which can be utilized. Historically, these systems have been based on reflective viewing of objects through their gray scale levels which poses extremely difficult problems. The trend is thence to ever more complex systems, which runs counter to good plant reliability.

This inventor, for example, has been involved in the installation of nearly 1,000 electro-optical sensor units in plants of varying types for inspection. Substantial difficulties have been encountered when such electro-optical image based sensors were utilized to obtain part images, particularly in reflection.

When one considers that the robot based system must achieve a reliability far higher than even these inspection based units, in order that it not ruin the product, drop it on the floor etc., it becomes apparant that a simple and reliable means of solving these problems is required.

This invention seeks to illustrate such means. In particular, solution is possible if one restricts the problem simply enough to targeted objects. This then leads to the possibility of tracking the parts or the containers, conveyors etc. so targeted, possibly using further sensors if required to find parts within these containers, instrumented grippers or the like.

The application by the inventor, Ser. No. 200,401, illustrated in the embodiment of FIG. 13, instrumented monorail and walking beam conveyors utilizing fiber optics directed through portions of the conveyor apparatus which could be illuminated on demand in order to provide one or more targets for tracking or homing purposes using robotic or other automation.

Also described in Ser. No. 200,401 are many other novel features of interest. These are:

(a) The general concept of use of such 'active' lighting in automation and particularly the use of fibers therefore.

(b) The use of 'active detection' wherein the light is directed from the robot into one end of a fiber, and sensed at the opposite end of said fiber.

(c) The use of other materials than fibers, for example, translucent fixtures of teflon or ceramic.

(d) The use of multiple target points on the illuminated piece to be tracked.

(e) The use of blow-offs to keep the targeted fixtures clean.

(f) The use of pulsed or modulated light sources discrimination against background noise.

(g) The use of light sources and electro-optical sensors both located on robot where the light source of the robot is directed to a predicted entrance point of the fiber(s) and the light emanating from the opposite end of the fiber(s) is

4

sensed by the camera of the robot. Two robots for example could be used, one to light the part or fixture, the other to sense it.

In addition, the application described how to track conveyors carrying parts and made reference to the tracking the parts themselves.

It is an object of the present invention to provide a method and apparatus for determining the position of a targeted object or object carrier. It is a further object of the invention to provide such method and apparatus having particular suitability for providing robotic "vision" and to disclose practical system based thereon.

It is further intent of this invention to expand the previously disclosed concepts beyond simply the fixtures themselves and the parts within the fixture, to the targeting and identifying of containers and parts of all descriptions, for example to baskets, trays, cartons, tools for pickup, parts in warehouse bins, and indeed the parts themselves.

In addition, this invention elaborates further on the use of other targeting materials than fiber optics, not only transmissive materials of other sorts, but objects such as glass beads, drilled fascets, casting risers and the like.

It is a further purpose of this invention to show other means in the sensing which can give improved target position and data. Particularly of interest are those related to apparatus such as Pinkney, U.S. Pat. No. 4,219,847.

It is further a purpose of this invention to show specifically how certain parts in overhead monorail conveyors can be picked off under random situations with the high reliability needed to work in plants.

It is further a purpose of this invention to show means for outlining the edges of targets for use with stereo cameras or other sensing means not necessarily based on point targets.

It is a further purpose of this invention to show means for coding the various fiber input or outputs, or other targets by use of colors or modulation frequencies. This is also possible with inserted glass beads and retro-reflectors.

Finally, it is a desirable purpose of this invention to show that standardized systems, based on such tracking, can be used across the total spectrum of manufacturing and industry with very litte change as long as one sticks to certain target principles. This allows the wide spread use of reliable guide robots at affordable cost.

Other features and advantages of the present invention are stated or apparent from a detailed description of presently preferred embodiments of the invention found hereinbelow.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 schematically illustrates a targeted assembly fixture with part loading by a robot.

FIG. 2 is a simulation block diagram.

FIGS. 3a and 3b schematically illustrate a dual robot version of the invention, with specialized target concepts including targets on two sides of parts, on end effectors and the like.

FIGS. 4a and 4b schematically illustrate, respectively, an assembly technique using targets which surround an opening and targets which are covered up by other parts or assembled to point the targets away from view.

FIG. 5 schematically illustrates transformation of target data bases due to forming.

FIG. 6 schematically illustrates flexible "fixtureless" robotic assembly.

FIG. 7 schematically illustrates an assembly cell according to the invention.

Nintendo Ex. 1001

US 6,167,607 B1

5

FIG. **8** is a diagrammatic side elevation view of an overhead conveyor system utilizing the present invention, FIG. **9** is an enlarged diagrammatic perspective view of hook **14** of FIG. **1**.

FIGS. **10A, 10B** illustrates a complete system for the picking of transmission clutch parts off of overhead mono-rail conveyors in an automatic transmission plant. The sensor is of the general type described by Pinknewy, utilized to track the conveyor carrier(s) which are targeted by means herein disclosed. Optionally, an additional sensor or analysis means on the robot may be used to find the part within the carrier.

FIG. **11** illustrates target embodiments on the carriers used in FIGS. **10A, 10B**.

FIGS. **12A, 12B** illustrates an embodiment showing methods of targeting a plastic door panel having built-in optical fibers.

FIG. **13** illustrates a car windshield with lossy fibers to outline its periphery, which is imaged by stereoscopic cameras.

FIGS. **14A, 14B** illustrates a part targeting embodiment employing drilled holes.

FIGS. **15A, 15B, 15C** illustrates a part targeting embodiment wherein said targets are cast into the part or are appendiges thereto.

FIG. **16** illustrates a part targeting embodiment wherein said targets comprise directional or color reflective elements which may be molded or pressed in.

FIG. **17** illustrates a robotic system employing targeted boxes randomly spaced on a roller conveyor, utilizing either targets printed onto the box, fibers, or retro-reflectors.

FIG. **18** illustrates means for targeting a tool.

FIG. **19** illustrates alternative means for creating siitable targets, and use on car body assembly.

FIG. **20** illustrates reusable targets for parts.

FIG. **21** illustrates a method of assembling cars according to the invention.

FIG. **22** illustrates a sensor embodiment according to the invention.

FIGS. **23A, 23B, 23C** and **24** illustrate further part targeting embodiments.

Incorporated by reference other copending applications by the inventor. Many embodiments therein illustrate sensors and hardware of use in this disclosure.

5. Electro-optical sensor systems for thread and hole inspection Ser. No. 64,867.

6. Method and apparatus electro-optically determining the dimension, attitude and location of objects: Ser. No. 34,278.

7. Method and apparatus for determining physical characteristics of object and object surfaces: Ser. No. 15,792.

8. New photodetector array based optical measurement systems: Ser. No. 163,290.

9. Electro-optical inspection, Ser. No. 073,226.

10. Co-ordinate measuring method and device, Ser. No. 201,081.

11. Electro-optical sensors with fiber optic bundles, Ser. No. 173,370.

12. Electro-optical surface roughness measurement and control Ser. No. 240,459.

13. Apparatus for determining dimensions, Ser. No. 134,465.

14. High speed electro-optical inspection, Ser. No. 203,866.

6

15. Fiber optic based robot controls, Ser. No. 200,401.

16. Electro-optical sensors for machine tool and robotic inspection.

17. Electro-optical systems for control of robots, manipulator arms and coordinate measurement machines Ser. No. 262,497.

18. Method and apparatus for determining wear or breakage of tools and other defects.

19. Electro-optical systems for detection of leakage and blockage.

20. Productivity improvement via robotic electro-optical part and tool inspection.

21. Robot tractors.

22. Method and apparatus for determining physical characteristics of object outer surfaces Ser. No. 15,614.

23. Method and apparatus for determining dimensional information concerning an object (division of Ser. No. 15,792).

24. Method and apparatus for detection of surface deformaties (division of Ser. No. 15,792) Ser. No. 234,728.

25. "Linear" continuation of Ser. No. 015,792.

26. "Circular" continuation of Ser. No. 015,792.

27. Optically controlled plumbing apparatus Ser. No. 29,840.

28. Optically controlled bathing systems Ser. No. 23,150.

29. Electro-optical and robotic casting quality assurance.

30. Controlled machining of combustion chambers, gears and other surfaces including methods for obtaining correct combustion chamber volume in finished engine assemblies.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. 1 illustrates an assembly operation using a robot **10** with a control computer **11** to place a part **12** of a car on an assembly fixture **15** which has been targeted according to the invention. As is desirable, the CAD system **30** (which has created the design for both the part and/or the fixture) has recorded the target data points **40, 41, 42** and **43** that are to be used by a camera unit **35** to locate the part **12** and/or the features of the part **12** that have been designated as targets plus the target points of the assembly fixture. It is noted that in some cases assembly fixtures are not required as pointed out below. When this data is obtained, the CAO system **30** downloads to the robot control **11** the description of the target point locations and the robot then homes in on these points using the present invention.

In a typical example, a hood inner support is part **12**. Part **12** is loaded in a programmable manner from the download data onto locators **17, 18, 19** and **20** on a fixture **15** where targets **35, 37, 38** and **39** have been placed. Targets **36, 37, 38** and **39** are either on or near the locators **17, 18, 19** and **20**, or on points **50, 51, 52** and **53** around the framework of the fixture **15** which are related to the locators **17, 18, 19** and **20**. The camera system **35** located on the robot (or alternatively off the robot as shown) locates these points and guides the robot **10** in. Differential closing data between part and locators can be provided to allow a smooth close and mate operation.

To assemble hood outer panel **60** to the inner part **12**, adhesive for example, is first applied to hood inner part **12**. The adhesive is conveniently applied using the same robot **10** and using the fixture or part target data to guide the robot **10** (although once the part **12** is well-located on the fixture **15**, it is known accurately enough in position to not require additional vision sensing except as a verification check).

Nintendo Ex. 1001

7

The robot **10** goes and gets the hood outer panel located in rack **61** using either of two methods. First, it can locate the hood by its corner edges **70, 71, 72** and **73** as target points, grasp the outer panel **60** with a suction cup, and place it on the inner support part **12**.

Another method is that the robot **10** grasps the panel **60** arbitrarily at the best estimated location on its outer surface. The robot **12** then presents the rear of the surface of panel **60** having holes **80, 81, 82, 83** to camera **35**. Camera **35** then establishes the part reference to the robot so that the hood outer panel **60** can be reliably placed over the inner part **12** and joined.

The fixture design and the target relationships to-the part design can be optimally matched in the design computer **100** as shown in FIG. **2**. This allows a simulation routine **102** of the whole process at a point before construction. Unlike other hypothesized robot simulation activities, this one is based on the sure knowledge that the target points will be identifiable within any given practical accuracy range because only highly well defined targets are utilized which are at sufficiently precise locations to the data bases of the part or fixture to assure success.

As shown in FIG. **2**, simulation routine **102** begins with design part box **104** which takes account of the design data of the part, including any special points (if any). Next, from this data, target points are designated on the part as shown in box **106**. The operational parameters are then specified as indicated by box **108**. These parameters include camera-processor plans, type of robot(s), distances, range of possible orientations, tracking algorithms used, photogrammetric algorithms used, special target indicators, and the like. Using the operational parameters selected, an operation such as assembling or handling is tried as shown by box **110**. The results of this "try" are then determined as indicated by box **112**. These results are such things as cycle time, functionality, etc. Depending on the results obtained, various parameters are varied in an effort to improve the process as shown by box **114**. Among the parameters which might be varied are the following: change equations, redesign part, change target points, apply special targets, add light sources, and add front end processor.

After the appropriate parameters are varied, the operation is again tried as indicated by box **116**. If not successful, the parameters are again varied and the operation rerun until a successful operation is achieved. At this point, the operation is ready to be integrated with other operations as indicated by box **118**. It should be noted that CAD system **100** would have ideally programmed the parameter (speed, accuracy, risk etc.) of various target choices to be seen using various camera lighting, image processing, and the like.

In addition, simulation **102** can continually optimize the solutions of the photogrammetric target equations to allow the best performance accuracies to be obtained within the desired cycle time of the operation. For example, the target choice and location, number of targets etc., can be changed on a CAD system and operation of the process using robots interacting with these targets simulated and photogrammetric and/or tracking equations optimized.

A simulation block diagram is shown in FIG. **2**. With the system, it becomes cost effective to develop simulation programs for robot systems since one has an assurety of vision based guidance. This is not true with other guidance systems in operation today, and particularly not so with those capable of the high speed accurate operation required to justify cost in modern manufacturing.

FIG. **3a** illustrates a variation on this particular embodiment in which a dual set of robots is used. In this case, Robot

8

A picks up the part **300** and presents it to Robot B which then inserts a shaft part **301** into a sleeve **302** in part **300**. This assembly operation could be any other type of operation as well.

Part **300** is picked up by the robot gripper **304**, preferably, but not necessarily, using target points **310, 311,** and **312** on part **300** viewed by camera **321**. When it is presented to part **301**, the second robot can interact in any one of several ways. In the first case, the part **300** has target points that can be identified such as holes or other purposely placed targets that can be identified relative to it. In this case, the camera unit **320** on Robot B can home in on those points. Again, as before, all of this data can be downloaded from a central computer **350**.

Another possibility is to target the Robot A end effector or tooling **304** holding the part **300**, as shown with targets **340** and **341**. Since part **300** has been picked up originally in an accurate manner relative to the tooling **304**, the tooling **304** then can act as the data base to provide the target data points for the second Robot B. This is particularly true since these target data points can be idealized targets comprising retro reflective material or active fiber illumination which are almost perfect in the ability to be accurately judged. Thus, minimal stackup error due to this transfer of location data occurs.

It is noted that the camera **321** to target the Robot A can "home-in" on targeted tooling plate **360** on Robot B having **3** targets as shown while the camera on Robot B can look at tooling **304** on robot A. Each one can thus home in on the other.

