No. 15-1867

In the

# United States Court of Appeals for the Federal Circuit

## MOTION GAMES, LLC,
*APPELLANT*,

v.

## NINTENDO OF AMERICA INC.,
*APPELLEE*.

———————

*Appeal from the Patent Trial and Appeal Board, United States Patent and Trademark Office in Case IPR 2014-00164*

———————

**BRIEF OF APPELLEE NINTENDO OF AMERICA INC.**

———————

JOSEPH S. PRESTA
NIXON & VANDERHYE P.C.
901 North Glebe Road
Arlington, VA 22203
Telephone: 703-816-4000
Facsimile: 703-816-4100
jsp@nixonvan.com

BRIAN D. ROCHE
REED SMITH LLP
10 South Wacker Drive
Chicago, IL  60606
Telephone:  312-207-1000
Facsimile: 312-207-6400
broche@reedsmith.com

RUDOLF E. HUTZ
REED SMITH LLP
1201 North Market Street
Wilmington, DE 19801-1163
Telephone: 302-778-7571
Facsimile: 302-778-7575
rhutz@reedsmith.com

BARRY J. COYNE
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, PA 15222
Telephone: 412-288-3131
Facsimile: 412-288-3063
bcoyne@reedsmith.com

*Counsel for Appellee Nintendo of America Inc.*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for the Appellee Nintendo of America Inc. certifies the following:

1.     The full name of every party or amicus represented by me is: Nintendo of America Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: Nintendo Co., Ltd. and Nintendo of America Inc.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: Nintendo Co., Ltd., whose stock is publicly traded in Japan, owns 100% of Nintendo of America Inc.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

| <u>Law Firm</u> | <u>Attorney</u> |
|---|---|
| Reed Smith LLP | Brian D. Roche |
| | James C. Martin |
| | Barry J. Coyne |
| | Rudolf E. Hutz |
| | Jennifer Yule DePriest |
| | Matthew J. Shiels |
| | Vanessa Marti Heftman |
| | Keyonn L. Pope |
| Nixon & Vanderhye P.C. | Joseph S. Presta |
| Yarbrough Wilcox, PLLC | Herbert A. Yarbrough, III |

Dated:   December 14, 2015                    By: */s/ Barry J. Coyne*
                                                       Barry J. Coyne

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS................................................................................i

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT OF RELATED CASES ......................................................1

PRELIMINARY STATEMENT ................................................................2

COUNTERSTATEMENT OF THE ISSUES.............................................6

COUNTERSTATEMENT OF THE CASE..................................................7

I.    THE '607 PATENT ..........................................................................7

    A.    The Claims at Issue ................................................................7

    B.    The Disclosure.........................................................................8

    C.    The Prosecution History of the '607 Patent .........................11

II.   THE INTER PARTES REVIEW PROCEEDING.........................16

    A.    Nintendo's Petition................................................................16

    B.    The PTAB's Claim Construction .........................................17

    C.    Obviousness Based on Hay and Haas ..................................20

SUMMARY OF THE ARGUMENT .......................................................21

ARGUMENT ...........................................................................................23

I.    THE PTAB CORRECTLY CONSTRUED THE TERM "CREATING A DATA BASE OF SAID OBJECT"............................................................23

II.   THE MAY 22, 2000 AMENDMENT DID NOT "CLEARLY AND UNMISTAKABLY" DISCLAIM A DATA BASE "WITH REFERENCE TO OR KNOWLEDGE OF THE OBJECT" OR A "CORRELATED" DATA BASE.................................................................26

A.    The Applicant's Amendments and Argument Added the
      "Pattern" and "Discrete" Limitations, but Nothing More ..................28

      1.    The Applicant's Arguments in the May 22, 2000
            Amendment do not Amount to a Disclaimer of Scope .............29

            a.    The "Without Reference to or Knowledge of" Language
                  does not Amount to a Disclaimer ...................................30
            b.    The "Correlation" Language Does Not Amount to a
                  Disclaimer ........................................................................34

B.    Motion Games' Purported Disclaimer Finds no Support in the
      '607 Patent's Specification .................................................................39

C.    Nintendo's District Court Arguments Were Consistent With its
      Arguments in the IPR ..........................................................................46

III.    HAY AND HAAS RENDER THE ASSERTED CLAIMS OBVIOUS .......47

IV.    MOTION GAMES FAILED TO ESTABLISH OBJECTIVE
       INDICIA OF NONOBVIOUSNESS. ...........................................................50

CONCLUSION .....................................................................................................53

CERTIFICATE OF SERVICE ..............................................................................55

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
     LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE
     REQUIREMENTS ......................................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apex Inc. v. Raritan Comput., Inc.*,
325 F.3d 1364 (Fed. Cir. 2003) ...............................................................52

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
713 F.3d 1090 (Fed. Cir. 2013) ...................................................18, 26

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*,
334 F.3d 1294 (Fed. Cir. 2003) ...........................................................31

*Conoco, Inc. v. Energy & Envtl. Int'l., L.C.*,
460 F.3d 1349 (Fed. Cir. 2006) ...........................................................38

*In re Cuozzo Speed Techs., LLC*,
793 F.3d 1268 (Fed. Cir. 2015) ...................................................17, 23

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
851 F.2d 1387 (Fed. Cir. 1988) ...........................................................51

*Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*,
508 F.3d 1366 (Fed. Cir. 2007) ...................................................27, 45

*Grober v. Mako Products, Inc.*,
686 F.3d 1335 (Fed. Cir. 2012) ...........................................................27

*In re Huang*,
100 F.3d 135 (Fed. Cir. 1996) .............................................................51

*Inline Plastics Corp. v. EasyPak, LLC*,
799 F.3d 1364 (Fed. Cir. 2015) ...........................................................26

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
327 F.3d 1364 (Fed. Cir. 2003) ...........................................................32

*Key Pharms. v. Hercon Labs. Corp.*,
161 F.3d 709 (Fed. Cir. 1998) .............................................................44

*In re NTP, Inc.*,
654 F.3d 1268 (Fed. Cir. 2011) ...........................................................23

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ..........................................................18

*Oracle Am., Inc. v. Google, Inc.*,
  606 F. App'x 990 (Fed. Cir. 2015) ....................................................48

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ..............................................23, 44, 46

*Prolitec, Inc. v. Scentair Techs., Inc.*,
  No. 2015-1020, 2015 WL 7873637 (Fed. Cir. Dec. 4, 2015) ...........................44

*Suprema, Inc. v. ITC*,
  No. 2012-1170, 2015 WL 5315371 (Fed. Cir. Sept. 14, 2015).........................26

*Tokai Corp. v. Easton Enters.*,
  632 F.3d 1358 (Fed Cir. 2011) ..........................................................51

*TomTom, Inc. v. Adolph*,
  790 F.3d 1315 (Fed. Cir. 2015) ....................................................27, 48

*Wasinger v. Levi Strauss & Co.*,
  106 F. App'x 34 (Fed. Cir. 2004) ....................................................45

*Zodiac Pool Sys., Inc. v. Aqua Products, Inc.*,
  IPR2013-00159, 2014 WL 424016 (PTAB, Aug. 22, 2014)............................52

## Statutes

19 U.S.C. § 1337 ....................................................................52

28 U.S.C. § 1338 ....................................................................52

35 U.S.C. § 271 ....................................................................52

35 U.S.C. § 311 ....................................................................52

## STATEMENT OF RELATED CASES

Appellant Motion Games sued Appellee Nintendo of America Inc., Nintendo Co., Ltd., and other defendants in the United States District Court for the Eastern District of Texas on November 16, 2012, in Case No. 12-cv-00878.  Motion Games asserted in that district court case that Defendants infringed U.S. Patent No. 6,167,607, the patent at issue in this appeal.  The PTAB found all of the claims at issue in U.S. Patent No. 6,167,607 to be unpatentable in a final written decision resulting from an *inter partes* review petition filed by Appellee Nintendo of America Inc. that is at issue in this appeal.  The district court later stayed Case No. 12-cv-00878 pending the outcome of this appeal.

## PRELIMINARY STATEMENT

Motion Games appeals from a final written decision of the PTAB finding that the challenged claims in Motion Games' '607 patent are unpatentable for obviousness.  The '607 patent discloses a method and apparatus for assembling, handling, and fabricating objects, such as automobile parts.  In the patent, imaging devices are used to detect targets on the objects in order to guide the robots that carry out the work.  The '607 patent broadly claims methods of, and an apparatus for, "creating a data base for an object having at least two discrete targets thereon in a pattern."

Motion Games sued Nintendo in the United States District Court for the Eastern District of Texas, claiming that Nintendo's Wii video gaming system infringes the claims of the '607 patent.  Nintendo denied infringement and petitioned the PTAB for an *Inter Partes* Review (IPR) of the patent.  Relying on the patent's claim language, specification, and prosecution history, the PTAB concluded "that the broadest reasonable interpretation of 'creating a data base of said object' requires, at a minimum, storing the sensed pattern of the first and second targets."  Based on that construction, the PTAB found that the challenged claims in the '607 patent were obvious in light of the prior art Hay and Haas

patents, and accordingly found the claims unpatentable.  The PTAB's construction is correct and should be affirmed.