This ability of Robots A and B to look at each other is illustrated in FIG. **3b**. A targeted plate **361** surrounding camera **360** is attached to robot arm **362**, while a similar targeted plate **371** is adjacent camera **370** on robot arm **372**.

Note that robot arm **372** could, for example, be instead a fixed structure such as a drill or router unit with camera **360** (or **370**) homing the robot arm **362** in on it with a part in its gripper using targeted plate **371** (or **361**).

A third possibility is to target both robots in a manner visible from above (or elsewhere) and use an overhead camera system **390** to monitor the closing target conditions of one to the other. This is schematically shown in FIG. **3a**.

Another version is a front/back target situation where control transfer is made between target sets on a part. A part can be picked up (say by robot A) based on targets on one side, and presented to a camera on robot B whose camera locks in on targets on the other side.

FIG. **4a** illustrates a robotic arrangement for putting parts into holes or other openings. The area around the hole **500** in part **499** is targeted with targets **501, 502, 5Q3** and **504**. Typically 3 or more targets are utilized to allow the total 6 degree of freedom approach to the holes to be made. In this example, the camera **510** on robot **530** senses the target points **501, 502, 503** and **504**, and knowing their locational relationships to the hole **500** and its centerline, guides the part **520** such as a pin into hole **500**.

TV camera **510** can be located on the robot arm, or elsewhere. The camera sensor unit may also be augmented by triangulation sensors using a diode laser or other light source **540** to project the laser spot **541** or other zones onto the part to further aid the guidance. Such spots or zones can also be viewed by the same camera **510**.

The targets around the hole can be anything suitable. For example, on a cast iron block or a cast aluminum block, these can be cast in indentations, raised areas, etc. perhaps with special signatures (e.g. triangles, stars, etc.) to allow

Nintendo Ex. 1001

US 6,167,607 B1

9

their easy acquisition. A variety of other possibilities are also in order. The lighting for such targets is usually provided by a source on the robot arm although the maximum contrast, indented, or raised targets should be sometimes lit at an angle (see copending application reference 1 on lighting for robot applications.)

The particular opening can be any opening, not just a hole. For example, the points at which a gas tank lid is to be placed onto the side of a car rear quarter panel could be used. In this case, the target points might be painted onto the body side outer surface, or other inner points, which would be covered up by the lid.

In this general case, the target points on the surface are covered up after the part is assembled on the shaft by the part. This way they are removed from aesthetic consider- ations. There are numerous examples where the object involved can be used to cover up the target points that were first used to find the **6** degree of freedom or multi degree of freedom location of the object.

For example, consider FIG. **4a** where the part could be a radio knob with a disc **598** (dotted lines) on a shaft **520**. When assembled into hole **501** in dashboard **499**, disc **598** covers up targets **500–504**.

It is noted that hole **500** in FIG. **4a** could also be a protrusion like a shaft, stud, etc., assembly to which also requires multi degree of freedom guidance.

Target points can be located on the end of protruding objects as well. For example, it is often necessary to insert something with multiple holes onto multiple pins (or vice versa). This is the case of wheel bolts on a car. In this case, illustrated in FIG. **4b**, the targets are the ends of the wheel bolts **601, 602, 603** and **604** which are suitably targeted according to the invention, for example, with reflective paint. Conveniently, the camera **620** can be mounted in the tooling **621** holding the wheel **622** so as to look through the wheel at the bolt ends.

Another example of targets which can be camouflaged is the use of targets on the back side of an object as was illustrated in FIG. 1. In this case, it is desired for example to assemble a part which has been targeted for ease of manipu- lation to another part. The targets in this case are purposely chosen to be on the inside when the assembly is complete.

For example, let us consider a process where a robot utilized for assembling a house is used. The robot picks up targeted board lumber which is targeted on its back face with the target points, or what will be the back face in the home. The back face is then presented by this first robot to a second robot which nails the board to other boards that have already been assembled. The assembly is done in such a manner that the target points that have been used are moutned on the inside. Indeed, this works out quite well since the robot can also look at target points on the outside of the rest of the structure and determine from them the location to place this first part over same. As the structure is totally assembled, all targets end up pointing inside (or are covered up). This allows the use of such targets without creating aesthetic problems on the outside.

This coverup was shown relative to the ratio knob in FIG. 4a but also would be the case here on the inside where one would cover it up later with wallboard.

Consider now FIG. **5** which illustrates the use of target points **700** all over a structure **702** and particularly on formed parts. The intent here is twofold. The first is to deduce from the changes in the target pattern the effects of forming on the part **702**. For example, it may be desired to obtain the new dimensional shape of the part **702** using the

10

data base now resulting from the forming process **706** and any strains or any in-plane deflections which may have occured as a result of the forming or welding process, etc. This can be used to control the process **706** as well as feed data forward as to the new shape for further robotic assem- bly.

For example, consider the case of metal body panels or aircraft panels. They start out as steel blanks **702** which can be imprinted with a dot target pattern on one inch centers throughout the total width. The targets **700** can be rather precisely applied, or if not, can be initially monitored by a camera means **708** to discern what the pattern is. Such applications could be through a roll coat **704**, an etch process, or the like.

This sheet of steel **702** is then formed into a new form such as a car door or, in a more simpler case, a deck lid. It is now desirable to sue those target points **700** as viewed by camera means **710** which have now changed their form to determine any irregularities of the forming process as well as to establish the new data base for the part. Where this data base (namely shape and so forth) is a known desired one as ti is in the case of a door, one would then like to compare the desired data with that resulting from the new pattern. Furthermore, this new data base can be utilized in the actual handling of the part between stations of a press line, for example, as long as it is known what to anticipate in terms of what it is. Indeed, it is noted that rather than putting down a roll coated impression every one inch at squares on the initially formed blank, one can actually roll coat down a series of dots of other target points which make a square pattern when optimally formed.

Now, take this case one step further, where a formed part **702** such as a deck lid has dot points **700** on it. This formed part is then to have a part **712** welded to its rear by spot weld robot **716**, which part **712** is the inner stiffner of the deck lid. The dots **700** are viewed by a camera means **714** and not only used in the handling process of handler **718** to move this part **712** into place also using camera means **714**, but also to position the welded inner part **712** relative to part **702**. These dots are furthermore used to check after welding whether or not certain distortions have occured beyond limits in the welding process and to establish the new data base for the part.

If new data base is satisfactory, the part is moved on by a suitable camera equipped handling robot to shipping or to the body build process. In this process, this formed part is mated up with other parts and again the target points **700** can be used in this mating, for example, in putting the deck lid into a deck lid opening.

In the case of doors, it is particularly important because the door is loaded with hardware and then hung from hinges which can tend to further distort the door. Indeed, if all the formed parts were made up and targeted in such a manner, it would make the job much easier for the automation and inspection through the total build of the part. This concept goes well beyond formed parts, to all types of things. However, formed parts are the ones in which the most distortion can occur.

In the final operations, the etched on or painted inked on marks, etc., if on the outside of the car, are generally painted over or otherwise removed. Naturally when such marks occur on the inner portions of the metal, no aesthetic problem exists.

This process is particularly applicable to formed metal which can spring back and generally has a relatively unknown shape such that errors in target point locations are not severe relative to the accuracy of the metal.

Nintendo Ex. 1001

US 6,167,607 B1

11

Another process that is somewhat similar is casting which is a relatively loose process on the same tolerance level as the forming. Plastic molding is another with the same tolerance but unfortunately this generally does not lead to distortion except during perhaps glueing operations. In any of these cases, suitable target points can be molded in, cast in, etched on, burned on as with lasers, or any suitable means can be utilized.

One can also use an absolute encoded target pattern, one which has no ambiguity as to where each target is. This could be with clusters of targets on different centers or patterns, different shaped targets, or the like.

It has been noted that this process is most applicable where more operations occur to a given part that can change its shape and where the part is more likely to change shape as a result of the operation (as in springback). This means that the roll forming, hydroforming, press forming, press brake forming and other forming operations done in the automobile, aircraft, and offroad vehicle industry, particularly are natural users of such technology. By judicious choice of targets and their applications, one can utilize these targets throughout the process for material handling assembly and inspection purposes and generally effect large cost reductions in the manufacturing as well as improve greatly the flexibility with which such manufacturing can occur.

The target application techniques can be whatever is suitable. As is obvious, the closer to a flat blank that the targets can be applied in, the better from the purpose of target application as long as those targets through the forming process can maintain their legibility.

Speaking of legibility, the typical technique is to utilize a solid state TV camera to look at the target points This has proved satisfactory, for example, to look at etched lines on die blanks in press forming.

While target points on the formed materials and other shapes are considered here mainly in the light of formed steel stampings, aluminum graphite epoxy and other formed parts, one can actually extrapolate this to all types of structures and parts such as, for example: plywood on buildings, concrete which sets and takes a shape and then might later be used for further operations, ground (earth) as in targeting points on the ground which would then be used later on to guide particular items even though the ground had shifted or was distorted by working around it, and the like. Indeed, it is the general case that if one can get targets onto the surface of structural parts or other objects in their original form before any further work and if those targets stay on those parts throughout the work, then they can be used the maximum number of times and therefore increase the cost justification of the targeting concept. For targeting on concrete, targets such as glass beads, dot targets, or cats eye retro reflectors could be actually inserted into the material where they would harden therein and still be visible from the outside. These, of course, are idealized targets. Others would simply be little dots, points, or even non-circular targets. In fact, non circular ones could be advantageous from the point of view of absolute target coding. However, in general, circular targets are desirable.

One must consider the integration of all these target concepts. For example, discussed above is targeting the points in their bare form and looking at a changing data base for the part as it goes through the various forming and joining operations. Also discussed was designing the part in the computer with the targets present thereon, the targets being in this case either special targets or normally appearing portions of the part or both on any one part or on any grouping of parts.

12

In other copending applications such as those referenced above in the Background section, other systems for targeting the work area of robots and automation of guiding vehicles and other target functions are performed. The operation too of the various vehicles and robots can be simulated in the computer relative to these target points as well. Again, a key item is that with target points one is much more assured of accurate reliable operation and therefore the justification for such simulation and expense thereof is paid back by the surety of the function of the final simulated structure. And too, one is dealing with mathematical representations of target points and photogrammetric equations, not relatively unknown functions of vision systems with gray level images of object features. Simulation of dynamic target tracking also become feasible as the problem is much more defined than with gray level scene analysis. This also leads to faster assembly and more justification.

One can indeed state that the whole work area and work environment of automation in the factory of the future could well be targeted. All the parts, the fixtures, the jigs, the tooling, the robot worked areas, the passageways and areas of travel of automated guided vehicles carrying the parts, the transfer conveyers, even belts on which the parts ride could be targeted. With such target data stored in the data base of a master control computer for any one cell or an overall host computer, one has complete control of the environment. Everything is known relative to known target points such as: the location of the automation, part, the part shape, material handling, bringing the part and taking it away, relationship of other parts to the part, and the like. The data relative to this information can be manipulated in the computer and optimum operations derived such as trajectories of robots, forming, and the like. It is considered within the purview of this invention to integrate these functions to the maximum extent possible to where flexibility is attained while still having complete control over the operation.

FIG. 6 illustrates robotic fixtureless assembly using targets and further illustrates the concept of dynamic target location to adjust holding or welding robots dynamically under target control in response to forces (clamping, welding) tending to change the part from its correct shape.

As shown, car cowl 802 is to be welded to flange 803 of underbody 801, under control of at least one target sensing camera 800. Camera 800 senses various targets 804 on cowl 802 and targets 809 on underbody 801 itself. The sensed data is then fed to computer 808 which is connected to holding robot 805 and welding robot 810.

Robot 805 has gripper 806 holding cowl 802 in place and having target plate 807 observable by camera 800. Robot 810 has spot weld gun 851 putting flange to cowl welds on, with target plate 850 also observable by camera 800.

The holding robot 805 is moved into position to the correct location determined by cowl 802 and underbody target location and the weld commenced. If distortions occur moving any part to a wrong position, the holding robot 805 and welding robot 810 acting in concert under control of computer 808 move to correct them. Typically, a plurality of welding and holding robots would be utilized. Some non-adjustable or non-programmable clamping or welding could also be used in conjunction.

The target's data base provides reliable accurate control over this operation and allows instant feedback correction. The procedure is flexible and could be programmed for any operation or car line. Typically, several cameras looking from different views would be required on a complex structure.

Nintendo Ex. 1001

US 6,167,607 B1

13

Note that when such a fabrication cell or an assembly cell is fixed all in one spot (no moving conveyors), the camera computer **808** can memorize the position of each of the pieces in build up, from its targets, even though they are later covered or partially covered up. For example, when cowl **802** is positioned to underbody **801**, computer **808** records the position of underbody **801**. Then, after cowl **802** has been welded to underbody **801**, computer **808** again records its position. As a next step, computer **808** could guide A-pillars in each side from their targets relative to the recorded cowl position (and if desired, considering underbody **801**, too).

For example, one might purposely slightly change the A-pillar locations relative to the cowl if another body portion mating to the A-pillar was related more to underbody position. This avoids stackup of errors. This really is a major advance in that it accounts for weld distortion-you can measure and correct while welding and after weld you know the final location.

Correction of distortion or stack up of tolerances in real time is absolutely a major advance. This would apply to adhesive bonding, riveting and other joining processes as well.

The term "TV Camera" in the invention generally connotes a dimensionally stable type, such as a solid state TV camera, e.g. a GE TN2500. However, other means for electronic imaging can be used such as Vidicons, image disectors, linear arrays and the like. Indeed, a mechanically scanned laser beam, like a flying spot scanner, can be used to sweep through space in order to find target points some of which envisioned could be particularly reflective or responsive to laser light. The primary goal is to find target points or features. However, the TV cameras also allow normal gray level part images to be obtained, a big secondary advantage since this is often combined with the target based guidance function for inspection, recognition or other purposes.