On appeal, Motion Games does not dispute that based on the PTAB's construction, the '607 patent's challenged claims are obvious over Hay and Haas. Nor does it contest the PTAB's findings that Hay and Haas are analogous prior art, and that there was sufficient motivation to combine them.  Motion Games' appeal instead is based on the assertion that the PTAB erred in not including in its construction a disclaimer of claim scope from the original prosecution history. Motion Games contends that during prosecution, the patent applicant's attorney made an argument to overcome the Bales prior art paper that now requires limiting the scope of the claim term "creating a data base of said object."   Motion Games asserts that the PTAB's construction "storing the sensed pattern of the first and second targets" should have limited the claimed data base to one "without knowledge of or reference to an object," or what Motion Games calls an "uncorrelated" data base.   When the term is construed with the added disclaimer, Motion Games argues, the challenged claims are not obvious in light of Hay and Haas.  Motion Games' position is meritless.

There was no disclaimer because there was no clear and unmistakable disavowal of claim scope during prosecution.   First, in attempting to distinguish Bales, the applicant focused on a requirement that was added to the claims by

amendment, namely, that the claimed data base must include at a minimum a "sensed pattern" of "discrete targets," not that the data base must necessarily be "uncorrelated." Specifically, the applicant amended the claims to require, at a minimum, a "pattern data base." The applicant thus distinguished Bales because it did not disclose a data base that included the new claim requirement of a "sensed pattern" of "discrete targets."

Further, the applicant's arguments to distinguish Bales indicate that whether or not the data base had knowledge of or reference to the object, or was "correlated," was immaterial. According to the applicant, the data base in Bales "merely correlates targets to the object." This is not an argument that correlated information is necessarily excluded from the claimed data base, but that mere correlation alone is insufficient to meet the claimed requirement of storing the "sensed pattern." Accordingly, the applicant argued that the stored "pattern itself . . . is used *regardless* of a correlation to the actual object." The applicant thus stated that correlation may or may not exist, but what distinguishes the data base from Bales as a result of the amendment is that the claimed data base at a minimum stores a pattern of the targets, which Bales did not do. The applicant's statements thus are not a clear and unmistakable disavowal of data bases created "with knowledge of or reference to an object" allowing for "correlation" with the object.

- 4 -

Second, the applicant did not attempt to amend the claims to add the limitations that Motion Games' now seeks to introduce into the claims as required limitations. During prosecution, the applicant amended the claims to recite "pattern" and "discrete" targets. But the applicant never sought further to restrict the "data base" claim language to necessarily exclude a data base that had "reference to or knowledge of an object" or any similar limitation. During prosecution, in order to avoid repeated rejections, the applicant redefined the claimed "data base" at least four times through sequential express claim amendments. But not one of these amendments included the limitations that Motion Games advances here as necessarily limiting the claims. Nor did Motion Games ever seek to amend the claims during the IPR proceeding.

Third, the language Motion Games seeks to add now does not appear in, and is not supported by, any disclosure in the '607 patent's specification. Motion Games cannot now limit the issued '607 claims to avoid Hays and Haas by adding language that would have been properly rejected during prosecution under 35 U.S.C. §112 for lack of written description.

Separately, although Motion Games does not dispute that Hay and Haas render the claims obvious under the PTAB's construction, it asserts that the PTAB erred by ignoring objective indicia of non-obviousness in the form of the Wii's commercial success. The PTAB's finding of no commercial success should be

affirmed because Motion Games failed to satisfy its burden to prove a nexus between the sales of the Wii and the claims of the '607 patent.  Motion Games reliance on appeal on its two experts does not solve the same proof problem it had before the PTAB: one of those experts, Dr. Bobick, relied only on Motion Games' attorneys' argument in its preliminary infringement contentions served in the district court case, while the other expert—Ms. Cummings, not a technical expert—relied only on Dr. Bobick.

The PTAB's construction of the '607 patent should be affirmed.  It is grounded firmly in the patent's claim language, specification, and prosecution history.  And because Motion Games does not appeal the PTAB's finding of obviousness based on that construction, the Final Written Decision that the claims of the '607 patent are obvious also should be affirmed.

## COUNTERSTATEMENT OF THE ISSUES

Whether the PTAB was correct in finding that the broadest reasonable interpretation of the claim term "creating a data base of said object" requires "at a minimum, storing the sensed pattern of the first and second targets" and is not subject to a disclaimer that would impose the added limitation "without reference to or knowledge of the object itself" or would otherwise limit the data base to be "uncorrelated."

Motion Games does not contest that, absent the alleged disclaimer, the

PTAB's broadest reasonable interpretation is correct, or that Hay and Haas render

the claims at issue obvious under this construction.  Accordingly, the issue of

objective indicia of non-obviousness under the PTAB's construction is moot.  The

issues of obviousness and objective indicia if there were a disclaimer were not

addressed by the PTAB and thus are not issues for this appeal.

## COUNTERSTATEMENT OF THE CASE

### I.    THE '607 PATENT

#### A.    The Claims at Issue

The claims at issue contain specific open-ended language, that defines the

claimed  "data base" as one "comprising" a "sensed pattern of said first and second

targets" on the object.  For example, claim 1 states as follows:

> 1. A method of creating a data base for an object having
> at least first and second discrete targets thereon in a pattern,
> said method comprising:
>> electro-optically sensing, with an electro-optically sensing
>> means, the pattern of said first target and said second
>> target; and
>> using a processing means, creating a data base of said
>>> object using said sensed pattern of said first target and
>>> said second target, said created data base comprising
>>> said sensed pattern of said first and second targets.

A-0074.  Independent claim 25 describes an apparatus using substantially the same

open-ended language.  A-0075.  The other claims at issue, namely claims 15-17,

26, 34, and 39-41, depend from independent claim 1 or 25, respectively.  A-0074-

75.  At issue in the IPR and this appeal is the construction of the phrases in these independent claims of "creating a data base of said object."  The "object" in question has "at least first and second discrete targets thereon in a pattern."  As the claim language states, the method and apparatus create a data base of said object "using said sensed pattern of said first and said second target."  Further, the "created data base" is subsequently defined in the claim with open-ended language that defines what at minimum it must include, namely, that it is a data base "comprising said sensed pattern of said first and second targets."

The words "without reference to or knowledge of the object," "uncorrelated," "correlated," "correlation," or any variation thereof do not appear in any claim in the '607 patent.

## B.    The Disclosure

The disclosure of the '607 patent is consistent with the language in the claims that the "data base" includes the "sensed pattern" of the targets.  The '607 patent generally discloses "methods and apparatus for assembling, handling, and fabrication … in which targets are used on objects."  A-0029.  The '607 patent states that "[o]ne or more robots and imaging devices for the targets are used" and that "[t]he robots can be used to handle or assemble a part."  *Id*.

Figure 5 and the associated disclosure in the specification are, for a number of reasons, central to understanding the claimed invention and that the "data base"

is comprised of the "sensed pattern" of the "targets."  During prosecution, the

applicant cited to Figure 5 as support for the amended claim language at issue.  A-

0319, A-0347, A-0464-65.  On appeal, Motion Games cites to Figure 5 and a

portion of its explanatory disclosure as support for its disclaimer arguments.  A-

0059 ('607 patent, col. 10, lines 10-12).  In the specification, the only mention of

"data base" and "pattern" occurs in conjunction with Figure 5.  A-0057, A-0059.

Figure 5, reproduced below, "schematically illustrates transformation of

target ***data bases*** due to forming."  A-0056 (col. 4, lines 62-63) (emphasis added).



*FIG. 5*

Figure 5 "illustrates the use of target points 700 all over a structure 702 and

particularly on formed parts."   A-0059 ('607 patent, col. 9, lines 62-63).

According to the applicant, the "intent here is two-fold":

The first is to deduce from the changes in the target ***pattern*** the effects of forming on the part **702**. For example, it may be desired to obtain the new dimensional shape of the part **702** using the ***data base*** now resulting from the forming process **706** and any strains or any in-plane deflections which may have occurred as a result of the forming or welding process, etc. This can be used to control the process 706 as well as feed the data forward as to the new shape for further robotic assembly.

A0059 (col. 9, line 64-col. 10, line 6) (emphasis added).

The specification further mentions the terms "data base" and "pattern" as follows:

Where this ***data base*** (namely shape and so forth) is a known desired one as it is in the case of a door, one would then like to compare the desired data with that resulting from the new ***pattern***. Furthermore, this new ***data base*** can be utilized in the actual handling of the part between stations of a press line, for example, as long as it is known what to anticipate in terms of what it is. (col. 10, lines 20-27)

…

These dots are furthermore used to check after welding whether or not certain distortions have occurred beyond limits in the welding process and to establish a new ***data base*** for the part. If new ***data base*** is satisfactory, the part is moved on by a suitable camera equipped handling robot to shipping or to the body build process. (col. 10, lines 40-46)

A-0059 (emphasis added).

These passages from the '607 specification disclose that, consistent with the language in the claims, the "data base" includes the "sensed pattern" of the targets.

The specification does not describe anywhere the type of limited data base now asserted by Motion Games to be central to the claimed invention — one that is

"uncorrelated" or "without reference to or knowledge of the object itself."  In fact, such a data base is inconsistent with the '607 disclosure.  The '607 disclosure explains that the "data base can be utilized in the actual handling of the part" or can be used to obtain the "shape of the part" — meaning that the data base could have some reference to or knowledge of the object.  A-0059 ('607 patent, col. 10, lines 19-20, 23-26).  Further, the specification explicitly confirms that the data base can have reference to and knowledge of the object in disclosing that:

> With such target data stored in the ***data base*** of a master control computer for any one cell or an overall host computer, one has complete control of the environment.  ***Everything is known*** relative to known target points ***such as the location of the automation, part, the part shape, material handling, bringing the part and taking it away, relationship of other parts to the part, and the like.***

A-0060 (col. 12, lines 24-30) (emphasis added).