A suitable target sensing vision system is that described in the prior copending applications noted above, and it is noted that the design program on the computer aided design system should be able to design the type of location of these targets which are suitable for the vision system.

The laying in of the targets could be by specifying operations which put the targets on as special items, i.e. by spraying them on, sticking them on, or drilling special holes or the like. The other idea is to use the CAD system to design the part, and then to look at the part as designed in its functional way. Drawing upon the knowledge of what can constitute a natural target (as in a naturally occuring hole or corner), suitable targets are specified. A computer program can be used, if desired, to augment the decision as to which natural targets are the targets to be used.

The beauty of the computer design system then would be to allow you to "try out" the design with a hypothetical target set using a typical simulation program for a RPS (or other target determining camera system) equipped robot.

Suppose one would wish to design an operation where a sheet metal door inner which is full of holes is to be attached to an outer panel by welding. One robot holds the outer, one holds the inner. The robot grabbing for the inner would use a camera located on its end effector (or near its end effector) and guide the robot in using certain holes on the inner panel as the targets. The CAD system program would be designed in such a way as to allow a three dimensional simulation of the robot's movement to be made, and to determine the robot cycle time which would be achievable

14

in the accuracies of position using those targets. This would be done by working through the known accuracies of the camera system, and the photogrammetric equations could also be utilized (which would be called upon from memory) and the whole system designed on the CAD system. The other robot picking up the door outer would work in a similar way, and other points on the door outer that could be picked up would be monitored and the total assembly predicted using the control equations of the two robots.

Each operation involving a particular part that might go through a line could then be tracked. For example, now that the inner and outer track are assembled, the assembly could also be sensed from the holes on the inner or other features in the operation of putting the door onto the car. This too could be automatically tried out on the computer.

The key here is that the target type solution allows us to quantify everything. Every single possibility can be predicted by mathematical equations which can be put into a simulation program used to try out designs.

One key advantage obviously is that if the whole operation is not fast enough or accurate enough, other types of targets might be specified than certain naturally occuring ones. One would then know that in planning the line layout for this operation, and one might have to use two robots per operation instead of one, etc. All of this could be known in advance.

Also, the CAD system could design the way in which the different stations interact on a line. For example, certain targets might be covered up by assembly operations and alternate targets would have to be used. Indeed, complete alternate strategies in case certain targets were missing could also be programmed into the CAD system and the whole design checked out so that such targets were present in the initial CAD design part.

The assembly operations usually require the build up of components on targeted tooling which is used to hold the portions in place while other components are added. If such tooling is targeted, the location and precision of the robots, etc. doing the assembly can be vastly reduced.

We should consider the problem of assembly with and without tooling plates. In one case, where the robot holds the part to be assembled, the other robot assembles another part to it having a target. Perhaps even the first robot's gripper is targeted, which in essence then is a programmable tooling plate. In fact, changeable grippers can be used, as can changeable tooling plates, all with targets to facilitate their changing.

Continuing the ideas of these RPS things, it is not just usable on tooling fixtures for assembly. It is also welding or any other kind of fixtured operation where one would put the object onto the tooling and then add another object to it. Any sort of holding fixture will do. Again, another robot (if it is still enough to act as the fixture on the other side) can be used assuming the part is targeted.

Also covered in this case is the concept of covering up targets on an object when the object is assembled to it. For example, a radio knob attached to a targeted radio front plate with targets around the knob post would be suitable. Also suitable is the assembly of a tail light bezel to a car with targets around the attachment points.

For example, if everything could be put together from the targets in a static location, this would be most advantageous. Also desirable is to only move the part or whatever simply to 2 or 3 such static locations. For example, right now instrument panels are put together on a continuous line where they go around a continuous loop with maybe 16, 20,

Nintendo Ex. 1001

US 6,167,607 B1

15

or 25 people standing in the loop assembling all clusters etc. into the instrument panel.

Assuming that the problem of the wiring could be solved in an instrument panel line, one might replace this with a single fixed panel. FIG. **7** shows a fixed assembly cell **900** for an instrument panel, engine or other component **902** into which would be placed all of the various items by one, two, robots or more robots **904** movable on tracks **910** going out and grabbing them from different containers **916** located nearby. There are certain advantages to cell **900**, namely that one does not have to deal with a moving line and that everything is fixed (which means the highest placement accuracy that could be expected.) In this condition, one would have to be able to pick out all the different parts. There might be 20 to 25 parts required for the panel, plus the multiplicity of different versions of the same thing, which might lead to a total of 100 different choices with the robot. This would require either very well positioned parts or a good vision system, and the targets would make it quite easy to do both fast and accurately.

Speed and accuracy would be paramount because if this system could not go fast, it cannot possibly compete with humans on a moving line.

Most of the parts of the instrument panel or engine **902** as shown in FIG. **7** could have targets on them, which could be made to seem like the existing parts of the panel or engine **902** (which have lettering on them or certain points or corners and holes). These are all already present in abundance on a panel or engine **902**, for example. In addition, knobs on the panel can be used to cover up targets and other whole assemblies can cover up the targets on the inside of the panel which would be used to guide it in.

The central problem with this then may not be the targets at all but the tooling. If a universal robot is utilized, the robot might have to have different end effector tooling and thereby lose cycle time changing it. Such a robotic work cell is thus very appealing. However, parts would have to be brought in when they ran out from outside the periphery of the cell. In other words, what is essentially parts trains **906** would come in on tracks **908** or **914**, just like tracks into a roundhouse.

With a car body, clearly the body in the first place is made up of a large number of panels welded together. This is done in-line, and at each station a varying piece is brought in, fixtured and the car body welded up. This could conceivably be done without the fixtures using targets.

For example, suppose we wish to build a car body up from scratch. We could take stampings that comprise the side of the car, e.g., start first with the cowl and the A-pillar and assume that the cowl is welded to some sub-frame. The A-pillar could be brought in using targets on the cowl and targets on the A-pillar. The A-pillar would be accurately picked up and placed by the robot on the cowl where it would then be welded once it was in place. The accuracy of the positioning would be taken from the targets on the car, not from a fixture.

Satisfactory target accuracy could be achieved with an A-pillar roughly 2 ft. long welded to a body cowl. This piece should be accurately positioned within +/−10 thousandths. Whether it is, in practice, is debatable however. First, one would figure out just what the target error is to do this. In any case, with one robot holding the part per the camera unit (which would now be not on the robot at all but off to the side so that it can get the true reference of the A-pillar to the cowl), another robot comes in and welds it. This can be done with dynamic correction, if necessary, by the first robot for position due to distortion by the welding robot. This could be called "fabrication method with dynamic real time target location".

16

After putting on the A-pillar, one could then go over and put on the other A-pillar, so that one could come in the body side. Indeed, all of the parts could be welded on this way, particularly those internal ones. This is really just like a completely flexible fixture. With different programs for different parts, one could make anything.

Using targeted outer parts, you can then drill all of the holes needed from the targets etc. Again, one would have to bring all the parts to it, so that it would then move the finished subassembly out of this cell and bring another one in. Instead of having a continuous line, you would have a relatively few number of stations, relatively widely separated. This would allow, however, different things to be made more easily because on a continuous line, the varying part steps would not match up (although the same technology could apply to that too).

To do an assembly like this, you might have multiple cameras too, one above the whole cell **900** and various ones off to the side coming in from every angle. This would allow you to get a better fix on each of the parts as well as deal with the fact that sometimes you would obscure yourself with the tooling doing the operation.

An interesting thing is a co-target, that is a target that tells where the other targets are. Such a co-target identifies the part and as such tells where the targets are. It also gives the orientation coordinates so that one can find the other targets.

The beauty of this one market idea is that the single market identifies the part and therefore all the targets around it. It could also give an approximate orientation code for the part, which now could include not just a reticle (which was shown in the turbine case noted above) but actual dot code or something from which an accurate orientation in 6 degrees could be created. From that, one can then find the other features of the part that one wishes to use for further use such as the corners, the holes, etc. Therefore, there is a one-step process using that single marker to tell the rest, including where the others are which in turn are then used.

Other kinds of targets include: a serial plate, either just as it is, specially designed, or with print markings; a logo; a bolt head (as mentioned above); and an instruction plate or a bar code marker.

Getting targets on sheet metal can be a problem as lots of sheet metal really does not have any holes in it per se, at least on certain surfaces that one might want to use. In such a case, we can paint targets on those for the assembly operation noted. Marks such as small indentations, ridges, tabs or the like can also be stamped in.

Painting could be done in a stamping fixture coming right out of the press, since the part is trapped anyway usually upside down. It would not take too much to lay it in another fixture and determine target locations. Another possibility would be to actually stamp the target in. This would seem to be impossible on an outer surface unless one stamped on as part of the stamping process something that would essentially come off.

The other obvious place would be in a weld fixture where one clearly welds most panels together with some other panel. Obviously, you cannot replace the weld fixture with a robot and targets if one does this, but at least the assembly of that welded up component to any other could be target automated. Weld fixtures typically also have sensing associated with them to create an in-line check fixture situation. Even this check fixture could actually contain the marking units.

Obviously there are numerous underbody and chassis components that could be targeted without any detrimental

Nintendo Ex. 1001

US 6,167,607 B1

**17**

aesthetic effects—mufflers, tail pipes, brackets, clamps, tie rods, steering parts, etc. These are obviously labor prone things to assemble and one could envision robots working underneath the car while the other work is going on above in the assembly function. This is, of course, very tiring work for people and therefore would be well set up to robots. There is no reason why the whole operation could not be up above the floor. The car is brought in overhead with some robots on a second tier and other ones underneath.

This system should be usable in a variety of circumstances, such as: components that are all assembled to the body in the trim area including tail lights, glass, front, rear, wheels, headlights, grill, door handles, rear view mirrors, antennas; internal assembly components such as door assembly, lift mechanisms, trim, and instrument assembly covered above; and underhood assembly (this too probably can be marked up in any way desired with no detrement).

Note that another type of marking, purely decorative, is trim decals which could be judiciously chosen as targets.

So far all target sensing development is based on a raster scan camera. These, therefore, were generating windows, tracking, etc. Other types of special cameras might be interesting for this application. For example, if one always has 4 targets you could have literally 4 image chips with 4 separate scans of the field which would then simplify the processing. In addition, one really does not need all the number of lines that there are in a field if one uses targets that occupy large portions of the field. Therefore, a camera having 10 vertical lines and 10 horizontal lines widely spaced might be quite suitable. Instead of scanning say 300 lines with a camera, you would then scan only 20, but this would presumably be sufficient. This would require a target design that was able to be cut at multiple points and give the right answer. Naturally, the speed of response of this would be quite a bit higher.

A polar scan swept like a radar screen is also possible. Although these are not widely available, one could assume some future value.

One of the beauties of putting targets on the A-pillar, etc. is that the fixture can actually slip, and dynamic correction be made via the high speed of response to the target position.

One would also expect that you would have to have 3 or 4 targets to go along with all of this or else you could not do it. The other thing is that you would certainly want to have redundant targets in case some of them were knocked off or the paint gun did not work, or whatever.

One can also come up with a plan for automating the way in which the parts are brought in. Targeted little trucks would be provided that instead of having fixed tracks can actually reposition themselves at different locations, either in the horizontal plane or even vertically, to be grabbed by the robot. This ability to have them at multiple different planes with a very high reaching robot and targets also allows floor space to be conserved. Indeed, another robot could be used to load the parts into the racks from the targets out of the dunnage. In that case, therefore, the parts would be presented to the assembly robot in a better orientation while still targeted, possibly saving some assembly time. The other unload robot then would be used to essentially deal with the messy conditions.

From the above, it appears that all things can be made from targets. If robots can accurately position and are structurally stiff enough to withstand the forces of welding, drilling, or whatever (and this is not quite sure), then presumably all things can be made this way. However, some

**18**

things apparently cannot. For example, if one has to back up a drill, this can be done with a robot in some cases, but not in other cases.

In a structure such as this, important considerations would be: where the cameras would be located, what kind of robots would be utilized, whether it be better to have more than one robot holding each part or clusters of parts, etc. Particularly, the concentration should be on the target orientations and the cameras or the like.

As noted above, the following are parts of the car in which, the theory, targets would mean very little in terms of their add-on aesthetic value: under hood, under carriage, when covered up by something else as in seats over bottom part, inside door covered by trim, inside of tail light covered by light, grill covering other part, etc., inside trunk only to a degree. Those are the main areas, but they may constitute at least half of all the assembly work, if not considerably more (in fact, much more).

The other thing to be considered is can the body structure be built up with targets and then the targets taken off. This seems logical. Every weld fixture of every panel can be a place for target application.

Incidentally, there are people talking about painting the whole car after it is assembled, not just sticking painted doors on. That would of course make the job even easier. Then everything is targeted going in and you just paint over them.

If parts are targeted, then obviously, an RPS equipped robot can pick up a part in a very well known way. Assuming that the gripper is correct for this, it can then (within the accuracy of the robot itself, which also could be RPS controlled) present this part to another robot in a well positioned manner. ostensibly, the accuracy of this position be just as accurate as if it would be fixtured, assuming that the fixturing details and the RPS were equal in accuracy. The only problem would be the inherent inaccuracy of the robot.

However, it should be noted there is nothing to keep the second robot used to assemble something onto it from using targets as well, therefore taking out that positional error. Conversely, the targets utilized by the second robot could be on the first robot as on its gripper. In other words, if the first robot grabs the part in a known way, the second robot only needs to home in on the first one, not on the part. This could make it a lot simpler for an assembly operation. A very clear-cut target board could be utilized on the gripper or somewhere on the end of arm toolings that would be directly relatable in a known way.