Accordingly, there is nothing in the '607 specification that discloses an "uncorrelated data base" or limits the pattern data base to one that is not correlated or that has no reference to or knowledge of the object.

## C.      The Prosecution History of the '607 Patent

During prosecution, the applicant proposed four different claim definitions of how a data base is created.  Each but the last was rejected under § 112 and under § 103 over Bales.  In his final response, the applicant amended the claims to define the data base as "comprising" the "sensed ***pattern***" of two or more "***discrete*** targets" and repeatedly described the data base as a "***pattern data base***."  A-0480-

484, A-00485, A-489.  The applicant successfully argued that these final amendments overcame the §112 and §103 rejections.  A-0480-84.

The applicant submitted the first claims mentioning a "data base" in 1997. A-0310-19.  He claimed an apparatus and "[a] method of determining information concerning an object having at least one artificial target," including the step of "creating a data base" of said object with a processing means using said sensed location of said at least one artificial target.  *Id.*  The Examiner rejected these claims under §112, first paragraph, for lack of enablement and as obvious over Bales.  A-0326-31.  In response, the applicant amended both the method and apparatus claims to require that the data base be created using "said sensed location of said at least one artificial target" and "said location of at least one physical feature of said object in relation to said location of said target."  A-0334-38.  The applicant argued that Bales lacked the newly recited feature of sensing both a target and "the sensed location of at least one physical feature of the part in relation to the location of the target."  A-0344-49.

The Examiner again rejected the amended claims under §112, first paragraph as unsupported by the original disclosure and still as obvious over Bales.  A-0450-54. The Examiner made this rejection final.  *Id.*  In response, the applicant provided his third definition of "data base," this time as one comprised of information regarding the relative locations of first and second targets.  A-0459, A-

- 12 -

0461.  The applicant argued that Bales did not describe a data base comprising information regarding the location of two targets.  A-0464-66.

After an unsuccessful interview (A-0471), the Examiner for a third time rejected the claims under §112, first paragraph because again, (i) the newly-defined data base lacked support in the original disclosure and (ii) for obviousness over Bales.  A-0472-76.  The applicant responded with a May 22, 2000 amendment and now his fourth definition of "data base."  This amendment and the accompanying remarks are the bases for Motion Games' alleged disclaimer.

According to this amendment, the data base is created for "an object having at least first and second *discrete* targets thereon *in a pattern*," the "*created* data base *comprising* said sensed *pattern* of said first and second targets."   A-0485, 0489 (emphasis added).  The applicant deleted all earlier references in the claims to sensing the location of the first target in relation to the location of the second target.  *Id*.

The applicant argued that these new amendments, characterizing the data base as comprising a "sensed pattern" of at least two "discrete" targets, avoided the §112 rejection and patentably distinguished over Bales.  A-0480-84.  Addressing the previous §112 rejection, the applicant asserted that the amendment relied on language from the specification, specifically a "pattern of targets," such as "dot targets on one inch centers or a pattern which is determined," and emphasized that

"it is this pattern that is subsequently used as the data base for the object."  A-0480-81.

In responding to the rejection for obviousness over Bales, the applicant argued that the "pattern" becomes the "data base."  Specifically, the applicant stated that:

> In the present invention, an object is provided with at least first and second targets thereon which are in a ***pattern***.  This ***pattern*** may be known (target dots on one inch centers) or unknown (for example applied to the object at random locations).  Whatever the ***pattern***, it is this ***pattern*** which is then sensed electro-optically, and ***this sensed pattern then becomes a data base for the object***.  This ***pattern data base*** can then be ***used*** in a number of ways, ***such as to handle the object or to track changes made to the object***, all without reference to or knowledge of the physical object itself.

A-0481 (emphasis added).  Thus, the applicant first defined how the "pattern data base" is ***created*** (electro-optically sensing first and second targets on an object) and then provided examples of how the "pattern data base" can later be ***used***.

The applicant distinguished this newly claimed data base by stating that Bales does not "disclose the use of discrete targets ***in a pattern as a data base***" but rather uses "the visible portions of a spiral stripe located at a known position on a known cylinder in order to determine the rotational position of the cylinder or three spots in a line on a flat plane at a known location on a known object."  A-0482 (emphasis added).  The applicant addressed the Examiner's prior statement that those of ordinary skill "could create a data base using the sensed locations of the

targets" by stating that "this is not the data base which is being claimed." A-0482. What "is [now] being claimed," according to the applicant, is a "pattern data base" of "discrete targets." A-0482. The applicant further argued, "[t]he suggested data base that the Examiner proposes would be obvious from the Bales paper is one which merely correlates targets to the object, while in the present invention there is no such correlation … [r]ather it is the ***pattern*** itself which now stands for the object and which is ***used*** regardless of a correlation to the actual object and, which is neither disclosed nor made obvious by the Bales paper." A-0482 (emphasis added). To overcome Bales, the applicant characterized the created data base, at least six separate times, as a "pattern data base." A-0481-83.

Lastly, in response to the Examiner's request to "specifically explain what constitutes the data base and how this data base is arrived at," the applicant stated "that the use of the term 'pattern' in describing the data base now claimed does substantially provide the requested information, as it is obviously this ***pattern which is used***, ***after sensing*** by the electro-optical (camera) means." A-0483 (emphasis added). A Notice of Allowability issued without explanation and with no Statement of Reasons for Allowance. A-0495.

Only the applicant's final response identified the "pattern" of the targets as the "data base" and stated that the "pattern data base," once created, could be "used regardless of a correlation to the actual object" and "can then be used in a number

of ways … all without reference to or knowledge of the object itself." A-0481, A-0483. But the applicant never sought to amend the claim language expressly to add "without reference to or knowledge of" to limit the term "data base." Rather, the applicant added only "pattern" and "discrete" to the claim language and then, to gain allowance, argued that those newly introduced characteristics, repeatedly called a "pattern data base," were not found in Bales. A-0481-84.

## II.     THE INTER PARTES REVIEW PROCEEDING

### A.     Nintendo's Petition

Nintendo's IPR Petition proposed that the construction of the term "data base for an object" should be "the sensed pattern of the targets on the object." A-0085. In support of this construction, Nintendo quoted and emphasized the following language from the applicant's May 22, 2000 Amendment:

> The applicant further argued that the Examiner stated that "those of ordinary skill could create a data base using the sensed locations of a targets" in Bales, but "this is not the data base which is being claimed and used in the [applicant's] present invention." (*See* Exhibit 1005, May 22, 2000 amendment at p. 4). Rather, the applicant argued: "The suggested data base that the Examiner proposes would be obvious from the Bales paper is one which merely correlates targets to the object, while in the present invention there is no such correlation … *[r]ather it is pattern itself which now stands for the object and which is used regardless of a correlation to the actual object, which is neither disclosed nor made obvious by the Bales paper*." (See Exhibit 1005, May 22, 2000 amendment at p. 4)

A-0092-93 (emphasis in original petition) (quoting from A-0482).

Though it had the opportunity, Motion Games did not file a preliminary response to Nintendo's petition and offer its own construction of "data base for an object."

## B.    The PTAB's Claim Construction

In its decision to institute the IPR, the PTAB considered the '607 specification and the May 22, 2000 Amendment and held that creating the object's data base "requires, at a minimum, storing the sensed pattern" of the first and second targets.  A-0850.  In so ruling, the PTAB noted that in the May 22, 2000 Amendment, the applicant stated that "it is the pattern which is sensed electro-optically, and this sensed pattern then becomes a [data base] for the object."  A-0850 (citing to A-0481).

In its Final Written Decision, the PTAB adopted this construction under the applicable "broadest reasonable interpretation" standard.  A-0005-10 (*citing In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1279-81 (Fed. Cir. 2015) (holding that "broadest reasonable interpretation" standard applies in IPR proceedings)).  The PTAB reasoned that its construction was consistent with the claim language, specification and prosecution history.  A-0006-10.

Separately, the PTAB fully considered Motion Games' contention that, during prosecution, the applicant's attorney had disclaimed the scope of the claim language "creating a data base of said object" in the May 22, 2000 Amendment.

- 17 -

A-0006, A-0008 (citing to A0480-82).  In its Patent Owners' Response, Motion

Games had specifically identified a portion of a paragraph in this Amendment—

including the phrase "to handle the object or to track changes made to the object,

all without reference to or knowledge of the physical object itself" (A-0481)—as

the disclaimer.  A-0888.  Motion Games argued that this and other statements in

the May 22, 2000 Amendment such as "in the present invention there is no such

correlation" explicitly disavowed a data base that "references or uses knowledge of

an object (e.g., by correlating observed targets to known targets on a known

object)."  A-0888-890.