This two robot assembly is very similar to the human using his two hands, one to hold the first part and one to hold the second, and indeed a twin armed robot could be considered for the job as well. It is more arms and hands than it is robots per se, although they have to be separately controllable.

It is however interesting to note that the inherent accuracy of the position is considerably higher than for a human. The human, if there are no marks on part at all, would have a great deal of difficulty for example, drilling three precise holes exactly positioned in a location. The human himself would need some kind of fixture as in a template or something. Wherein in this case, the targets actually provide that since they are carried on the part. They can be on there in a way that a human would not be able to directly relate to in an easy manner. The advantages over humans are noted.

There is a special assembly technique that lends itself to this. One clear-cut aspect is targeting parts in unobtrusive zones, as on the back side away from the observer. For

Nintendo Ex. 1001

US 6,167,607 B1

19

example, a radio knob on which the back of the knob had the targets or a door handle of a car in which the inner door panel was targeted (this is almost a natural case anyhow since it is full of holes which can be used as targets) . If we then use one robot to grab at the inner side where the targets are present, we can then assemble the outer side which might be a visible one onto something.

The outer is usually the part you would like to grip so that you could assemble it to something else like the shaft on a knob or the body on a car. This is not easy to do if the targets are on the inner. What is more straightforward, therefore, is to use the targets on an item that it is to be assembled onto as in around the shaft or around where the door goes (the opening)

One possible way to do this is to have 'U' shaped tooling where it is grabbed on the rear part but held on the front via the 'U'.

One thing is sure, you could take doors that way and use drilled trim things on the outside doing it that way. This is if it all lined up. We might have to do this on the finished car, however, targeting the outside.

One could also grab the part from its targets and then move it over to a drill fixture rather than a second robot. The fixed drill fixture or whatever it is could be different for different cars say-this would of course give it flexibility. The robot would take the part and move it to one of five stations depending on which type it was sensed to be, and then orient itself relative to that station which itself would be targeted.

In the latter example, it is a gang drilling, gang welding or some other multi-position gang operation with multiple points. This would be true of a robot grabbing parts up willy nilly and just putting them in the right thing. Note however, we are talking about non-fixtured parts in this case. Parts that are not being dropped into a fixture, only presented to a gang drill that itself does not have any fixture locators because the targets have located it.

However, this might not work since in some operations the robot could not hold steady enough and you would have to drop it onto locators. But in other cases, it would just present it to it. The interesting thing about a robot, like a human, is that it could just go to one drill and sequentially drill four holes in a row using the targets to set up the straight line or whatever the other pattern was. This could be totally varient depending on what part it was, without the necessity of building the special gang drilling fixtures. This could be the putting of moldings on, but really it could be anything (even cylinder heads or something else) if one could position accurately enough and hold it, of course.

One obvious thing that you do not have to position ultra accurately is spot weld guns. This would be relatively simple. You could sequentially, using targets, put a part set to a spot welding gun that would then put different spot welds depending on what it was (or glue or anything else like that). Therefore, one robot which would target on the gun that it could aim the part off of, could actually do numerous parts in many ways, all programmably. However, such a robot would obviously not be very fast as it is a one at a time deal. This would be the opposite effect of having gangs of spot weld guns on fixed automation coming in on a part that is transferred through. In this case, a single robot would go make all the welds on a part, and it would be transferred out. It would take many more robots, but that might not be more expensive You get to optimize the one gun you do have, or any other things such as adhesive sealer or guns or whatever.

The same logic holds for presenting a part that has numerous threaded holes in it to an automatic tapping

20

machine or an automatic nut runner or for that matter taking a nut runner and moving it to different points on a part.

One interesting question is whether all this allows whole other assembly procedures. If you do not need special tooling and fixtures, you could just put a car together by feeding parts to the assembly point such as cell 900 depicted in FIG. 7 just as if a human was going to stand there and build a car in his garage. He would go out and get the parts and bring them in and assemble them up. The advantage of this is that you are moving the parts by conveyors to the build points, rather than the cars to separate build points. The robots 904 are going out getting the parts and coming back. Robots, for example, could be mounted on slides 910 or for that matter could be gantries themselves. This would look like a round house or something with each of the slides then being fed. However, you still have to get the parts in and out of the system or the finished cars have to be moved as by conveyors 912 and 918.

It does mean that the car as it is built up is fixed in a known place. Thus, each place you do something is dimensionally known from the operation before. This is not true in line type assembly unless elaborate shot pining is taking place. Thereofre, the total build up of the car is a known commodity even if the positions of the parts and the other things feeding into it are unknown.

In this new mode, each of the parts of the car is targeted and as they are laid upon each other the assembly itself becomes targeted insofar as they are not covering up the old pieces. This means that as each robot approaches it can memorize the locations or use the targets. Indeed, the targets on some of the parts as they are positioned offer a chance to update the robot coordinate system so that it can re-memorize the positions in case the robot gets out of sync.

For welding, a robot would bring the parts in from one side, lay them down and the second robot would grab arc welding tooling and weld them all. Such a method that could be totally programmed in a CAD system. This completely relieves having to transfer data to fixture builders, etc., shaking down lines and so on since one can theoretically do this in CAD and you are dealing with minimum numbers of pieces of hardware and delivery time therefore. One robot, perhaps two robots would be working on a single area, each with different sets of tooling that they can use. Different robots might pick up parts from different sides with an overhead gantry type robot as well.

This whole procedure would just keep proceeding until the car was built. Obviously there cannot be much room for parts washers in this type of thing. Instead, the car would be transferred out on conveyors 912 and 918 after the body was welded up to a second location where it would be washed and then transferred in to another similar type station for assembly. In this case, all parts would be brought in from the outside and the assembly built up. One might do this in two stages, assembling the inner parts of the car and then using the assembly robots to go ahead and weld the top on. This type of procedure allows one to completely change ones mind as to how you are making the car. Make it one way one day and another way the next. You do not have an investment in the lines and fixtures. This is really a big advantage.

In order to achieve 60 jobs an hour, you would need 60 such robot cells each putting a car together in an hour for example. A big question is how would you feed the parts to the cells. Note that 60 jobs an hour is a typical number for both body plants and assembly plants but some Japanese run 30. We can take that to be the minimum.

Clearly some sort of very clever material handling would be required in order to get the parts to these individual drops.

Nintendo Ex. 1001

US 6,167,607 B1

21

The simplest of all, of course, is an overhead monorail conveyor **914** bringing the parts in with the robot simply going over just as the human does in a transmission plant and grabbing off the one it wants in place for its job. This would be by far the cheapest, but would require numerous conveyor loops which might get in the way of each other since we are talking about multiple types of parts coming in at once. The loops might have to go in a circle around the whole operation with the robot moving radially outward from its job to find the part it wants, grabbing it, off and bringing it back.

A second way is to simply have them in racks **916**, bring the racks in (as many of the parts are racked anyway) and bring them in with trucks to each of the individual job sites. For example, if each rack contains 16 parts, we can do a day's production with a single rack full at any one cell. The true flexibility of this is a distinct advantage.

One of the fascinating aspects of all of this is that probably the optimum way in which the car was built could be totally laid out on a CAD system. Different cars would use different sequences or different ideas. You could build anything given this approach, just as humans could in a garage if they were presented with a kit of parts.

Note too that the CAD system could also design the target on the part-specifying special stamped in (cut in, molded in, etc.) targets etc. at certain points on the part surface. The CAD system too would not only know the location of the targets to other part features, but to all other targets on all other parts used to form the assembly.

With reference to FIG. **8**, an item **1010** is shown being moved in the direction of arrow A below an overhead conveyor system **1011** generally comprising a track **1012** on which a carriage **1013** is movable. Object **1010** is suspended in any suitable manner from a hook **1014** secured to carriage **1013**. Hook **1014** includes an aperture **1015** for a bolt **1016** for securing hook **1014** to carriage **1013**. A fiber optic **1017** is embedded within hook **1017** and has a light receiving end **1018** in a surface **1019** of hook **1014** and a light emitting end **1020** in a surface **1021** of hook **1014**. Fiber optic **1017** can be any fiber optic element such as a single fiber optic or a bundle thereof, of which several are commercially available. A plastic 'corfon' fiber optic element is quite suitable.

In FIG. **8**, it is assumed that it is desired to determine the position of item **1010** suspended from hook **1011** when item **1010** is at a general location designated **1022**, in FIG. **8**. It is also assumed in FIG. **8** that item **1010** is in a known position relative to the position of hook **1014**.

A light source **1023** is positioned above track **1012** to direct light downwardly such that it will be incident on the upper surface **1019** of hook **1014** of carriage **1013** when a carriage is positioned below the light source.

A light detector **1024**, in this case a scanning matrix photo detector camera comprising a lens and a detector array comprised by a plurality of horizontal rows of discrete photo diodes, is positioned adjacent the conveyor so as to be adjacent hook **1014** when conveyed item **1010** is located generally in position **1022**. More particularly, when the conveyed item is in position **1022**, the light emitting end **1020** of fiber optic **1017** is imaged by the camera lens **1040** onto the matrix array which provides real time information as to the location of hook **1024**.

In a typical case, illustrated in FIG. **8**, the light **1025** emitted from end **1020** is imaged to form a spot **1025** on four adjacent photo diodes of array **1024**. As the photo diode array is scanned, an output signal **1026**, indicative of the position of the spot of light **1025** on array **1024** is conveyed

22

to suitable means **1027**, such as microcomputer, to determine the position of hook **1014**, and thus item **1010**, relative to any known position, such as the position of a robot, or the position of detector array **1024**. A signal **1028**, indicative of the position of hook **1014** and/or item **1010** is then conveyed to suitable robot control means for control of a robot, not shown, for manipulation of the hook **1014** of conveyed item **1010**. A signal **1029** controlling the robot thus includes positional information concerning the hook **1010** or item **1014** to be manipulated by the robot.

It will be readily apparent that the matrix array in FIG. **8** provides positional information in the x and y directions in the plane of the drawing. It is also possible to readily provide information concerning position in the z axis. For example, as shown in dotted lines in FIGS. **8** and **9**, a further fiber optic element **1030** may be embedded in hook **1014**, extending from horizontal upper surface **1019** to front surface **1031** which extends vertically and transverse to the plane of the drawing.

Thus, a further linear photodetector array, positioned to detect light emitted from light emitting end **1032** of fiber optic **1030** would provide a signal indicative of the position of hook **1014**, and thus item **1010** if desired, in the "z" axis, that is, in a direction transverse to the plane of the drawing. This signal would be processed in the same manner as signal **1026** to provide a three-dimensional determination of the relative position of the conveyor hook and/or suspended item such as its position relative to a robot. Alternative means utilizing additional targets for providing three dimensional data as to hook location using multiple targets are disclosed below.

In the embodiment depicted in FIGS. **8** and **9**, the elongate light conducting means is shown embedded in hook **1014**. In some instances, as where hook **1014** is a monolithic cast metal item, it may be more convenient to fix the fiber optic to the hook in some other way as by simply gluing or otherwise adhering to an outer surface thereof. In that event, however, it is preferred to provide a housing for the fiber optic to prevent damage in use. This is readily achieved by providing a groove or slot in a surface of the hook, in which the elongate light conducting member can be laid and thereafter covered with a protective material, preferably opaque.

Where the invention is utilized to determine the position of a member of like objects, such as the position of a plurality of identical hooks **1014**, it is preferred that the position of the light emitting end or ends of the elongate light conducting member are in substantially identical position on each item. Where this is not practical, or where more precise position determination are required, the position of the light emitting areas of each object may be calibrated.

In the embodiment of FIG. **8**, the light conducting members are fixed to hook **1014**. It will be readily apparent, however, that the members be fixed to suspended item **1010**. In the latter event, position of suspended item **1010** is determined directly whereas, in the latter case, it is determined indirectly by determining the position of hook **1010** and by knowing the position of a suspended item relative to hook **1010**.

FIGS. **10A** and **10B** illustrate a basic application of the invention to an important sector of robot usage, that of taking parts off or placing parts into continuously conveyed containers or transport media. There is substantial amounts of labor worldwide utilized in this material handling procedure. In addition, many assembly operations require a human to first take a part, for example, off a conveyor, (for

Nintendo Ex. 1001

US 6,167,607 B1

23

example, an overhead monorail conveyor here illustrated) and assemble it to some other part. He may have to then put the part back on such a conveyor. In other words, only if the conveyor interaction problem can be solved, can the assembly process be automated.

A particular embodiment of the invention is shown here utilized to remove transmission clutch parts off an overhead monorail carrier. In this particular carrier, 1200, there are two parts, 1201 and 1202, resting in a pocket of the carrier. To keep the cost low, the carriers are typically made out of angle iron, bent rod etc. and are not overly precise in any direction. In addition, they are conveyed often from an overhead rail 205 and can swing in the direction of motion, side to side and twist over limited angles. They can vary easily in their position from the reference point of the monorail +/−½ inch and as time goes on, they degrade still further due to repairs, substitutions etc.

Rather than attempt to build highly precise conveyors, it is of extreme interest to provide a robot system that can deal with this particular type of conveyor, not only allowing one to retrofit existing plants, but further keeping future conveyor costs low-at the price of certain additional sophistication in the robot hardware. As can be seen from this particular example, however, the embodiment of the invention provides a system which can be made at low cost, much less than that of providing precision conveyors capable of being used with robots without the invention.

As shown in the top view, a robot 1210 is positioned to grab the part off of this particular monorail choosing one of the two parts in this particular carrier. At a later time, it may choose any one of parts such as shafts 1220 to 1223 located in another carrier 1225 onthe same monorail, to be used in assembling with the first parts. For example, robot 1350 is used to assemble the parts pulled off the conveyor by robot 1210.