    As Motion Games acknowledges (Brief for Appellant Motion Games, LLC

"MG Brief" at 23), the PTAB applied the proper standard for evaluating an alleged

disclaimer, namely whether there was a "clear and unmistakable disavowal during

prosecution."  A-0007 (citing *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d

1090, 1095 (Fed. Cir. 2013) and *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d

1314, 1325 (Fed. Cir. 2003)).  The PTAB, however, was "not persuaded" that the

language Motion Games relied on "clearly and unmistakably disclaims a data base

that stores the sensed pattern with reference to or knowledge of the physical object

itself."  A-0008-9.  The PTAB noted that the May 22, 2000 Amendment states that

"the data base is created from the sensed pattern of the discrete targets and states

that it could be ***used*** without reference to or knowledge of the object itself or ***used*** regardless of a correlation to the actual object."  A-0008 (emphasis in original).

The PTAB saw "nothing in the language of claims 1 and 25 that additionally requires that the sensed pattern is stored without reference to or knowledge of the object, itself, or additionally requires that the sensed pattern is later used without reference to or knowledge of the object, itself."  A-0009.  The PTAB found that the specification also supported the broadest reasonable interpretation of "creating a data base of said object" as requiring "storing the sensed pattern of the first and second targets," but did not support Motion Games' proffered disclaimer.  A-0010.

Contrary to Motion Games' assertion, the PTAB's ruling in no way "alters" or ignores the language that Motion Games alleges constitutes the disclaimer.  A-0006-8; A-0850 (citing to A-0092-93).  Motion Games contends that the PTAB ignored and substituted ellipses for the following language:

> In the Action, as noted above, the Examiner has again stated that those of ordinary skill could create a data base using the sensed locations of the targets in the Bales paper.  But this is not the data base which is being claimed and used in the present invention.

(A-0482).  This language, however, was cited and quoted by Nintendo in its Petition for IPR as follows:

> The applicant further argued that the Examiner stated that "those of ordinary skill could create a data base using the sensed locations of a [sic] targets" in Bales, but "this is not the data base which is being claimed and used in the [applicant's] present invention."  (See Exhibit 1005, May 22, 2000 amendment at p. 4).

- 19 -

A-0092.  The PTAB cited to this section of the Petition and the May 22, 2000

Amendment in determining that creating the object's data base requires, "at a

minimum, storing the sensed pattern."  A-0850 (citing to A-0092-93).  The PTAB

also referenced language that Motion Games relies on for the concept of

"correlation", namely that "***it is the pattern itself which now stands for the object***

***and which is used regardless of a correlation to the actual object, and which is***

***neither disclosed nor made obvious by the Bales paper***."  A-0008 (emphasis by

PTAB).

Motion Games never sought during the IPR to amend the claim language to

add that the "data base" was created "without reference to or knowledge of the

object itself" or any other similar wording.  A-2659-60.

### C.    Obviousness Based on Hay and Haas

The PTAB additionally concluded that Nintendo had shown, by a

preponderance of the evidence, that all challenged claims of the '607 patent were

unpatentable as obvious over Hay in light of Haas.  A-0016-18.  The PTAB found

that Hay discloses "computer 17, which stores signals indicative of the positions of

the target points on the focal plane of the camera array" and thus disclosed

"creating a data base of said object."  A-0017-18.  The PTAB further concluded

that Hay and Haas were analogous art (A-0020-21) and that there was a motivation

to combine them.  A-0019-20.

The PTAB rejected Motion Games' argument that Hay and Haas do not

disclose "creating a data base of said object" because the argument was based on

Motion Games' erroneous proposed construction, not the proper broadest

reasonable interpretation determined by the PTAB.  A-0016-17.   Even though

Nintendo had argued the point, the PTAB did not address whether Hay and Haas

disclose "creating a data base of said object" under the rejected disclaimer-based

construction proposed by Motion Games.

## SUMMARY OF THE ARGUMENT

The PTAB considered the claims, specification, and prosecution history of

the '607 patent and was correct in finding that the broadest reasonable

interpretation of the term creating a data base of an object "requires, at a minimum,

storing the sensed pattern of the first and second targets."  Based on that

interpretation, the PTAB also was correct in finding, by a preponderance of the

evidence, that all challenged claims of the '607 patent were unpatentable as

obvious over Hay in view of Haas.

The PTAB rejected Motion Games' assertion that the applicant made a clear

disavowal of the ordinary meaning of the term "creating a data base of said object"

so as to limit its meaning to "storing as data a sensed pattern representative of a

physical object without reference to or knowledge of the object itself."  There is no

support for Motion Games' argument that the '607 patent would not have issued

over the prior art Bales reference but for the alleged disclaimer. The portion of the prosecution history on which Motion Games relies actually distinguished Bales because Bales failed to disclose a data base that includes a "sensed pattern" of "discrete" targets, as the claims required, not because Bales discloses a data base that included knowledge of or reference to the object, which was not in any way excluded from the claimed data base. Further, during prosecution, the applicant never sought to add "without reference to or knowledge of" to the claim language to modify or limit the "data base" to overcome Bales.

Motion Games' disclaimer argument is thus prompted not by the Bales prior art the applicant faced during the original prosecution, but by the newly cited Hays and Haas prior art Motion Games faced in the IPR. The applicant was satisfied with the express amendments focusing on a "pattern data base" to overcome Bales, but now, relying on expert opinion and other extrinsic evidence not supported by the specification or the claims, Motion Games seeks to import a new, additional claim limitation to overcome the patent-defeating effect of Hay and Haas. That gambit is improper and should be rejected.

Finally, Motion Games does not assert that the commercial success of the accused Wii system — which, it argues, constitutes objective indicia of non-obviousness — requires reversal of the PTAB's holding that Hay and Haas render the claims obvious under the PTAB's construction. Accordingly, the issue of

objective indicia of non-obviousness is moot. In any event, Motion Games did not

establish a connection between the success of the Wii and the claims of the '607

patent for such success to constitute objective indicia of non-obviousness.

## ARGUMENT

### I. THE PTAB CORRECTLY CONSTRUED THE TERM "CREATING A DATA BASE OF SAID OBJECT"

The PTAB applies the "broadest reasonable interpretation" standard of claim

construction. *See, e.g., In re Cuozzo*, 793 F.3d at 1279; *Phillips v. AWH Corp.*,

415 F.3d 1303, 1316 (Fed. Cir. 2005) (*en banc*); *In re NTP, Inc.*, 654 F.3d 1268,

1274 (Fed. Cir. 2011). Applying this standard, the PTAB correctly held that, in

light of the '607 patent's claim language, specification, and prosecution history,

the broadest reasonable interpretation of "creating a data base of said object"

requires "at a minimum, storing the sensed pattern of the first and second targets."

A-0010. The challenged claims expressly describe "said object" as having "at least

first and second discrete targets thereon in a pattern." A-0074-75 ('607 patent,

claims 1 and 25). According to the claims, the "data base" is created by sensing

this "pattern" and the data base then comprises or includes, at a minimum, the

"sensed pattern" of the at least two "discrete" targets. *Id*. Thus, the ***least*** that is

required to create a data base of the object is storing the sensed pattern; the claim

does not foreclose additional information about the object. A-0009.

- 23 -

The prosecution history also supports the PTAB's construction of "creating a data base of said object" to mean "storing the sensed pattern of the first and second targets."  During prosecution, the applicant introduced the unequivocal claim language that the data base comprises the "sensed pattern" of the at least two "discrete" targets by an amendment with the accompanying explanation: "Whatever the pattern, it is this pattern which is then sensed electro-optically, and ***this sensed pattern then becomes a data base for the object***."  A-0481-482 (emphasis added).  The applicant then argued this "pattern data base" distinction to overcome Bales and the §112 rejection. The applicant concluded the final amendment prior to allowance with the statement:

> In section 5, the Examiner requested that this response specifically explain what constitutes the data base and how this data base is arrived at.  It is believed that ***the use of the term "pattern" in describing the data base now claimed*** does substantially provide the requested information, as it is obviously this pattern which is used, after sensing by electro-optical (camera) means – all as noted above.

A-0483 (emphasis added).

The specification supports the PTAB's construction of "creating a data base of said object" to mean "at a minimum, storing the sensed pattern of the first and second targets." A-0010.  The specification discloses sensing and storing a "pattern" as the data base.  A-0059.  It first discloses sensing a "pattern" through "camera means":

> For example, consider the case of metal body panels or aircraft panels. They start out as steel blanks 702 which can be imprinted with a dot target *pattern* on one inch centers throughout the total width. The targets 700 can be rather precisely applied, or if not, can be initially monitored by a camera means 708 to discern what the *pattern* is.

A-0059 ('607 patent, col. 10, lines 16-23) (emphases added).  The specification

then discloses storing that sensed "pattern" as a "data base":

> It is now desirable to sue [sic] those target points **700** as viewed by camera means **710** which have now changed their form to determine any irregularities of the forming process as well as to establish the new *data base* for the part.  Where this *data base* (namely shape and so forth) is a known desired one as ti [sic] is in the case of a door, one would then like to compare the desired data with that resulting from the new *pattern*.

A-0059 ('607 patent, col. 10, lines 7-12) (emphases added).

Based on the language in the claims, specification, and prosecution history, "creating a data base of said object" means "storing the sensed pattern of the first and second targets," the construction found by the PTAB in its Final Written Description.  This Court should affirm that interpretation.  Motion Games does not dispute that this construction is correct; only that it does not go far enough to limit the claimed data base to preclude a data base that also includes "reference to or knowledge of the object itself."