The robot 1210 can be of any particular type. However, a Cartesian coordinate robot is generally preferred and a specialized one for this purpose is shown in the drawing. It is noted, however, that polar coordinate robots can be utilized, although they require much more control sophistication. A polar coordinate robot on moving linear slides parallel to the conveyor can also be utilized but requires added cost.

As shown, Cartesian coordinate robot 1210 has an arm 1231 moving in and out toward the conveyor line 1205 and it moves along an x axis slide 1232 parallel to the conveyor. The third axis is the vertical axis or z axis out of the plane of the drawing 1234.

In this invention, the carrier has been provided in this example with four targets located, in this example, at the four corners of the carrier, 1240 to 1243. These targets can be any type, for example those described in this application. The use of four such targets is not necessary, but is preferable in many cases to provide a full six axis solution of object position with redundancy. Three targets is sufficient to provide the solution alone. The carrier also contains, desirably in this case, a snubber rail 1245 located beneath the carrier which can contact certain mechanical guides such as 1250 and 1251 to restrain the side to side motion. These guides are also shown in the end view (FIG. 11). They can optionally be spring loaded as shown such as 1251 to keep the snubber up against the stationary guide 1250. A lead-in on the snubber guides is shown in the top view.

FIGS. 10A, 10B, and 11 illustrated targets such as the four as shown affixed to the carrier. In this case, these targets provide a signal from which the sensing camera unit such as

24

1260 can lock on. This camera unit can be located either on the robot arm as 1261 or external to the robot as 1260 (shown mounted by the side but also mounted above the station). If it is external to the robot, it may also be desirable to also have targets such as flashing LEDs, 1265 on the end of the robot arm which can also be tracked to provide relative data. Both types 1260 and 1261 can be used to provide data from different points of view. When the robot sensor such as 1260 has locked onto the carrier (or other item, see subsequent embodiment) it can then track this conveyor even in its side to side motions in a reliable manner due to the very high signal to noise ratios of the targets as will be discussed below. This is vastly superior to looking at the parts or carriers from their gray level images in this kind of swinging and uncertain environment. It is noted that the referenced Pinkney invention or other photogrametric solutions can offer high resolution data in up to 6 coordinates, x, y, z, roll, pitch and yaw. This is fully sufficient and often more than sufficient to accomplish the job, particularly if constraints such as the snubber guide rails 1250/1251 shown are utilized to restrain the motion in one or more axes.

Once the main camera unit such as 1260 has locked onto the conveyor and can compute its position for the feeding to the robot command computer 1280, then a second system (such as 1261), either using a different camera or simply different lighting, circuits etc. can tell where the part is in the carrier.

An important feature of the invention is the use of one camera unit to track the targeted conveyor (or other object) while a second subsystem, even with the same camera, senses the part within the conveyor carrier or on it. Such a second camera or subsystem is described in reference no. 6, and can provide up to five axes of data itself (x, y, range, pitch and yaw). This system can be right in the gripper as in FIG. 8 of referenced copending application (Ser. No. 200, 401).

It is noted that the sensing of where the part is in the carrier does not necessarily have to be made at the robot station. It could be made upstream, using for example sensor camera 1262. This serves the additional purpose of signaling the robot system if any out of specification situations exist, so as to abort the attempt to grab the part. This could be a badly mangled carrier, a carrier with no parts at all, a carrier with the wrong part, etc. Thus, identification of the part obviously can be done as well as sensing its location on the carrier, pallet, or whatever.

Once the decision has been made as to where the part is and the fact that it's a correct part, the robot moves in to remove it or conversely to place another part back on the carrier. In this case, the control computer 1280 of the robot takes the data as to the coordinate position of the targeted carrier and continually updates the robot's information. With a Cartesian coordinate axis, it is particularly easy to make this approach since one can simply run parallel to the conveyor (x direction) and only take out the differences in position relative to the parallel line of motion. While this can be done with a polar coordinate system, it is much more difficult to do dynamically. In any case, one need follow the carrier only in an approximate sensor using the gripper, and possibly other sensors to take up the difference.

The tracking target approach, for example, using hardware such as disclosed in Pinkney or a twin stereo approach with two cameras, can be accomplished using a camera tracking both the gripper and the carrier conveyor (or part) and/or with a camera mounted on the robot arm itself. The reason why this is so successful is that it tracks targets which

Nintendo Ex. 1001

US 6,167,607 B1

25

can have, and maintain, high visibilities even in an industrial environment. These targets can be differentiated by means of intensity, color or shape. Any and all can be utilized by this system.

For example, in the end view of FIG. 11, light **1300** from light source **1301** behind the carrier can be provided which illuminates the targets **1240**–**1243** at the four corners (or any other place) . These targets can be simple apertures in plates such as circles, squares, triangles, etc.-whatever is distinctive and can be discerned by a computer vision camera such as **1260** or **1261**. A triangle aperture **1302** in target plate **1241** is shown for illustration.

Alternatively, the targets can be comprised of color filters such as **1305** and indeed a different color could be used for each different target (**1240**–**1243**) or different part carriers if desired to automatically code which is which, if this is a problem, as it could be in certain more random applications. In this case, when utilized with white light source **1300**, the color of the target is an immediate indicator. However, in some industrial environments, maintaining a colored filter may be harder than a simple slot.

It is noted that when utilized as shown, with the light source behind, it may be desirable to put a diffuser such as ground glass **1310** (dotted lines) in the slot or near the slot (but not necessarily on the carrier) such that the light is directed over a range of directions. Other more directional diffusers such as diffraction gratings, prismatic devices and the like can also be used where more light is desired at certain angular locations such as the approach path of the robot, or in the direction of camera **1260** for example.

It is also, of course, possible to use the fiber optic based targets such as disclosed in FIGS. **8** and **9** above and in Ser. No. 200,401.

A final type of target of use on a system such as this is a retro-reflective target, such as plastic prismatic retro-reflectors, retro-reflective tape, lectilinear material and the like. This is shown as target **1242** in FIG. **11**. In this case, a light field **1320** must be provided to illuminate this. If reflectors having a high degree of retro-reflective capability are utilized, the light source should be coming from the same angle as the sensor (e.g. from **1260**). The source could either be fixed or mounted on the robot. The reflected light field is shown **1321** directed back along the incident path.

Let us now consider the question of targeting the parts themselves or a container of parts such as carton **1579** travelling on a pallet in conveyor of FIG. **17** wherein the targets are simply printed on.

There are many means of implementing such targets on parts, although this is obviously somewhat more difficult since one has to consider the function of the part and often it's aesthetics as well. From the point of view of the robotic system, however, targets need to be such that at least three of the four targets for example are visible in order to provide a satisfactory 6 axis solution to the photogrametric equations. Under certain circumstances, where there are more constraints, perhaps only one or two targets need be visible.

In continuing the example of FIGS. **10A**, **10B**, and **11**, it is noted that it is sometimes desirable to have an auxilliary robot such as **1350** (possibly with polar coordinates as shown) to take parts such as **1202'** which robot **1210** has pulled out of the carriers and loaded onto an assembly fixture **1351**. This robot then assembles different parts such as the shafts **1220'** for example that have also been pulled off and puts the two parts **1202'** and **1220'** together and then shoves the completed assembly down on a chute onto an outfeed conveyor **1360**.

26

Alternatively, robot **1210** can be utilized also to perform the assembly operation particularly if it is provided with rotation about the y axis. A dual robot system, however, is faster since one can be assembling while the other retrieves more parts.

The converse is also true, the previous assembly can be going on while robot **1210** puts the assembly back on a monorail conveyor of the same type. For example, in this particular application, a second conveyor can be located right under the first conveyor **1205** on which the assembled parts were placed. This conveyor could be floor mounted or overhead. Robot **1210** could also turn around **1800** and put a completed assembly on a conveyor parallel to **1205**.

FIG. 12A

FIG. 12A illustrates a car door targeted according to the invention **1352** travelling on a conveyor **1353**. As it passes a light source **1355**, four fiber ends **1359** are simultaneously illuminated and light eminates from the opposite fiber ends **1360** to **1363** which then form the targets. These fiber ends are flush with the door panel which itself may be plastic such that the plastic fiber blends with the plastic door. Indeed, the fibers carrying the light **1370** to **1373** may be cast right into the plastic in the injection mold. They may be in the door panel sheet, laid in just as if they were regular glass fibers in a SMC (fiberglass) door, or maybe carried in or adjacent the ribs of the door (if any). Alternatively, where there's an inner and outer panel, the fibers may be placed in between.

A camera unit **1368** looks at the light from the fiber ends **1360**–**1363**. This camera may be located overhead the conveyor and/or on a robot arm coming in to pick the door up for example.

The light source itself may be pulsed to create a higher signal to noise ratio of the targets relative to ambient light. It is noted that each of the fibers comprising the targets may transmit colors to allow color discrimination on that score. Indeed, one might even think of the fibers **1370** to **1373** as bundles of fibers. Indeed different numbers or arrangements of fibers and different arrangements of the target ends **1360** to **1363** could be used such that varying codes were used to deliniate which was which and what door type etc.

It is noted that paint, ink or other film or coating type targets can be sprayed on parts utilizing spray marking guns. Particularly effective for this in terms of producing nicely shaped targets such as triangles and other items that have a very recognizable shape is the Diffracto TurboJet, U.S. Pat. No. 4,269,874. Clearly, a marking station on the panel for example could be utilized to spray certain targets on with paint. These targets can be provided with special paint such as phosfluorescent, infra red absorbing or ultra violet reflecting, something that would tend to distinguish them under certain types of lighting. They could even be clear coating which would be invisible to the eye but under certain lightings would fluores or absorb certain wavelengths preferentially. The latter would be particularly nice for finished parts. However, any sort of paint could be utilized for example on an unpainted door which would later be painted just as long as it was chemically compatible or would be removed in a normal preparation process.

FIG. 12B illustrates the color filter plate **1380** which can be placed in front of the group **1359** of four fiber ends of FIG. 12A. This color filter plate has filters red, yellow, green, blue as shown which cause the light eminating from each of the fiber ends **1360**–**1363** to show those colors for example. These colors could all be infra red or any other colors.

An alternative for differentiating which target is which, is to actually use different light sources for each of the fibers and modulate them at different rates or pulse light on each of the fibers sequentially.

Nintendo Ex. 1001

US 6,167,607 B1

27

FIG. **13** illustrates another application of the invention, this one being to a windshield **1400** the edges of which as well as other features are viewed by cameras **1405** and **1406** having an included angle, θ between them such that 'stereo' vision in terms of depth perception is provided.

This stereo vision or any other vision of this part is made vastly easier by the deliniation of the object edge provided by the 'lossy' fiber **1411** which runs around the periphery of the part eminating or 'leaking' light at each point as it goes when illuminated at its end by light source **1410**.

While the whole edge has been deliniated in this particular example, it is obvious that only sections of the edges of a part such as this are required for accurate placement of it. It should be noted as well that it allows for actual mensuration of the part itself since the contour of the windshield edge is desired to insure that it will fit into the windshield opening of the car in a correct manner.

The fiber in this case can be cast into the windshield glass at the time of manufacture and could even be a glass fiber itself simply of slightly different characteristics. Alternatively, this fiber could be really just a portion of the same glass made in such a way as to convey light around the windshield periphery.

It's obvious that these same principles could be utilized on plastic or for that matter, even on metal parts where the fiber would simply be glued onto the periphery of the part or be covered over only in part by the metal if desired.

It should be noted again that the light eminating from the fiber can be infra red or any other wavelength that might be desirable for better deliniation of the surface. Indeed, the fiber in the case of plastic, can be buried such that it could not normally be seen under visible light but that infra red radiation, in this case eminating from the fiber outward through the glass or plastic could be seen.

Clearly, more than the four targets shown in FIG. **12**A on a door can be used as can more zones than simply the periphery of the part of the windshield such as FIG. **13**. However, these are the two principle examples, namely four points is the sufficient solution including a redundant check of the six axis, photogrametric equations, and of course the periphery is the main item of interest when looking with stereo cameras.

Note that in FIG. **13**, many fibers are lossy just by themselves. If additional losses were required, for example when they were imbedded in a matrix, the fibers could be roughened for example.

Clearly, plastic pallets and carriers can also be so instrumented. Indeed, light conductive paths can even be built into the plastic of a carrier such as FIG. **11**.

FIGS. **14**A and **14**B illustrates another method for targeting objects. In this embodiment of the invention, a cylinder head **1500** is targeted, in this case on the rocker cover rail **1501**, with targets **1502, 1505, 1506** and **1507** on the four corners of the rail perimeter.

Target **1502** in this case is formed by a single depression in the rail, for example, the conical surface made by a drill as it just touches the metal. Such a conical surface reflects light at diverse angles from that of the flat machined face of the cover rail itself, and therefore makes an excellent contrast target when viewed at appropriate angles. For example, when light from source **1510** carried on robot **1512** hits the cover rail containing such conical target, light is directed back at camera **1511** from the target because the face of the target is pointed more or less at the camera **1511**. However, the light from the cover rail is directed off at a angle away from the camera. Therefore, it appears bright against the background of the cover rail and against that of the cast

28

surface of the part. In other cases, the rail surface would be bright and the conical surface dark. The fact it is a cone, means that approach from any direction in the plane of the rail face desirably produces similar results.

Shown in the top view for illustration, different sets of targets have been shown on each of the corners. However, it is considered likely that in any one case, one type of target would be used. For example, the target cluster **1505** contains four such conical faces or for that matter, four targets of any sort such as will be shown in FIG. **15** for example. In this case, four targets of course are much more unusual than a single point and would be unmistakable relative to any sort of backgrounds since nothing else on the part could have such a cluster reflection. In this case, the center of the four dots gives the center of the target.