## II. THE MAY 22, 2000 AMENDMENT DID NOT "CLEARLY AND UNMISTAKABLY" DISCLAIM A DATA BASE "WITH REFERENCE TO OR KNOWLEDGE OF THE OBJECT" OR A "CORRELATED" DATA BASE

During the IPR, Motion Games argued that the construction of "creating a data base of said object" should be limited by the addition of the terms "without reference to or knowledge of the object itself." On appeal, Motion Games contends, in the alternative, that the data base should exclude what it calls "correlated data bases" and thus is limited to an "uncorrelated" data base. *See, e.g.,* MG Brief at 2, 31. Regardless of which language Motion Games argues should be added to the construction of the phrase "creating a data base of said object" via its asserted disclaimer, the PTAB fully considered the portions of the prosecution history on which Motion Games relies and was correct in finding that there was no disclaimer.

"A disclaimer must be 'clear and unmistakable,' and unclear prosecution history cannot be used to limit claims." *Suprema, Inc. v. ITC*, No. 2012-1170, 2015 WL 531537, at *5 (Fed. Cir. Sept. 14, 2015). To rise to the level of disclaimer, a statement must be a "clear and unambiguous disavowal of claim scope . . . to depart from the meaning of the term provided by the written description." *Inline Plastics Corp. v. EasyPak, LLC*, 799 F.3d 1364, 1369 (Fed. Cir. 2015) (citation omitted); *see also Biogen Idec,* 713 F.3d at 1095 (the law requires "a clear and unmistakable disavowal during prosecution" to "overcome the heavy presumption

- 26 -

that claim terms carry their full ordinary and customary meaning."); *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1325 (Fed. Cir. 2015) (recognizing that doctrine of prosecution disclaimer is well established, but that it will not apply where "alleged disavowal of claim scope is ambiguous."). The law requires a clear and unambiguous disavowal because the ongoing negotiations between the Examiner and an applicant would otherwise create ambiguities about what was surrendered. *Grober v. Mako Products, Inc.,* 686 F.3d 1335, 1341-42 (Fed. Cir. 2012); *Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1371-72; (Fed. Cir. 2007).

Motion Games relies on the May 22, 2000 Amendment but no language in that amendment, including the applicant's arguments therein, supports a "clear and unmistakable" disclaimer of claim scope. Instead, the amendment accomplished two things. First, it introduced into the claims the new elements of a "pattern" of "discrete targets" and argued that the "data base" now comprised a "sensed pattern" of at least two "discrete" targets to overcome the §112 and obviousness rejections over Bales. A-0481-82, A-0485, A-0489. Second, it distinguished that "pattern data base" from the Bales reference as it had been described by the Patent Examiner. A-0481-83. In so doing, the applicant gave examples of how the "pattern data base" *once created*, could then be *used.* "This pattern data base can then be *used* in a number of ways … all without reference to or knowledge of the

object itself." The "pattern itself which now stands for the object" . . . is "*used*

regardless of a correlation to the actual object." A-0481-82 (emphasis added).

None of these examples about how the pattern data base once created can be used

is a statement that the pattern data base itself necessarily excludes knowledge of or

reference to the object or that the data base cannot be correlated to the object.

### A. The Applicant's Amendments and Argument Added the "Pattern" and "Discrete" Limitations, but Nothing More

The actual language amending the claims to recite a "pattern data base"

contradicts Motion Games' litigation argument that the applicant further limited

the claims by disclaimer. The applicant amended the claims to define the "data

base" as "comprising" a "sensed pattern" of "discrete targets." The applicant's

accompanying arguments stated: "Whatever the pattern is, it is the pattern which is

sensed electro-optically, and *this sensed pattern then becomes a data base* for the

object." A-0481-82 (emphasis added). The applicant then argued this "pattern

data base" distinction to overcome Bales and to avoid the §112 rejection. No

language in the claim amendment, or in the applicant's argument, further limits

this sensed pattern data base to one created without reference to or knowledge of

the object.

The fact that the applicant did not attempt to so limit the scope of data base,

either in the actual claim amendment or by express disavowal in attorney

argument, confirms that there was no disclaimer of claim scope. With three earlier

- 28 -

rejections under §112 for lack of written description support for claim amendments, the applicant did not attempt to amend the claim language to state that the "data base" was "without reference to or knowledge of the object itself" or "uncorrelated" or any other variation thereof. The applicant instead amended the claim language to include "pattern" and "discrete" and represented they were supported by the disclosure. A-0480-81.

Motion Games asserts that the '607 patent issued only because the applicant made the asserted disclaimer. MG Brief at 5. If the applicant, to overcome Bales, had actually made a significant disclaimer of claim scope beyond the explicit change in claim language from "sensed location" to "sensed pattern," one would expect the Examiner to have noted it. The Examiner, however, allowed the amended claims without discussion, argument, or reasons for allowance. A-0495-96.

### 1.    The Applicant's Arguments in the May 22, 2000 Amendment do not Amount to a Disclaimer of Scope

The applicant's arguments distinguishing the "pattern data base" from Bales do not amount to a disclaimer of claim scope. Between the IPR and its appeal brief, Motion Games has, inconsistently, identified two passages from the May 22, 2000 Amendment that it argues constitute the disclaimer. *Compare* MG Brief at 30-31 *with* A-0888-890. The first passage explains that the pattern data base "can be used" in a number of ways, such as to handle the object or track changes to the

object, "without reference to or knowledge of the object."  The second passage

explains that Bales disclosed storing information that was "merely correlated" to

the object, but that this was not a stated requirement of the "present invention" as

defined by the newly amended claims, whereas storing the pattern within the data

base was a requirement, which Bales did not disclose.

Neither of these statements nor any other statements in the May 22, 2000

Amendment—all of which the PTAB fully considered—is a clear and

unmistakable surrender of subject matter that constitutes a disclaimer of claim

scope.

### a.    The "Without Reference to or Knowledge of" Language does not Amount to a Disclaimer

In its Response in the IPR, Motion Games identified the alleged disclaimer

in the May 22, 2000 Amendment as arising from the following prosecution

statements:

> In the present invention, an object is provided with at least first and
> second targets thereon which are in a pattern.  This pattern may be
> known (targets dots on one inch centers) or unknown (for example
> applied to the object at random locations).  Whatever the pattern, it is
> this pattern which is then sensed electro-optically, and this sensed
> pattern then becomes a data base for the object. This pattern data base
> can then be used in a number of ways, such as to handle the object or
> to track changes made to the object, all without reference to or
> knowledge of the physical object itself.

A-0888 (citing to the May 22, 2000 Amendment (A-0481)).  None of these

statements provides any support for Motion Games' purported disclaimer either.

First, these statements focused on how the "pattern data base" ***once created*** can be ***used*** in later steps of a manufacturing process, such as handling or tracking the object, and is not a disclaimer of what the data base ***is*** as argued by Motion Games.  The assertion that the pattern data base can be ***used*** "without reference to or knowledge of the object itself" is a statement about ***use***, not about how the data base is created.  This is a crucial distinction because the claims recite a method and apparatus for "creating a data base of said object."  A-0074-75.  There are no limitations in the independent claims on how the data base, once created, can then be used.

Second, the applicant's statement that the created data base "can" be used in this fashion means such use is optional, not required.  This optional later use of the claimed data base is consistent with the fact that the claims do not recite any limitations on how the data base, once created, is later used, such as by handling or tracking the object.  This optional, later use of the data base "without reference to or knowledge of the object itself" is not a limitation that can properly be read into the claims to limit the scope of the data base.  *See Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1301 (Fed. Cir. 2003) ("Absent a clear disclaimer of particular subject matter, the fact that the inventor anticipated that the invention may be used in a particular manner does not limit the scope to that narrow context.")  Nor is the further, unrecited requirement that Motion Games

proposes—that the data base must necessarily be created "without reference to or knowledge of the object"—proper to add into the claims.

Third, the applicant's use of the "comprising" claim language in the amended claims is also consistent with an open-ended claim that does not have the limitations Motion Games would impose with the disclaimer.  Specifically, the amended claims recite "said created data base ***comprising*** said sensed pattern of said first and second targets."  A-0074 (claim 1), A-0075 (claim 25), A-0485, 489. The transitional term "comprising" is open-ended.  It means here that the created data base includes, but is not limited to, the sensed pattern and can include information that is not specifically stated in the claims.  *See*, *e.g.*, *Invitrogen Corp. v. Biocrest Mfg., L.P.,* 327 F.3d 1364, 1368 (Fed. Cir. 2003) ("The transition 'comprising' in a method claim indicates that the claim is open-ended and allows for additional steps.").  The use of "comprising" to describe what information is included in the created data base means that the data base can include, for example, information and data about the object itself.

Motion Games' position that the claims necessarily exclude any and all information regarding "reference to or knowledge of the object" is inconsistent with the use of the term "comprising" in the claim language.

The dependent claims further confirm that the "data base" can indeed include information about the object, and further refute Motion Games' narrow

view of the claimed "data base." Claims 12 and 13 (which depend from claim 1) and claims 35 and 36 (which depend from claim 25) require that an "image of the surface of the object" or "grey level image of the surface of the object" are "used in creating said data base of said object." A-0074-75. Claims 20 and 44 require "determining an orientation of said object" and "creating said data base using said determined orientation." A-0075. Claims 23 and 24 (which depend from claim 1), and claims 46 and 27 (which depend from claim 25) (A-0075), require that at least one target must be a "natural target on said object," meaning a target that is a naturally occurring feature on the object. A-0055 ('607 patent, col. 2, lines 33-34). These dependent claims confirm that the data base in claims 1 and 25 ("said data base" in these dependent claims) does not necessarily exclude information that amounts to knowledge of or reference to the object. Images of the object, the orientation of the object, and naturally occurring features of the object that may also serve as targets, all qualify as information that reflects knowledge of or reference to the object. These dependent claims show that, contrary to Motion Games' position, such information is not excluded from the scope of the "data bases" recited in claims 1 and 25, but may be included within them. Each of these dependent claims confirms the open-ended nature of the contents of the created data base, consistent with the "comprising" language in the claim.