The same holds true of **1506** which is a three pointed version, also providing a center. Cluster **1507** having two points, while probably unmistakable, does not have a center point exept in the one plane. In this case, therefore, the center of the dots themselves would have to provide the answer in one plane.

FIGS. **15**A and **15**C illustrates another target method, also applied in this case to cylinder heads but of course general to any sort of part. In this particular case, the part is cast where it is shown that on cylinder head casting **1530**, there are appendges cast which do not interfere with either the assembly or the function of the part. These are shown as **1531, 1532, 1533** and **1534**. These appendges are indeed targets and of course are unmistakable in any sort of view.

To make them more unmistakable, certain angles have been cast into their sides. Such as shown in the end view of **1532**, the particular angle of reflection transverse to the head axis is such that when overhead light from an overhead light field **1535** is projected, that these facets shoot light off to a camera at a preferred angle. In this particular case, the opposite one **1531**, would have to be made in a different way as shown, such that it too had a facet in that direction. It is noted that the direction can be chosen such that no other features on the part have reflective angles in the same direction. In other words, for any part, no matter what it is, one should be able to find certain angles at which target data can be made to show up either brighter or darker than the rest of the part with no other, or at least a minimum of other part features having angles at these directions. This of course helps the discrimination in a passive manner.

Similarly, certain targets can be bevelled in more than one plane, such as **1533** as shown such that when viewed from either of two angles, a brigher reflection is shown. (Conversely the lighting can be at an angle and the camera located overhead.)

Also shown in this drawing, are cast in target cones or crosses such as were applied in a separate drilling operation in the FIGS. **14**A and **14**B version above. These are shown as **1540, 1541, 1542** and **1543**.

In this case, a male portion in the mold itself provides a suitable indentation in the part. Since the targets can be so cast, they can be of many other shapes besides simply conical surfaces, holes or other easily machined shapes. For example, cross shapes like the facets of a Phillips screw, which are undeniably discriminate as targets as opposed to other features on the object which can have some resemblence to conical shapes.

It should be noted as shown, that such shapes do not necessarily have to be indented in the part but can be raised such as the equivalent feature **1545** shown sticking up. Such a knob or bump on the part, however, can be in the way of the function of the part and its handling if it is not properly

Nintendo Ex. 1001

US 6,167,607 B1

29                                                              30

positioned. It is therefore thought since many parts generally have flat surfaces, which are either functional or to simplify handling, that the best means is an indentation in those surfaces which does not interfere with either purpose.

As shown in 16B, a cast or drilled in cone, cross etc. in a surface 1545 into the surface of material 1546, can optionally have a transparent plastic filler material such as 1550 placed into it to cover up a portion or all of the depression or even provide a raised portion sticking out from the surface of 1546.

This plastic material can serve several purposes. One purpose is that it simply protects the surface of the depression from rust and deterioration. This could be quite important in let us say a bright shiny drilled portion on an aluminum or steel part which in time tarnishes or rusts.

A second purpose is that the filler itself makes a different optical element out of the mirror formed by the cone surface (cross etc.) and in this case forms it into a prism which can have use for either spreading the light or directionalizing it.

A third potential reason is that the plastic filler may itself be chosen so as to preferentially reflect light only of certain colors. This then allows another form of discrimination of the targets based on color.

The principal disadvantage of using such a filler is that a separate operation must be made to put the plastic in, which cannot normally be done easily on a machining line. One exception, however, is the process whereby first the reflective hole is drilled into the casting, then plastic is sprayed into the holes very simply, and then a final machining pass required for other purposes is done which in the process shaves the excess material away leaving the plastic flush with the hole surface. This obviously then only adds the spray guns to the process.

FIG. 16 illustrates another example of targeting, this time on a plastic body panel 1570 illuminated by light field 1571 which is then detected by a target molded into the plastic surface 1572 onto camera 1575. As shown, the target is reflective and is composed of a diffraction grating which directs particular colors or, in general, light of all colors, at angles from the surface. An alternative is that the target 1572 be composed of a multi layer interference elements preferably in plastic which also can direct light at preferential angles in preferential color combinations.

If the camera 1575 is capable, as is a color TV camera, of color sensing as well as spot shape sensing, it can then differentiate these colors and unmistakably identify that such a color spread can come only from such a target. This can be done even in the presence of strong background, as from the surface of object 1570. Such color combinations can also be coded into the targets to identify the part 1570, its angle of orientation etc.

Rather than mold the plastic into the part, it can also be simply glued onto the surface of the part (1578). If a thin reflector film, such as 1578, it may, even though sticking up, be non-interfering with the function of the part. However, for plastic outer body panels in cars, the flush target mounting such as 1572 is preferred. These targets on painting of the car, become covered over. For example, if the targets are on the door panels of the car, which are mounted to the car at the time of painting, their presence is lost once the car is painted. The targets used for such mounting for example, should be flush and create no disturbance with the panel surface once they are painted. It is also noted that targets can be built into objects however to actually be part of the object's appearance. The necessity of covering the target up depends greatly on the aesthetic characteristics of the object.

Another possibility is to utilize targets which are seen as targets only under special illumination which would not normally be present in a human situation. For example, consider target 1572 which could be either molded into the panel or for that matter, simply a portion of the plastic surface of the panel itself treated with a special ultra violet florescent material. Only under ultra violet light would this target portion of the panel actually be visible relative to its surroundings.

This is partly true of the multi layer diffraction case above where the line spacing of the diffraction pattern or the multi layer material and spacing could be chosen such that only under certain colors of illumination, and then perhaps only at certain angles, could the light be strongly seen relative to the surroundings. This then would be particularly easy to arrange if such wavelengths were in the UV or infra red just beyond human vision. The near-IR is an exellent region for sensing with present day solid state cameras for example.

It should be noted that such targets do not necessarily have to be molded in but could be evaporated onto the surface such that the raised amount of material is virtually negligible. Naturally, in crude applications, such applied targets such as 1578 could simply be white crosses of plastic glued on. Clearly, this could be unobjectionable in the final product if in the final painting process there is a wash that simply removes the glue and target. One advantage of the fiber types shown in FIG. 12A, is that the fiber end can be extremely bright and flush to the part surface.

FIG. 17 illustrates another application of the invention, to tracking a carton such as 1579 travelling on a 'car' or carrier conveyor such as 1590. The carton has been randomly placed onto the carrier and it is desired using programmable robotic means to grab the carton and pull it off at a certain station.

To accomplish this, all sides of the carton have printed on target sets of which 1580, 1581 and 1582 are visible in the drawing. These target sets can be of any usable description and remain with the carton always. The beauty of this is that they can be utilized for tracking in the manufacturing plant, and for robotic warehousing purposes and throughout the distribution chain, even for example in a supermarket provide robotic unpacking of the product and place the product on the shelves. Naturally the product packages within the carton, such as let us say egg cartons, or milk cartons, cans etc. can also be targeted for the same purposes since all those have printed on labels or the like.

While each face in this case is shown with four dot type targets, these could clearly be of any number or type. The carton also could be coded to indicate the goods within the carton. In the extreme case, this would require a UPC type codes (eg. 1591), and indeed a miniature UPC code itself could constitute one or more targets. However, it is considered that most of these would use much less complicated codes since there would normally be no need for such large amounts of information.

It may well be necessary to code the object or targets since all different boxes would have different target spacings due to their own shape and one would first wish to decode which type it was so that the spacing of the targets could be known to the computer of the robot mechanism and fed into the calculations for the various solution of the photogrammetric equations.

For example, it could well be that a special code target might also be used such as 1591 which would include all the photogrammetric solution data for that carton plus an indication of what was inside if desired. The robot camera system could read the code first and from same determine the various target location data on each of the faces of the carton including the target shape and size, the target spacing,

Nintendo Ex. 1001

US 6,167,607 B1

31

how many targets there were and for example the shape of the product itself, whether in a square carton or what have you.

FIG. 18

FIG. 18 illustrates a similar concept this time using targeted tools such as the grinder 1600 driven pneumatically via air hose 1601. It is desired that a robot with a gripper come pick this grinder up and do work on an object, for example the leaded-in zones of a car body at the panel junctions.

For this purpose, the tool gripping area 1610 itself is targeted, in this case using light emitting diode targets 1605, 1606, 1607 and 1608, also fed through the embilical 1601. These diodes can either be on continuously, may be flashed to provide has high signal to noise, or rippled such that only one is on at any given time. The latter is useful if photo sensors responsive only to one point at a time are used such as continuous spot detectors (eg. UDT SC-10).

Naturally, rather than light emitting diodes at the tool, fibers can be utilized to feed this data to the same points from one or more remote light sources.

The robot hand with camera would approach this tool and via the targets grab the tool at the desired location, in this case, the cylindrical surface 1610 which would be grabbed by 'V' shaped grippers. It is noted that the targets can be placed specifically so they bracket this area and this is a preferred mode of target placement in such instances. However, this is not necessarily required. The targets could be placed such that gripping would be known to the computer to occur in any other location as well.

In this case, it may also be desirable to have a code such as 1620 shown. This code could carry with it the data of where the part is to be gripped, whether it's between the targets or somewhere else, and again, what tool it was and perhaps other data as well.

It is noted that a target such as 1532 and 1531 of FIGS. 15A and 15C, if they project from the object in one or more planes, can allow more accurate solutions of the various pitch and yaw data which are derived from the projected spacing of such targets viewed by the camera. However, the more the target projects from the part in question however, the more the possibility it is objectionable for handling or aesthetic reasons.

FIG. 19

FIG. 19 illustrates another application of the invention to the assembly of car bodies. In this case, it is desired to assemble a deck lid 1660 onto the body opening formed by two fenders 1661 and 1662 and the other portions of the body not shown for clarity. This problem is very similar to that of fitting the doors in a door opening or the hood in the hood opening and is optimally improved using optical sensing as disclosed.

As shown, a robot arm 1650 carries with it a tooling fixture 1651 containing vacuum cup fixture 1652 and 1653 which attach to the deck lid 1660 to be put on. The fixture itself contains optical sensors, in this case 1670 and 1671 which are used in the mode shown here tracking targets as well as to measure certain variables of the part itself using concepts shown in the referenced applications.

Such applicable sensors are shown in reference nos. 6, 16, and others.

As the robot approaches the car body containing the fenders carrying with it the deck lid 1660, sensors 1670 and 1671, which contain linear or matrix camera units, have determined the position of the deck lid relative to the cameras themselves. In other words, the cups 1652 and 1653 can pick up this deck lid in a relatively random fashion from

32

let us say a roller conveyor and have the cameras compensate the robot for this random position by sensing the edges of the deck lid. Alternatively, the sensors can sense the deck lid edges ideally and cause the pickup to be made in the correction location. It is likely too that other cameras would be located on the other sides of the part, for example, as shown as 1680 (dotted lines).

When the robot is relatively far away from the body, the camera unit which also contains for example illumination source 1675, picks up the reflected image of a stamped in cone targets such as 1665 into the fender. Alternatively, for even better contrast, a hole 1665 can be provided, back illuminated if possible by a light source such as 1666. Unfortunately, however, in most portions of panels, extraneous holes are not desired. Such stamped in targets are however extremely possible and can be accomplished just as in the case of the cast in targets of FIGS. 15A and 15C in an analogous manner. The fiber based targeting systems are ideal if they can be employed economically.

As the sensing of targets such as 1665, and 1667 on the opposite side, as well as other targets around the rest of the periphery of the deck opening, allow the robot system to home in on the body. Note that unlike previous embodiments, it is not a single camera which is seeing all targets, but the ensemble of two or more cameras whose combined target data gives the position and orientation to the part. As the camera sensor unit comes in for its final approach, an oblique light projector unit such as 1672 illuminates the portion of the part itself from which a triangulation data as to the exact range to the fender 1661 can be provided at a higher resolution. Such a sensor unit incorporating this has been shown in reference no. 6 and other references.

As the part then fits into the opening 'D', the gap width 'W' on each side is sensed by each of the cameras on the four sides and optimized for the car body in question. When the deck is optimally positioned, then various hinge screws and bolts are run down to lock it into place. This process therefore not only generates a fully automated deck (or door) placement, but also creates a optimal body fit for highest quality performance. This operation does not necessarily require the use of the targets and can be done in a targetless fashion particularly if the body is stopped when this is occuring. If the body is however in motion, the target data definitely is very much desirable such that its side to side and forward/backward oscillations can be tracked on the approach.

It may also be required that two sets of camera magnifications be used, one at high magnification to determine the distance 'w' and one at lower magnification to track the targets. This depends on the application and naturally is not as desirable as just a single unit. Further, in this case the targets are shown being covered up by the panel, in other words, they are out of sight in terms of the body itself. This can be true in both doors, decks and so on. Some of the tracking however could be done by targets which were visible on other portions of the body and not covered. This would allow the targets to be tracked even at the time of actual panel insertion and bolting which would be desirable on moving parts. For this purpose, it is thought special targets should be stuck onto the body such as target 1681 shown which has been stuck onto the fender and is, for example, comprised by a white background with a cross on it. Such targets might be viewed by a completely separate camera system mounted to the side or overhead or on the robot arm 1650 itself rather than on the tooling.

It should be noted that in any of the above embodiments, targets should be as distinct as possible. If possible, certain

Nintendo Ex. 1001

US 6,167,607 B1

**33**

types of reflective target material such as plastic retro reflectors and retro reflective tapes can be of extreme interest as long as they can be placed on the object in a manner that does not ruin its function. Such tapes and targets, therefore, are best suited for use on objects which do not have an aesthetic purpose and some of these would certainly be all conveyor parts, cartons etc. The problem, however, with these targets is that they are generally of materials which must be attached and this can cause difficulties in terms of both the cost of attaching the targets in an accurate manner (remembering that for best operation, with multi target systems, the target spacing and orientation needs to be known, such that the photogrammetric calculations can be accurately solved. The second problem with these materials is that they are often plastic and in some cases, plastic will not survive the remainder of the process whether it be hot washes, heat treat, or what have you.