### b.     The "Correlation" Language Does Not Amount to a Disclaimer

In its opening brief in this appeal, Motion Games identifies the alleged disclaimer in the May 22, 2000 Amendment as arising from the following prosecution statements:

> [T]he Examiner has again stated that those of ordinary skill could create a data base using the sensed locations of the targets in the Bales paper. But this is not the data base which is being claimed and used in the present invention.  The suggested data base that the Examiner proposes would be obvious from the Bales paper is one which merely correlates targets to the object, while in the present invention there is no such correlation . . . .

MG Brief at 30-31 (quoting from A-0482).  The passage continues to state that:

> Rather, it is the pattern itself which now stands for the object and which is used regardless of a correlation to the actual object, and which is neither disclosed nor made obvious by the Bales paper.

A-0482.

In support of its disclaimer argument, Motion Games relies heavily on the statement that the data base in Bales "is not the data base which is being claimed and used in the present invention."  According to Motion Games, because the statement refers to the "present invention," this language is a "textbook example[s] of prosecution history disclaimer" that excludes "correlation" from the scope of the claimed data base.  MG Brief at 2.

Motion Games misreads the applicant's argument.

- 34 -

First, in the passage above, the applicant argued that the "data base using the sensed locations of the targets in the Bales paper" was not the data base required in the "present invention" because in the May 22, 2000 Amendment the "sensed locations" language had been deleted from the claims and replaced with the "sensed pattern." This May 22, 2000 Amendment redefined the required elements of the "present invention," and what the prior art must disclose to show invalidity. A-0481-82. In light of the amendment, a reference that merely disclosed "sensed locations," did not meet the newly defined "present invention" and its requirement of storing the "sensed pattern."

Second, in the passage above, the applicant equated the claim language it deleted—"using the ***sensed locations*** of the targets" —with "***correlation***." A-0482 (emphasis added.) Specifically, the applicant argued that what "the Examiner proposes" (i.e., a data base in Bales that includes the "sensed locations of the targets") is a data base that "merely correlates targets to the object." *Id*. Again, this was a concept that the applicant had deleted as a requirement from the claims.

The above explains why the applicant stated that "in the present invention there is no such correlation." A data base that stored the sensed locations of the targets, or correlated the targets to the object, was no longer a claim ***requirement***. That Bales disclosed a data base with such information was therefore not ***sufficient*** to meet the requirements of the newly defined "present invention."

- 35 -

The logic of this argument to distinguish Bales does not in any way suggest, as Motion Games asserts, that the scope of Motion Games' claims must necessarily exclude from the data base correlation or information regarding the sensed location of the targets.  Rather, it shows only that a data base with such information does not necessarily meet the requirement of storing the "sensed pattern" of the targets. Motion Games' reliance on the phrase "while in the present invention there is no such correlation" thus is misplaced and does not limit the scope of the claims.

In fact, other specific arguments and statements in the May 22, 2000 Amendment refute Motion Games' view.  The statements below show an express intent to keep the claims open-ended with respect to correlation or any other information in addition to pattern.

First, the applicant stated: "[r]ather, it is the pattern itself which now stands for the object and which is used ***regardless of a correlation*** to the actual object, and which is neither disclosed nor made obvious by the Bales paper."  A-0482 (emphasis added).  The applicant's use of "regardless" indicates that the applicant did not care if there was correlation or not because the claims do not require correlation.  The applicant did not argue that the "pattern" which constitutes the "data base" must necessarily have no correlation or reference to the object, but rather, that the "pattern" could be "used" ***regardless*** of the correlation.  This indicates that the "pattern data base" could either be correlated or not correlated.

Second, the applicant distinguished the data base that would be obvious from Bales as one that "*merely* correlates targets to objects." A-0482 (emphasis added). In other words, Bales does no more than correlate, but the "present invention" as newly amended requires something more, something which is not found in Bales, namely, the "present invention" requires storing a "sensed pattern." Had the applicant intended for the data base to exclude altogether any and all correlated information, as Motion Games now suggests, the applicant would have said that Bales includes correlated information and such information is excluded from the scope of the claims, not that Bales "*merely* correlates."

Third, as noted above, the claims use open-ended language to describe the content of the data base, as a data base "comprising said sensed pattern." The applicant did not change this open-ended language in the claims during prosecution. This open-ended language confirms that the claimed data base must include the claimed pattern, but is not limited to necessarily excluding any other kind of information, including "correlation" information. Had the applicant intended for the claims to exclude "correlation" or other information, this open-ended transition in the claim would have been amended in the May 22, 2000 Amendment. That it was not amended refutes Motion Games' narrow view of the claims.

The dependent claims discussed above, claims 12, 13, 20, 23, 24, 35, 36, 40, 46, and 47, all further refute Motion Games' position with regard to "correlation." Dependent claims that explicitly require that information about the object—in the form of images of the object, orientation of the object, or natural features of the object— can be used in the creation of the claimed "data base" show that "correlation" information is not necessarily excluded, but in fact can be included, in the claimed "data base."

The applicant's statements thus do not constitute a disclaimer as they are not a clear and unambiguous disavowal of claim scope. *See Conoco, Inc. v. Energy & Envtl. Int'l., L.C.*, 460 F.3d 1349, 1364 (Fed. Cir. 2006) ("[t]o invoke argument-based estoppel, … the prosecution history must evince a clear and unmistakable surrender of subject matter.") (citation omitted).  Allowing such statements to operate as a disclaimer would substantially lower the standard for finding a disclaimer and would lead to ambiguous statements being held to be disclaimers. This would leave the scope of issued claims in doubt until litigation and would enable patent owners, like Motion Games here, to manipulate the scope of claims without amending the claim language in an effort to avoid newly-cited prior art that was never considered during the original prosecution.

The applicant's statements during prosecution are consistent with the language of the claims which establishes that they are open-ended and do not

exclude information that is correlated.  They thus refute Motion Games' arguments

that the claims must necessarily exclude information that is correlated.  The

arguments in the May 22, 2000 Amendment are not a clear and unmistakable

disavowal that there can be no correlated information in the data base.[1]

### B.    Motion Games' Purported Disclaimer Finds no Support in the '607 Patent's Specification

The '607 specification also does not support the alleged disclaimer Motion

Games' seeks, and in fact shows that there is no support for such a disclaimer.  The

few sentences in the specification that mention a "data base" as set forth in Section

I(b) above do not mention a data base "without reference to or knowledge of the

object itself" or an "uncorrelated data base."  A-0059-60.  As the PTAB noted in

its Final Written Decision, the rare number of passages from the '607 specification

that in fact reference a "data base" explain that the "data base can be utilized in the

actual handling of the part" or can be used to obtain the "shape of the part."  These

passages confirm that the described data base can have some reference to or

knowledge of the object.  A-0010.  There is nothing in these passages that

disclaims a data base that references or has knowledge of the object.

---

[1] Motion Games suggests that if the PTAB had an issue with Motion Games' exact proposed disclaimer language, namely creating a data base "without reference to or knowledge of the object," then the PTAB should have found a disclaimer anyway even if it had to formulate its own disclaimer language.  MG Brief at 40-41.  As set forth herein, however, there is no support in the claims, specification and prosecution history that would allow the PTAB to formulate a disclaimer.

Motion Games points to only one sentence in the entire '607 specification as describing an "uncorrelated" data base.  Motion Games refers to the following sentence describing camera 708 in Figure 5: "[t]he targets 700 can be rather precisely applied, or if not, can be initially monitored by a camera means 708 to discern what the pattern is."  A0059 ('607 patent, col. 10, lines 10-14); MG Brief at 13-15.  Based on this sentence, Motion Games argues that the "camera 708" is used to create an "uncorrelated data base" and that "camera 708" is used "only when the targets are not correlated to the object."  MG Brief at 14.  Motion Games also argues, based on this sentence and its expert's declaration, that when the targets are "applied imprecisely" in Figure 5, the computer vision system "cannot know the location of the targets relative to features of the object," and that in such an embodiment, the pattern stands for the object and is stored to create an "uncorrelated data base."  MG Brief at 15.

Motion Games' assertion is not supported by the disclosure.  This single sentence does not state or disclose any of these asserted features.  A-0059 ('607 patent, col. 10, lines 10-14).  First, the specification never uses the word "uncorrelated" in connection with the term "data base."  A-0059-60, A-0009.  Second, the stated intent of the disclosure related to Figure 5 is to "deduce from the changes in the target pattern the effects of forming on the part 702."  A-0059 ('607 patent, col. 9, lines 64-66).  If the location of the targets relative to the features on

the object was not initially known, the changes in the target pattern could not be used to determine the effects of forming on the actual part. Third, the specification further discloses that with respect to Figure 5, if the "whole work area and work environment" is targeted, "[e]verything is known relative to known target points as the location of the automation, part, the part shape, material handling, bringing the part and taking it away, relationship of other parts to the part, and the like." A-0060 ('607 patent, col. 12, lines 27-30).