It should also be noted that targets, when applied can be removed for use on subsequent parts. For example, retro reflective glass targets of very high contrast can be screwed into tapped holes on the part at very well known locations and screwed off later on and used again. This would be easily accomplished for example, on the cylinder head of FIGS. **14**A and **14**B if the tapped rocker cover rail holes for the rocker cover were utilized to carry the targets which were screwed into those holes, preferably automatically. At the final rocker cover installation, these screws would be taken out and the rocker cover bolts put in. Naturally, however, this adds two operations, screwing in, and screwing out, to the process but it does utilize the same holes that are put into the part anyway. Other targets could be attached with glues etc. which could be taken off the part with solvent and off the target such that it could be reused again after cleaning. This is discussed relative to FIG. **20**.

In addition to the above ideas, ther are several other continuations from the previous application that should be noticed. For example, FIG. 8 of Ser. No. 200,401 discloses instrumented grippers with fiber optic sensor units including a triangulation projection source to which allows three axes of data to be obtained. It is noted herein that up to five axes of such data can be obtained using projection of multiple beams or four beams to get four or five axes of data. This allows the pitch and the yaw of the part to be obtained as well as the range, plus the xy image and is further described relative to FIG. **22** below.

It is noted that the robot arm may be instrumented for guidance with such a sensor either using LED or diode lasers as targets or via fibers. Such concepts of guiding robots with external cameras using targeted arms has been shown in the copending application of reference no. 17.

Color discrimination of the various targets can be made by using color TV cameras or with simply a color sensor in front of a detector if applicable. For example, relative to background levels, if all targets are infra red emitting such as infra red LEDs, then an infra red, band pass filter can be placed in front of the camera such that greatly discriminates against the white light image background and shows primarily the infra red targets superposed thereon.

Furthermore, the holes put onto cylinder head in FIGS. **14**A and **14**B can be more than just conical, they can be actually be drilled in deeper such that they tend to absorb all light. In this case, one would look at the angle of reflection from the bright machined face of the rocker cover rail and the target holes would show dark.

It should be noted in FIG. **15**B, a blob of plastic or a blob of silicone could be put on top of the part to act as a target.

Indeed, if a linear strip of silicone for example were utilized, this would approximate the fiber arrangements

**34**

shown in FIGS. **12**A or **13** and indeed light can be transmitted through and around the part illuminating edges of it thereby.

FIG. **20**

FIG. **20** illustrates one example of a reusable target, in this case, a special screw **1700** which is screwed into a threaded hole **1701** in a part **1702** such as the cylinder head of FIG. **15**, engine block, or for that matter just about any machined part that has a threaded hole. These threaded holes would as has been pointed out, be almost certainly holes that already exist on the part for other purposes and as for assembly with the target part taking the place of the regular part up until the point of final assembly when it would be removed.

The target screw is built like a socketed cap screw but instead of the socket hole, in this case, being at least partly filled with a retroreflective target **1705**, which is ideally comprised of plastic or glass retroreflective material for example that commonly used on automotive reflectors or specialized types built by 3M and other companies.

If desired, a color filter such as **1710** can be utilized on top of this screw or as part of the retroreflector to give a preferential color signal from this particular bolt or stud if it is desired to distinguish it against others. The reflector design itself may also provide such distinction being multi-pointed or what have you.

This particular arrangement provides an extremely high target deliniation, and allows the targets to stand outward from the part surface if desired (as for better photogrametric solution purposes) by simply having a long threaded length. Furthermore, this stud is a relatively low cost item and can use automatic lines to put in and take out. The only disadvantage of course is that it must go into a hole that is later used which means in the final assembly process, the target cannot be used unless the part is not moved during assembly after the target is taken out.

While a screw type has been shown, it is clear that other arrangements such as bayonet, snap in/snap out, or other targets could be utilized which could be removed with special tools from otherwise clear holes which later would accept trim strips, rivets or what have you.

In other cases, the target itself might simply have a pointed end such as a pin which could be stuck into the object material and later removed leaving a hole which would cover itself over if the material was relatively compliant. This could include, for example, seat materials or meat on overhead conveyor lines where the carcass itself could have targets put in it.

FIG. **21**

FIG. **21** illustrates an application of the invention to working on a continuously moving car body assembly **1780**. In this case, a robotic system according to the invention is provided complete with camera system **1785** which locks onto the body targeted with reflective targets **1781**–**1784** in the working region causing the robot to track the motion of the car body side to side, backward and forward on the body "truck" (not shown).

The sensor unit **1785**, in conjunction with robot control computer **1789**, controls the robot arm **1800** to move an abrasive belt grinder **1801** to grind out the lead **1790** fill-in between the sail panel **1791** and the roof panel **1792**. There are two forms of additional optical sensor units of use in this embodiment. The first is **1805**, such as FIG. **16** of the referenced application which allows the attitude of the belt grinder to the surface of the body to be determined for tracking purposes. The second (not shown) is a contouring sensor such as FIG. 4F of Ref. No. 16 which contours the leaded zone of the body to feed back contour coordinates to

Nintendo Ex. 1001

US 6,167,607 B1

35

the grinder and update the amount of metal left on and judge whether or not further grinding should occur and if so, from what angle (determined in conjunction with the dynamic tracking data at low resolution from the target sensor 1785, and at high resolution from the on-board sensor 1805).

Utilizing all three of the optical separate sensor systems plus force feedback, a complete grinding cell so to speak can operable on-the-fly. If the car can be stopped in its motion, the target based system is not as much required for tracking the gross motions of the body and the other two sensor systems are sufficient. However, the target system is a good "insurance" for rapid approach.

In the above application, considerable amounts of specialized hardware are of use, much of which has been discussed in the referenced applications. For example, camera units are best provided by solid state matrix arrays such as the GE TN2500 and the new solid state TV color arrays now appearing on the market by Sony and others.

In terms of light sources, flashed Xenon light sources are very good for illuminating targets with brilliant high signal to noise pulses, even when color filters are applied. Also, such flashes do not cause the solid state cameras to bloom, a desirable advantage.

Desirable laser light sources include diode lasers operating in the infra red made by RCA and Laser Diode Laboratories. Of interest too is the Mitsubishi 4001 laser diode which is partially visible.

The high powered infra-red LEDs such as the Texas Instrument types can also be utilized for such illumination through fibers or what have you. LEDs are very convenient in that they are low power consumption and can be modulated as can the current range of diode lasers.

The approach described relative to FIGS. 12A and 13 holds for all kinds of other parts such as tires, parts of aircraft, furniture, just about any part where some sort of method of casting, molding or otherwise placing fibers into the part can be done. Even metal parts can have integral fibers if they can stand the melting temperature (eg. quartz fibers).

It should also be noted that the part does not necessarily have to have fibers cast or molded in. One can also have a fiber placed onto this part, for example, glued to the part around its periphery or at specific points. These are then illuminated and can then be used for the same robotic and other purposes as shown above.

This gluing operation, however, generally requires additional labor, either human or robotic, although it could be done on an automatic in-line machine as well.

It should be noted that while fiber optics have been discussed as the light carrying medium, it is clear that a transparent silicon bead laid down on a part is also light transmitting although less so. This particular use of fibers and other light transmitting mediums applied into or onto parts is particularly appealing for many applications where they are to be substantially robotically handled and is, therefore, where the cost of applying the fibers in and illuminating them at different stations is made up by savings due to reduced complexity of robotic automation utilized.

The application of such concepts to things such as tooling was discussed in my recent copending application (ref no. 6) on robotic casting inspection, where sensors were in the tools to sense part condition. This disclosure has expanded on this to provide fiber illumination of tool location to allow handling or size determination of tools. This is also related to a copending application entitled "Method and Apparatus for Detecting Wear or Breakage in Tools". Suffice it to say that tools can also be illuminated like the J-hook of FIG. 8,

36

to provide meaningful indicators or targets to allow pick up by robots or other automation. One can consider such tools as cutting tools, small drills, routers, pneumatic wrenches, saws, lasers, weld heads etc. All can be instrumented in this manner. Even small things such as sockets for wrenches can be so instrumented.

Note that 'light' in this application refers to all wavelengths of electromagnetic radiation IR through UV.

Similar fiber optic emitter targets can be the grippers or arm robots themselves, replacing LEDs or other types on the grippers such as shown in copending application entitled "Electro-Optical System for Control of Robots, Manipulator Arms and Coordinate Measurement Machines".

Suitable fibers include, at the low end of cost, the Dupont Corfon plastic fibers as well as glass fibers made by American Optical, Corning and numerous other manufacturers.

It should be noted that image transmissive bundles can be utilized to remote the images of sensors shown in this application as has been shown in the referenced copending application which this application is a continuation in part. Such fiber optic bundles are made by Nippon Sheet Glass, Olympus and others and can have very high resolution.

It is noted that image scanning photo detector camera arrays and solit state TV (matrix array) cameras, while preferred, are not the only means of viewing the targets of this invention. Other TV cameras can be used, as can in some incidences scanning laser beams or even fixed detectors optimized for a preferred target signature. Continuous or quadrant position detectors (such as UDT SC-10's) can be used as well to determine the image position of a single spot or target at a time.

Shown in FIG. 22 is a sensor according to the invention providing an improvement on some of the fiber optically based sensors of the co-pending application Ser. No. 200, 401. This particular sensor shown is a multi range sensor of unique small size according to the invention which in this case is shown being so small that it can be built into the grippers of robots. It does not require targeted objects, but can be combined with other embodiments to work in conjunction with targets as well.

As shown sensor 1900, located in this case in one half of the gripper portion 1901 of a robot end effector is comprised of light sources 1905, 1906 and 1907. (In this example there are three light sources although there could be any number.) These light sources are diode lasers or in many desirable instances, they are 0.005 optical fibers remotely connected to diode lasers with only the fibers brought to the sensor.

In any case, light from each of the fibers is focussed by single lens 1910. However, due to the variation of positioning of the fibers, the light is focussed at different distances and at different angles depending on the position of the fiber. This is ideal for providing a multi range, multi resolution sensor, with highest included angle and resolution at the shortest ranges as is desired for accurate part pick-up and other purposes.

Light source 1906 is focussed at the nominal range to the part 1911 shown in the drawing forming a reflected spot 1912. This spot is, as has been described in many copending applications, imaged by lens 1915 onto an integral photo detector array 1916 (dotted lines). However, in this case, again for compactness, the image is formed onto a coherent fiber optic bundle 1918 and carried to a remoted matrix photo diode array. Thus, in this example, all light sources and sensing can be done over fibers if desired. This is attractive for thermal and electrical isolation purposes, plus light weight on small robots.

A suitable window, 1920 is provided in front of the sensor housing.

Nintendo Ex. 1001

US 6,167,607 B1

37

The other two light sources, **1905** and **1907**, on either side of the nominal, focus at different distances and at different angles. The larger the included angle theta, the more the resolution. Therefore, it can be seen as the image forming capability associated with **1907** is at the highest resolution with the part closest and this is used for the fine approach of the sensor where the range 'H' might be only half an inch. In the case of **1905**, 'H' might be set up for 10 inches.

Obviously, this sort of an arrangement is fine for maintaining a reasonable focus of light sources at different ranges. However, with a single lens **1915** one needs a narrow aperture to give large depth of field and maintain the spots projected in reasonable focus over a wide range of object locations. Alternatively, a zoom lens **1915** can be used to maintain focus over the range.

Since spot centroids are being measured, it is noted the spot image can be somewhat out of focus and still be utilized (see reference no. 6 or no. 8 for suitable circuit processing). Optional white light sources can also be used with this arrangement to provide a edge image lighting with the part **1911**.

It is further noted relative to FIG. **22** that each diode laser or fiber could be focused by an individual lens. While more complicated, this allows more angular spread between beams. It is contemplated that only one beam would be turned on at once, suitable for the range in question. However, even if more than one were on simultaneously only one is generally in the field of view of lens **1910** at a time. If there are two in the field, they can be discerned from their location. Indeed, two divergent beams can be projected on purpose at once in the field, one to determine range and the other to give angular orientation from the beam separation on the target, knowing range.

It is further noted that this invention is very useful to control robotically positioned non-contact processes such as laser welding, drilling etc. especially on continuous lines. In terms of processes in general, the invention applies to welding, drilling, grinding, cutting, hardening, and any other material removal, addition on transformation process.

The characteristics of targets used in this invention generally include distinctive shape, light reflection, light transmission or light emission characteristics relative to the normal surface of the object targeted. Where the 'normal' object has targets, a better definition is relative to the rest of the object surface, i.e. the untargeted remaining portion. Light emission, reflection or transmission can be distinctive in color, direction, distribution of direction or color, shape, and intensity.

In the case of the fiber version and other active targets, the targets can also be diverse in their light modulation frequency.

It is noted in the application of the invention to practical plant problems, that photodetector arrays are much prefered over the analog tube based TV cameras used by Pinkney and other photogrammatists. Particularly photodiode arrays such as the GE TV2500 do not require frequent calibration and therefore can be relyed on much more to give accurate dimensional data as to target or spot location. For example, a TV tube drift of 3% in the apparatus of Pinkney et al can create a generally intolerable error of 0.3" at 10" standoff in the range data alone. The arrays used in this invention preclude this possibility.

It is further noted that in the embodiments shown herein relative to continuous conveyors, if conveyor speed is known, the tracking requirements are reduced accordingly.