Indeed, Motion Games' own expert, Dr. Bobick, admitted that in the embodiment shown in Figure 5, one would have to know something about the object:

> Q. So in that particular figure, you have to know something about the object?
> A. You know something about the object. You don't know how the targets relate to the object *other than that they are on the object and the object is flat*.
> Q: But you do know something about the target -- I mean, excuse me, about the object?
> A: For that one example, yes.

A-1945 at 55:4-55:15 (emphasis added); *see also* A-1925 at 35:5-13. Dr. Bobick further admitted that in robotic assembly, such as described in the '607 patent, you would need to know something about the object:

> A: In robotic assembly you typically want precision and so you would want to know the precise location of the targets with respect to the object's coordinate system, if you will, so that as the object -- as the targets were detected, you could know how the 3D -- relative 3D geometry of the object changed, and that would be where you had a

precise model-based system.
Q: So you'd have to know the relationship between the targets and objects in that situation?
A: Yes.

A-1945-46 at 55:23-56:10 (objections omitted); *see also* A-1868-73 (Welch Dec. at ¶¶12-14), A-1882-90.

Because there is no description in the specification of a "data base" that is "uncorrelated" or "without reference to or knowledge of the object itself," Motion Games relies on its expert's declaration to create figures and describe an invention that appears nowhere in the specification. *See* MG Brief at 8, 10, 12. Motion Games' J-Hook figures and its explanation of "correlation" (*see* MG Brief at 6-10) are not found in the '607 specification or prosecution history. These J-Hook figures seem loosely based on Figures 8 and 9 of the '607 patent (A-0037-8). However, neither of these figures nor the portions of the specification that explain them mention a "data base," "creating a data base" or "correlation." A-0057 ('607 patent, col. 5, lines 1-4); A-0065 ('607 patent, col. 21, line 44-col. 22, line 60). Additionally, Figures 8 and 9 and their related disclosure refer only to one potential "discrete target" that the camera lens 1040 can view on the side of the J-Hook in the form of a "light emitting end 1020 of a fiber optic 1017." (A-0065, col. 21, lines 59-60). They do not discuss or disclose using a "pattern" having "at

least first and second discrete targets" as required in the claims.[2]  Motion Games'

J-Hook example thus contradicts the actual disclosure by including three targets on

the side of the J-Hook.

The section of Motion Games' Brief entitled "Dr. Pryor's 'Uncorrelated'

Computer Vision Systems" further exemplifies Motion Games' reliance on its

expert to describe an invention not disclosed in the '607 patent.  This section,

which opens with the statement that the applicant "invented a novel, non-obvious,

and much simpler computer vision system" contains not a single citation to the

'607 patent's specification.  Instead, Motion Games presents a drawing that

appears nowhere in the '607 patent or file history showing a "Pattern of Targets"

overlaid on various shapes to exemplify an "uncorrelated" data base  that "does not

know or care what the object itself looks like."  MG Brief at 12.  Motion Games

further states, citing its expert, that the "uncorrelated data base cannot be used to

determine the shape of orientation of the objects."  *Id*.  Motion Games does not,

however, provide any citation to the '607 patent that discloses the uncorrelated

data base of Motion Games' drawing and its expert's declaration.

---

[2] The items marked 1015 and 1016 are an aperture for a bolt and a bolt, respectively, and not discreet targets.  A-0037-38 (Figs. 8 and 9), A-0065 (col. 21, lines 35-36).  Further, the item marked 1032 in Figures 8 and 9 is at the end of the J-Hook and not visible to the camera lens 1040 on the side.  A-0037-38 (Figs. 8 and 9), A-0065 (col. 22, lines 20-24).

In its section on "Creating an Uncorrelated Data Base that Stands for an Object," Motion Games argues, again without citation, that "the specification in the '607 patent unambiguously teaches the creation of both uncorrelated and correlated data bases." MG Brief at 13. The specification, however, never describes any "data base" as "uncorrelated" or "correlated."

Motion Games' expert cannot rewrite the intrinsic record of the '607 patent to narrow the scope of the "data base" to an "uncorrelated data base." *See Prolitec, Inc. v. Scentair Techs., Inc.*, No. 2015-1020, 2015 WL 7873637, at *6 (Fed. Cir. Dec. 4, 2015) ("Prolitec's expert cannot rewrite the intrinsic record of the '683 patent to narrow the scope of the patent and the claim element "mounted."); *Phillips,* 415 F.3d at 1318 (explaining that "a court should discount any expert testimony 'that is clearly at odds . . . with the written record of the patent'') (quoting *Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)).

Motion Games mischaracterizes Nintendo's argument at the IPR hearing as an acknowledgment that the specification could be read to disclose an "uncorrelated" data base. Nintendo, however, stated that with respect to an "uncorrelated" data base, "you won't find that anywhere in the actual words of the patent" and "there is nothing in it that really says that." A-2609-10 at 15:13-16:8. Indeed, as previously established, the terms "correlation", "correlated" and

"uncorrelated" appear nowhere in the over 40 columns of text in the '607 specification.

Consistent with the wording of the specification and Motion Games' inability to point to any disclosure during questioning at the oral hearing in the IPR (A-2620-22) or otherwise, the PTAB properly found that Motion Games "does not provide any specific citation as to where the '607 patent discloses a non-correlated data base or the extolled benefits." A-0009. Motion Games is trying to revise the disclosure and create an invention after the fact using expert witness testimony that contradicts the actually disclosed invention.

Application of argument-based disclaimer that results in a construction unsupported by the claim language and the written description should be rejected. *See Elbex*, 508 F.3d at 1372-73 (Fed. Cir. 2007) (declining to apply disclaimer where there was an absence of support in the specification or drawings to support a proposed disclaimer and the ambiguity caused by considering the statement with other statements in the prosecution history as a whole) ; *Wasinger v. Levi Strauss & Co.*, 106 F. App'x 34, 38 (Fed. Cir. 2004) (in reversing summary judgment of non-infringement based on an incorrect construction, noting that "the district court's single-step process limitation is unsupported by the claim language and the written description, and we see no disclaimer . . . in the prosecution history"). The alleged disclaimer here is just like the one in *Elbex*, where "the [disclaimer]

- 45 -

statement in the prosecution history is unsupported by even a shred of evidence from the specification." 508 F.3d at 1372. Given the total lack of support in the specification and claims for the alleged disclaimer, such statements cannot be used to limit claim scope. Indeed, this Court has cautioned that the prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Philips,* 415 F.3d at 1317.

### C. Nintendo's District Court Arguments Were Consistent With its Arguments in the IPR

Contrary to Motion Games' contention (MG Brief at 22), Nintendo did not take a position on claim construction in the district court that was inconsistent with its position on disclaimer in the IPR. Nintendo never asserted or agreed in the district court that there was a prosecution disclaimer of a "data base" that limited the scope of "creating a data base of said object." A-0093-95. Nor did Nintendo ever agree that the construction of this term should be limited by Motion Games' proposed language, "without reference to or knowledge of the object."

In the district court, Nintendo proposed a compromise construction of "data base" that included the phrase "such that there is no correlation of the targets to the objects." Motion Games rejected this proposal (A-2577-78) and argued, over Nintendo's opposition, that the phrase "without reference to or knowledge of the object" should be adopted. A-0933. Nintendo's position in the district court was entirely consistent with its position before the PTAB, namely that "it is the ***use*** of

the 'pattern data base,' not the data base itself, that is 'without reference to or knowledge of the physical object itself.'"  A-0934-35 (emphasis added).

Nintendo's claim construction compromises and arguments in the district court, which the district court did not accept, are entirely consistent with its arguments in the PTAB and with the '607 prosecution history:  the applicant did not make a "clear and unmistakable disavowal during prosecution" that would require limiting the scope of "data base" as argued by Motion Games.

## III.  HAY AND HAAS RENDER THE ASSERTED CLAIMS OBVIOUS

The PTAB properly found that Hay discloses "creating a data base" and thus meets the claimed step under the PTAB's broadest reasonable interpretation.  A-0016-18.  Motion Games does not dispute the PTAB's finding that there is a motivation to combine Hay and Haas, or that Hay and Haas render the challenged claims obvious under the PTAB's claim construction.  Therefore, if the Court affirms the PTAB's construction, it should affirm the PTAB's ruling in its entirety.

Motion Games' argument against invalidity based on Hay and Haas is premised on its erroneous claim that the PTAB erred in not finding a disclaimer—had the PTAB recognized the asserted disclaimer, Motion Games argues, the challenged claims would be valid despite Hay and Haas.  *See* MG Brief at 5.  But the PTAB did not make any findings on whether Hay and Haas render the claims obvious under Motion Games' proposed construction.  Accordingly, if this Court

- 47 -

determines that the PTAB erred by not finding a disclaimer, the Court should remand to the PTAB to consider in the first instance whether Hay and Haas render the claims obvious. *See Oracle Am., Inc. v. Google, Inc.*, 606 F. App'x 990, 995 (Fed. Cir. 2015) (where the PTAB relied on an erroneous construction, remanding to Board to determine validity in light of proper construction); *TomTom*, 790 F.3d at 1328-29 (same).