It is also noted that the snubber rails **1250** and **1251** are but one example of means to constrain motion or velocity in

38

one or more axes of an object in this invention. It may also be useful to constrain velocity for example using electro magnetic or viscous fluid damping. Constraints of this sort generally make the total robotic handling or parts working system easier to control.

This disclosure has described many ways of adding targets to objects. Other ways of making the target part of the object have also been described. Where the object is one which is in it final form and located in a position that it can be seen by a consumer who expects it to provide a pleasing appearance, there is considerable requirement to make the targets used in the invention either essentially invisible or alternatively make them have asthetic value of their own.

For example, a doped target zone of a plastic dashboard piece can fluoresce under UV light but remain invisible in normal illumination.

Alternatively, a portion of the object may contain a special dopant to cuase it to reflect or absorb in the IR more than normal.

A desirable condition exists if one can make the targets part of the overall design to provide for example a pleasing accent feature which are viewed as part of the design. Where possible the targets can also be functional features such as holes, knobs etc.

For multi-target application involving three, four, or more targets (to provide maximum solution capability of the photogrammetric equations) it is noted that the targets do not have to be equi distant or otherwise or rigidly arrayed in their relation. Thus a variety of asthetic possibilities exist. For example:

On rectangular parts, the four corners are desirable where targets can be squares, circles or other shapes.

On circular parts or sections thereof, the four targets 90° are desirable or three targets 120°.

On irregular parts, the targets can be in any logical arrangement.

Examples are:

a furniture leg **1950** with round head tacks **1951**–**1955** at corners serving as targets (FIG. **23A**)

automobile grills **1960** with decorative square target fascets **1961**–**1965** or slots

near the corners (FIG. **23B**)

automobile steering wheels **1970** with triangular bright inserts **1971**–**1973** in outer edge of three 120° spokes (FIG. **23C**).

It is also noted that within the target slots **1241** etc. of FIG. **11**, transmissive diffraction gratings and other preferential diffusers of transmitted light can be located.

It is further noted that light from the fiber end **1020** for example need not necessarily be imaged by lens **1040**, but can be detected directly by one or more detectors.

It is noted that in many plant applications where the targeted object goes through many processes or are repetitively used (eg. the conveyor carriers of FIG. **10**), that the targets can degrade or be knocked off, destroyed etc. Thus it is desirable in many cases to have a superfluous number of targets.

Since only three targets are needed for a complete photogrammetric six axis solution (and even two will do if certain aforementioned constraints are used), two or three is then the base number of targets per object generally desirable. In many cases, a fourth target is desirable to provide a redundant solution however.

This invention therefore considers the purposeful addition of extra targets also in known locations relative to the two to four basic targets and for the additional step of determining which targets are present and using an optimal solution for those.

Nintendo Ex. 1001

US 6,167,607 B1

39

Consider FIG. 24. Illustrated is a conveyor pallet **1980** used repeatedly in a plant equipped with targets **1981–1984** and extra redundant targets **1986–1988**. In one mode of operation, normally camera **1990** and computer **1991** are programmed top consider only targets **1981–1985**. If, however, one of these targets is missing, the images of target-**1986**, **1987** or **1988** is utilized. In general the rationale is to use the remaining target closest to the missing one but the best rationale is to use whatever target combination gives the best solution (ie. most accurate) of the photogrammetric equations.

It is contemplated that certain additional targets might also be applied to provide, in certain instances, more accurate solutions for example, to pitch or yaw variables in the plane perpendicular to the lens axis. For example, one might choose at certain stations in the line where a higher degree of sensing in one or two of the variables were desired, to use target **1988** on purpose, instead of **1985** say.

Naturally, if all targets but three are damaged, one uses the remaining three regardless. However, the invention can include the additional step of signaling a control that pallet SN **1368** say is down to its last four targets and should be repaired.

It is further noted that a system input or verification station is often desirable in a system such as shown in FIG. **10**.

For example, consider providing sensor **1262** at a position where the conveyor carrier is well positioned such that the targets can be checked for presence and their locations verified if desired. Not only is this helpful in keeping the system in control, but if each carrier was serialized or sequenced the actual target location can be measured at this station and the locations stored in a computer, such as **1280**, relative to the carrier in question. This allows different carriers of different parts in different states of repair to be intermixed on the same line with no loss of target position accuracy. This is important since the accuracy of the solution of photogrammetric equations (used to guide the robots on the line such as at the station of FIG. **10**) is based on the degree of accuracy with which the relative location of the targets to themselves and to the carrier body is known.

Only one such verification station (which could also have a carrier serial code reader as could the station of FIG. **10**) is required per line. It also, as has been mentioned, helps monitor damaged carriers and damaged carriers could then be automatically routed off-line for repair.

Note that verification station can also be used for parts when they are in a fixtured or otherwise known correct position at some point in a line. Any missing targets as well as locations can be verified before they enter the system.

This invention will be useful in a wide range of applications and it is envisioned that a standard sensor computer unit can be built essentially independent of the application. The user would only need type in or otherwise enter data into the computer such as **1280**, to tell the system the pertinent target location and spacings on the parts or objects to be handled, assembled, or worked. Thus it can be reprogrammed to different parts, lines etc. and forms the basis of a generalized robot control system.

I claim:

1. A method of creating a data base for an object having at least first and second discrete targets thereon in a pattern, said method comprising:

electro-optically sensing, with an electro-optical sensing means, the pattern of said first target and said second target; and

using a processing means, creating a data base of said object using said sensed pattern of said first target and

40

said second target, said created data base comprising said sensed pattern of said first and second targets.

2. A method according to claim **1**, wherein one of said first and second targets comprises an artificial target.

3. A method according to claim **1**, further providing a predetermined data base of the object and comparing said created data base of said object to said predetermined data base.

4. A method according to claim **1**, further comprising, modifying a predetermined data base of the object based upon said created data base of said object.

5. A method according to claim **4**, wherein said predetermined data base comprises a design data base of said object.

6. A method according to claim **1**, wherein the shape of said object is changed after said data base of said object is created by said processing means, said method further comprising:

electro-optically sensing a changed pattern of said first and second targets on said changed object; and

creating a further data base of said object using said sensed changed pattern of said first and second targets on said changed object.

7. A method according to claim **6**, wherein said further data base is created by modifying said created data base based of said sensed changed pattern of said first and second targets on said changed object.

8. A method according to claim **1**, wherein said object is one of a plurality of objects being processed in an manufacturing line, said method further comprising feeding back information related to each said created data base of a process in advance of said electro-optical sensing step in said method.

9. A method according to claim **1**, wherein said object is one of a plurality of objects being processed in a manufacturing line. said method further comprising feeding forward information related to said data base to a process subsequent to said electro-optical sensing step in said method.

10. A method according to claim **1**, further comprising, using said processing means, controlling a function related to said object based upon said created data base of said object.

11. A method according to claim **10**, further comprising again electro-optically sensing the pattern of said first and second targets on said object after controlling said function related to said object.

12. A method according to claim **1**, further comprising electro-optically sensing an image of the surface of said object and creating said data base of said object using said image of the surface of said oblect.

13. A method according to claim **12**, wherein a grey level image of the surface of said object is electro-optically sensed and said grey level image is used in creating said data base of said object.

14. A method according to claim **12**, wherein one electro-optically sensing means is used for sensing said pattern of said first and second targets and for sensing said image of the surface of said object.

15. A method according to claim **1**, said method further comprsing illuminating one of said first and second targets.

16. A method according to claim **15**, wherein said one of said first and second targets is illuminated with radiation outside of the visible wavelengths.

17. A method according to claim **16**, wherein said one of said first and second targets is illuminated with infrared radiation.

18. A method according to claim **15**, wherein said one of said first and second targets is illuminated intermittently.

Nintendo Ex. 1001

US 6,167,607 B1

41

**19.** A method according to claim **15**, wherein said one of said first and second targets comprises a retro-reflective target and said illumination is along an axis substantially parallel to the axis of said electro-optical sensing.

**20.** A method according to claim **1**, further comprising determining an orientation of said object with respect to said sensed pattern of said first and second targets and further creating said data base using determined orientation.

**21.** A method according to claim **1**, wherein said pattern of said at least first and second targets includes at least a third discrete target and said pattern of at least first, second and third targets is electro-optically sensed in three dimensions.

**22.** A method according to claim **21**, wherein said pattern of said first and second targets is electro-optically sensed by an electro-optical sensing means comprising at least two photodetector arrays.

**23.** A method as in claim **1**, wherein one of said first and second targets is a natural target on said object.

**24.** A method as in claim **1**, wherein one of said first and second targets is an artificial target and one of said first and second targets is a natural target on said object.

**25.** Apparatus for creating a data base for an object having at least first and second discrete targets thereon in a pattern, said apparatus comprising:

electro-optical sensing means for sensing the pattern of said first target and said second target; and

processing means for creating a data base of said object using said sensed pattern of said first target and said second target, said data base comprising said sensed pattern of said first and second targets.

**26.** Apparatus according to claim **25**, wherein one of said first and second targets comprises an artificial target.

**27.** Apparatus according to claim **25**, further comprising means for comparing said created data base of said object to a predetermined data base of the object.

**28.** Apparatus according to claim **25**, further comprising, means for modifying a predetermined data base of the object based upon said created data base of said object.

**29.** Apparatus according to claim **25**, wherein said predetermined data base comprises a design data base of said object.

**30.** Apparatus according to claim **25**, wherein the shape of said object is changed after said data base of said object is created by said processing means, said apparatus further comprising electro-optical sensing means for sensing a changed pattern of said first and second targets on said changed object, and wherein said processing means creates a further data base of said object using said sensed changed pattern of said first and second targets on said changed object.

**31.** Apparatus according to claim **30**, wherein said further data base is created by modifying said created data base based on said sensed changed pattern of said first and second targets on said changed object.

**32.** Apparatus according to claim **29**, wherein said object is one of a plurality of objects being processed in a manufacturing line, said method further comprising means for feeding back information related to each said created data base to a process in advance of said electro-optical sensing means.

42

**33.** Apparatus according to claim **25**, wherein said object is one of a plurality of objects being processed in a manufacturing line, said method further comprising means for feeding forward information related to said created data base to a process subsequent to said processing means.

**34.** Apparatus according to claim **25**, wherein said processing means controls a function related to said object based upon said created data base of said object.

**35.** Apparatus according to claim **34**, further comprising electro-optical sensing means for sensing the pattern of said first and second targets after controlling said function related to said object.

**36.** Apparatus according to claim **25**, wherein said electro-optical sensing means senses an image of the surface of said object and said processing means creates said data base of said object using said sensed image of the surface of said object.

**37.** Apparatus according to claim **36**, wherein said electro-optical sensing means senses a grey level image of the surface of said object and said processing means uses said grey level image in creating said data base of said object.

**38.** Apparatus according to claim **36**, wherein said electro-optical sensing means comprises two electro-optical sensors and wherein one of said electro-optical sensors senses said pattern of said first and second targets and another of said electro-optical sensors senses said image of the surface of said object.

**39.** Apparatus according to claim **25**, said apparatus further comprising means for illuminating one of said first and second targets.

**40.** Apparatus according to claim **39**, wherein said means for illuminating illuminates said one of said first and second targets with radiation outside of the visible wavelengths so as to minimize interference from ambient light.

**41.** Apparatus according to claim **40**, wherein said means for illuminating illuminates said one of first and second targets with infrared radiation, so as to minimize interference from ambient light.

**42.** Apparatus according to claim **39**, wherein said means for illuminating illuminates said one of said first and second targets intermittently, so as to minimize interference from ambient light.

**43.** Apparatus according to claim **39**, wherein said one of said first and second targets comprises a retro-reflective target and said means for illuminating illuminates said artificial target along an axis substantially parallel to the axis of said electro-optical sensing means.

**44.** Apparatus according to claim **25**, further comprising means for determining an orientation of said object with respect to said sensed pattern of said object, and wherein said processing means creates said data base using said determined orientation.

**45.** Apparatus according to claim **25**, wherein said electro-optical sensing means comprises at least two photodetector arrays for sensing said pattern of said targets in three dimensions.

**46.** Apparatus as in claim **25**, wherein one of said first and second targets comprises a natural target on said object.

**47.** Apparatus as in claim **25**, wherein one of said first and second targets is an artificial target and one of said first and second targets is a natural target on said object.

*    *    *    *    *

Nintendo Ex. 1001

## **CERTIFICATE OF SERVICE**

I, Traci L. Eppley, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:  Motion Games, Inc. was retained by Boies, Schiller & Flexner LLP to print this document.  I am an employee of Boies, Schiller & Flexner LLP.

On October 16, 2015, Counsel for Appellant has authorized me to electronically file the foregoing BRIEF FOR APPELLANT MOTION GAMES, LLC with the Clerk of Court using the CM/ECF System, which will serve via email notice of such filing to counsel for Appellee pursuant to Fed. R. App. P. 25 and Fed. Cir. R. 25(a) and 25(b).

Additionally, paper copies will be mailed to the principal counsel at the below address on the date paper copies are sent to the Court.

Joseph S. Presta
Nixon & Vanderhye P.C.
901 North Glebe Road
Arlington, VA 22203
jsp@nixonvan.com

*Principal Counsel for Nintendo of America Inc.*

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Express Mail, within the time provided in the Court's rules.

By: _/s/ Traci L. Eppley_____
Traci L. Eppley

## **CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

The undersigned, an attorney, herby certifies that:

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Circuit Rule 32(b).  This brief contains 13,112 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Time New Roman type style.


Dated: October 16, 2015      Respectfully submitted,

By:    */s/ D. Michael Underhill*
        D. Michael Underhill
        *Attorney for Appellant Motion Games, LLC*