As Nintendo argued to the PTAB, however, even under Motion Games' narrow construction of "creating a data base of said object," Hay and Haas render the asserted claims obvious. Both Hay and Haas disclose an "uncorrelated" data base under Motion Games' construction and application of that term. A-1873-74 at ¶¶16-17. Motion Games' expert Dr. Bobick asserted that the simple passage in the '607 patent that the targets "can be initially monitored by a camera means 708" (*see* A-0059 ('607 patent, col. 10, lines 10-12)) discloses creating a data base "without reference to or knowledge of the object itself." When asked specifically what "initially monitored by a camera means 708" means, Dr. Bobick testified "[h]ere it means that you found them in an image." A-1919-20 at 29:20-30:3.

Although Nintendo disputes that the phrase "can be initially monitored by a camera means 708" in the '607 patent discloses creating a data base "without reference to or knowledge of the object itself" as set forth *supra*, both Hay and Haas similarly disclose an initial step of monitoring targets by a camera means,

i.e., finding the targets in an image.  *See* A-1873 at ¶16.  For example, Hay

discloses "read and store full camera matrix with LED numbers 1, 2 and 3

illuminated."  *See* A-0149, Fig. 7; A-0157, col. 1, lines 16-34; A-1873 at ¶16.

Haas likewise discloses: "One electro-optical sensor viewing a light source

generates X and Y analog outputs capable of fixing the position of the light source

in two angular dimensions."  A-0159, col. 3, lines 1-3; A-0155, abstract; A-0156,

Fig. 1A; A-0158, col. 1, lines 38-57; A-1873 at ¶16.  As Dr. Bobick testified:

> Q: In capturing the image, you can determine the coordinates of the –
> like target points in an image, for example?
> A: After you capture an image, you would typically have some
> features that you're looking for in the image and you would find the
> location in the image of those features.
> Q: And you could do all that before you would do any type of
> correlation or correspondence to the model, correct?
> A: You could, yes.

A-1910-11 at 20:19-21:4; *see also* A-1969 at 79:13-25; A-1980 at 90:17-25; A-

2006 at 116:4-11.

Thus, even accepting Motion Games' argument that the '607 patent

discloses creating a data base "without reference to or knowledge of the object

itself" because targets "can be initially monitored by a camera means 708," then

both Hay and Haas also disclose as an initial step creating a data base "without

reference to or knowledge of the object itself" as Motion Games construes and

applies that phrase.

Motion Games complains that, after this initial step, Hay and Haas go on to correlate the sensed target locations to the object. But that is no different than what the '607 patent discloses where the targets "can be initially monitored by a camera means 708" and then the data base can be used to form, handle, or join other pieces to the object. A-1874 at ¶17; A-0059, col. 10, lines 10-49. There is no disagreement that using the data base to form, handle, or join other pieces to the object, requires correlation between the targets and the object. A-1874 at ¶17; A-1945-461 at 55:16-56:10. Thus, just as Hay and Haas allegedly must correlate the targets to the object in order to function, so too does the '607 patent need to correlate targets to the object in order to function. A-1874 at ¶17; A-1871-4. Hay and Haas therefore disclose "creating a data base of said object" under both the PTAB's and Motion Games' constructions. A-1874 at ¶15.

## IV. MOTION GAMES FAILED TO ESTABLISH OBJECTIVE INDICIA OF NONOBVIOUSNESS.

On appeal, Motion Games does not contest the PTAB's finding that (i) one skilled in the art would be motivated to combine Hay and Haas, (ii) Hay and Haas are analogous art, or (iii) under the PTAB's construction of "creating a data base", Hay and Haas render the contested claims obvious. Consequently, if this Court affirms the PTAB's construction, the issue of commercial success is moot. If, however, this Court vacates the PTAB's decision and remands the issue of obviousness under a different construction, then the issue of commercial success is

not ripe for review.  In that instance, the PTAB must first address the issue of commercial success under the revised construction.

Motion Games nonetheless argues that the PTAB erred regarding a single objective indicia of nonobviousness—the commercial success of the accused Wii system.  It is wrong.

Motion Games has the burden to establish a connection between the success of Wii and the '607 claims for such success to be considered an objective indicia of non-obviousness.  *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988) ("The burden of proof as to this connection or nexus resides with the patentee.").  Where the patent is said to cover a feature or component of a product, the patent owner has the burden of showing that the commercial success derives from the feature.  *Tokai Corp. v. Easton Enters.,* 632 F.3d 1358, 1369-70 (Fed Cir. 2011).  Where that feature or component is found in the product of another, there must be proof that the feature or component falls within the claims.  *See, e.g., Demaco,* 851 F.2d at 1392.  Further, in order to establish a proper nexus, a patentee must offer "proof that the sales were a direct result of the unique characteristics of the claimed invention as opposed to other economic and commercial factors unrelated to the quality of the patented subject matter."  *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996).

The PTAB correctly found that Motion Games did not meet its burden because it failed to present evidence sufficient to establish that the Wii actually includes the feature of storing the sensed pattern without reference to or knowledge of the object.  A-0022.  Motion Games thus failed to demonstrate the required nexus between the commercial success of the Wii and the claims of the '607 patent.  A-0021-22.

Nintendo did not admit infringement but disputed it before the district court.  And there has been no determination that the '607 claims cover the Wii to establish the required connection between the '607 patent and the Wii's success.  The PTAB does not determine infringement in IPR proceedings.  *See* 35 U.S.C. § 311 (scope of IPR is to determine patentability of one or more claims); *Zodiac Pool Sys., Inc. v. Aqua Products, Inc.,* IPR2013-00159, 2014 WL 424016, at *22 (PTAB, Aug. 22, 2014) (PTAB does not determine infringement in *inter partes* review). Only a federal court and the ITC have the authority to determine whether a product infringes.  *See Apex Inc. v. Raritan Comput., Inc.*, 325 F.3d 1364, 1370 (Fed. Cir. 2003); 28 U.S.C. § 1338; 35 U.S.C. § 271; 19 U.S.C. § 1337.

Motion Games and its expert Dr. Bobick relied on Motion Games' preliminary infringement contentions, asserted in the district court.  A-1559-81. As the PTAB correctly noted, however, these contentions were "nothing more than attorney argument."  A-0022.  And they certainly are not unrebutted proof of

infringement because they are contested and Dr. Bobick himself admitted that he had not completed his own investigation and reserved the right to amend or change his opinions. A-1395-96 at ¶ 84; A-0022. Any statements from Motion Games' other expert, Ms. Cummings, likewise can provide no proof of infringement because she relies on Dr. Bobick and she is not a technical expert in any event.

As the PTAB properly recognized (A-0022), lacking proof of infringement, Motion Games did not establish the required nexus between the success of the Wii and the claims of the '607 patent. As a result, the commercial success of the Wii cannot constitute objective indicia of non-obviousness. If addressed by the Court, that determination should be affirmed.

## CONCLUSION

The '607 patent claims, specification, and prosecution history establish that the patent owner did not disclaim creating a "data base" containing only data that had "reference to or knowledge of" the object or that was "correlated." There is no dispute that Hay and Haas disclose a "data base" under the PTAB's construction and the asserted claims are obvious over Hay and Haas. The PTAB's Final Written Decision should be affirmed.

/s/   Barry J. Coyne
Barry J. Coyne
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, PA 15222
Telephone:  412-288-3131

Facsimile: 412-288-3063
bcoyne@reedsmith.com

Brian D. Roche
REED SMITH LLP
10 South Wacker Drive
Chicago, IL 60606
Telephone: 312-207-1000
Facsimile: 312-207-6400
broche@reedsmith.com

Rudolf E. Hutz
REED SMITH LLP
1201 North Market Street
Wilmington, DE 19801-1163
Telephone: 302-778-7571
Facsimile: 302-778-7575
rhutz@reedsmith.com

Joseph S. Presta
Nixon & Vanderhye p.c.
901 North Glebe Road
Arlington, VA 22203
Telephone: 703-816-4000
Facsimile: 703-816-4100
jsp@nixonvan.com

*Counsel for Appellee*

Date: December 14, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2015, I caused the foregoing BRIEF

OF APPELLEE NINTENDO OF AMERICA INC. to be electronically filed

through the CM/ECF system, which will send a notice of electronic filing to

counsel for all parties to the action who are registered in the CM/ECF system.  A

copy of the above-mentioned document has also been served by email on the

following counsel of record for Plaintiff-Appellant Motion Games, LLC:

> D. Michael Underhill
> Richard S. Meyer
> Patrick M. Lafferty
> Boies, Schiller & Flexner, LLP
> 5301 Wisconsin Avenue, NW
> Washington, DC 20015
> Tel: 202-237-2727
> Fax: 202-237-6131
> munderhill@bsfllp.com
> rmeyer@bsfllp.com
> plafferty@bsfllp.com
>
> Joshua M. Kalb
> Hunton & Williams LLP
> 2200 Pennsylvania Avenue, NW
> Washington, DC 20037
> Tel: 202-955-1500
> Fax: 202-778-2201
> jkalb@hunton.com
>
> *Counsel for Appellant*

> /s/ *Barry J. Coyne*
> Barry J. Coyne
> REED SMITH LLP

225 Fifth Avenue
Pittsburgh, PA 15222
Telephone:  412-288-3131
Facsimile: 412-288-3063
bcoyne@reedsmith.com

*Counsel for Appellee*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief contains 12,779 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point font and Times New Roman style.

/s/ *Barry J. Coyne*
Barry J. Coyne
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, PA 15222
Telephone:  412-288-3131
Facsimile: 412-288-3063
bcoyne@reedsmith.com

*Counsel for Appellee*